**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

**Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500**

**MOTION INFORMATION STATEMENT**

Docket Number(s): 22-2379 _____     _____ Caption [use short title] _____

Motion for: emergency interim stay of temporary

restraining order, and stay of order pending appeal

_____

_____

Set forth below precise, complete statement of relief sought:

Defendants-Appellants respectfully request a stay

pending appeal, and an emergency interim stay, of a          **Antonyuk v. Hochul**

temporary restraining order that indefinitely halts

enforcement statewide of several important New York

State statutes governing handgun licensing and

carrying.

MOVING PARTY: Governor Hochul et al. _____     OPPOSING PARTY: Ivan Antonyuk et al. _____

☐ Plaintiff          ☑ Defendant

☑ Appellant/Petitioner    ☐ Appellee/Respondent

MOVING ATTORNEY: Ester Murdukhayeva _____     OPPOSING ATTORNEY: Stephen D. Stamboulieh _____

_____ [name of attorney, with firm, address, phone number and e-mail] _____

N.Y. State Office of the Attorney General          Stamboulieh Law, PLLC

28 Liberty Street, 23rd Floor, New York, NY 10005     P.O. Box 428, Olive Branch, MS 38654

(212) 416-6279; ester.murdukhayeva@ag.ny.gov       (601) 852-3440; stephen@sdslaw.us

Court- Judge/ Agency appealed from: U.S. District Court for the Northern District of New York - Hon. Glenn T. Suddaby

**Please check appropriate boxes:**                    **FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**

Has movant notified opposing counsel (required by Local Rule 27.1):     Has this request for relief been made below?  ☑ Yes ☐ No
☑ Yes  ☐ No (explain): _____        Has this relief been previously sought in this court?  ☐ Yes ☑ No

_____                 Requested return date and explanation of emergency: _____
                                                 Appellants respectfully request that an interim administrative stay be granted by the end
Opposing counsel's position on motion:            of the day on Tuesday (10/11), as the district court's temporary restraining order is scheduled
☐ Unopposed ☑ Opposed ☐ Don't Know               to take effect on Wednesday (10/12), after that court's stay of three business days. Appellants
Does opposing counsel intend to file a response:   request oral argument and a decision on the stay motion as soon as practicable thereafter.
☑ Yes  ☐ No  ☐ Don't Know

Is oral argument on motion requested?  ☑ Yes ☐ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?  ☐ Yes ☑ No  If yes, enter date: _____

**Signature of Moving Attorney:**

/s/ Ester Murdukhayeva _____ Date: 10/10/2022 _____   Service by: ☑ CM/ECF  ☐ Other [Attach proof of service]

UNITED STATES COURT OF APPEALS
SECOND CIRCUIT

IVAN ANTONYUK, et al.,

                    *Plaintiffs-Appellees,*                No. 22-2379

                    v.

KATHLEEN HOCHUL, STEVEN A. NIGRELLI,* and
MATTHEW J. DORAN,

                    *Defendants-Appellants,*

WILLIAM FITZPATRICK, et al.,

                    *Defendants.*

# MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A STAY PENDING APPEAL AND AN ADMINISTRATIVE STAY PENDING RESOLUTION OF THE MOTION

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Appellants
28 Liberty Street
New York, NY 10005
(212) 416-8019 / 416-6279

Dated: October 10, 2022

BARBARA D. UNDERWOOD
  *Solicitor General*
ESTER MURDUKHAYEVA
  *Deputy Solicitor General*
ERIC DEL POZO
  *Assistant Solicitor General*
      *of Counsel*

---

* Substituted for Kevin P. Bruen pursuant to Rule 43(c)(2).

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..........................................................ii

PRELIMINARY STATEMENT........................................................1

FACTUAL AND PROCEDURAL BACKGROUND .................................4

    A.   New York's Concealed Carry Improvement Act.......................4

        1.   The U.S. Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen* ...........................4

        2.   New York's update of the State's gun-safety laws after *Bruen* .........................................................6

    B.   The District Court's Jurisdictional Dismissal and Advisory Opinion in *Antonyuk I*...............................8

    C.   The District Court's Entry of a Temporary Restraining Order in *Antonyuk II* ...................................10

ARGUMENT ........................................................................15

POINT I

THE COURT HAS JURISDICTION OVER THIS APPEAL................................15

POINT II

THE DISTRICT COURT'S ORDER SHOULD BE STAYED PENDING APPEAL ........................................................................18

    A.   Equitable Factors Overwhelmingly Support a Stay. ............19

    B.   The District Court's Merits Determinations Cannot Withstand Review..................................................21

    C.   Any Provisional Relief Should Be Narrowed.........................27

CONCLUSION ....................................................................28

# TABLE OF AUTHORITIES

**Cases**                                                       **Page(s)**

*Antonyuk v. Bruen,*
No. 22-cv-734, 2022 WL 3999791
(N.D.N.Y. Aug. 31, 2022) .................................................... 9-10, 18, 20

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ................................................................ 5, 22, 25

*GeorgiaCarry.Org., Inc. v. Georgia,*
687 F.3d 1244 (11th Cir. 2012) .................................................... 25

*Hassoun v. Searls,*
968 F.3d 190 (2d Cir. 2020) .......................................................... 18, 20

*Kane v. De Blasio,*
19 F.4th 152 (2d Cir. 2021) .......................................................... 28

*Kanter v. Barr,*
919 F.3d 437 (7th Cir. 2019) ....................................................... 27

*Libertarian Party of Erie County v. Cuomo,*
970 F.3d 106 (2d Cir. 2020) ........................................................ 26

*Maryland v. King,*
567 U.S. 1301 (2012) ...................................................................... 17, 20

*Matter of Cohen v. Kelly,*
30 A.D.3d 170 (1st Dep't 2006) ................................................... 17

*Matter of Rucker v. NYC/NYPD License Div.,*
78 A.D.3d 535 (1st Dep't 2010) ................................................... 17

*Mazurek v. Armstrong,*
520 U.S. 968 (1997) ...................................................................... 23

*Mohammed v. Reno,*
309 F.3d 95 (2d Cir. 2002) ............................................................ 18, 21

*Moore v. Consolidated Edison Co. of N.Y.,*
409 F.3d 506 (2d Cir. 2005) ........................................................ 23

| Cases | Page(s) |
|---|---|

*New York State Rifle & Pistol Association v. Bruen*,
142 S. Ct. 2111 (2022) ............................................................. 1, 5, 22-26

*Pan Am. World Airways, Inc. v. Flight Eng'rs' Int'l Ass'n*,
306 F.2d 840 (2d Cir. 1962) ........................................................... 16, 19

*Romer v. Green Point Sav. Bank*,
27 F.3d 12 (2d Cir. 1994) ..................................................... 15, 18, 20-21

*Sampson v. Murray*,
415 U.S. 61 (1974) ........................................................................... 16

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) ............................................................................. 9

*Thapa v. Gonzales*,
460 F.3d 323 (2d Cir. 2006) ........................................................ 19, 21

*Uniformed Fire Officers Ass'n v. de Blasio*,
973 F.3d 41 (2d Cir. 2020) .......................................................... 15, 17

*United States v. Smith*,
945 F.3d 729 (2d Cir. 2019) ............................................................. 24

*We The Patriots USA, Inc. v. Hochul*,
17 F.4th 266 (2d Cir. 2021) ............................................................. 21

## Laws & Rules

Concealed Carry Improvement Act Ch. 371, 2022 N.Y. Laws ....... passim

Penal Law
    § 265.01-d(1) ............................................................................ 7, 25
    § 265.01-d(2) ................................................................................. 7
    § 265.01-e ...................................................................................... 22
    § 265.01-e(1) ................................................................................. 7
    § 265.01-e(2) ................................................................................. 7
    § 265.01-e(3) ................................................................................. 7

**Laws & Rules** **Page(s)**

Penal Law
    § 265.03................................................................................4
    § 265.20(a) ..........................................................................4
    § 400.00(1) ...........................................................4, 6-7, 16
    § 400.00(2) ..........................................................................4
    § 400.00(4-a) .....................................................................21
    § 400.00(19) ........................................................................6

Pa. Cons. Stat. § 6109(d)(3).......................................................26

11 Del. Code. § 1441(a) .............................................................26

Fed. R. Civ. P. 65(b)(2) .............................................................15

**Miscellaneous Authorities**

City of New York, *Concealed Carry Firearm Laws in New York City* (Aug. 31, 2022), https://www1.nyc.gov/nyc-resources/new-york-city-concealed-carry-law.page.....................................19

David B. Kopel & Joseph G.S. Greenlee, *The 'Sensitive Places' Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205 (2018) ...........................................22

N.Y. Div. of Crim. Just. Servs., Frequently Asked Questions Regarding Recent Changes to New York State Firearm Laws (Aug. 27, 2022), https://troopers.ny.gov/frequently-asked-questions-regarding-recent-changes-nys-gun-laws.....................19, 21

Tim Balk, *NYC to Put up 'Gun Free Zone' Signs Throughout Times Square After Supreme Court Ruling*, N.Y. Daily News (Aug. 30, 2022), https://tinyurl.com/mrktjved ...................19

## PRELIMINARY STATEMENT

This motion seeks a stay pending appeal—and an interim administrative stay pending resolution of this motion—of an extraordinary temporary restraining order (Order) issued by the U.S. District Court for the Northern District of New York (Suddaby, J.), barring enforcement of integral aspects of New York State's Concealed Carry Improvement Act (CCIA), enacted in response to *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022).

The Order precludes the State from enforcing the CCIA's prohibition on firearms in various "sensitive locations," including public transit, parks, libraries, playgrounds, and zoos, and Times Square; mandates that strangers be allowed to carry firearms onto others' property absent an affirmative prohibition by the proprietor; and modifies New York's licensing requirement of "good moral character," while enjoining the enforcement of statutes requiring disclosure of contact information for household members, the presence of minor children in the home, and recent social media accounts, all of which are vital to the determination of good moral character. The Order bears the hallmarks of an appealable preliminary injunction, and a stay pending appeal is necessary given the

overwhelming balance of equities in favor of appellants and plaintiffs' failure to demonstrate a likelihood of success on the merits.

First, the Order is in substance an immediately appealable injunction. The Order is of indefinite duration, is supported by a 53-page decision, and was issued after notice, written submissions, and a hearing. Moreover, the Order was informed by the preliminary injunction briefing and decision in a prior case before the same judge involving the same issues and parties.

The serious risk of irreparable harm to public safety and the possibility of regulatory chaos necessitates an immediate appeal. As the data confirm, more guns carried in more places by more people result in more crime, violence, and homicide. In addition, state and local officials have spent significant resources implementing the CCIA and informing New Yorkers about the new law, only to have the Order sow confusion among the public, licensing officials, and law enforcement. The purpose of interim relief is to preserve the status quo, not to create turmoil during the pendency of litigation.

Second, the Order should be stayed pending this appeal. Many of the factors supporting appealability also reflect the equitable considera-

tions strongly weighing in appellants' favor, including substantial risks to public safety and impediments to law-enforcement administration posed by the Order.

A stay is also appropriate because plaintiffs failed to demonstrate a likelihood of success on the merits. *Bruen* recognized that States retain wide latitude to confront the regulatory challenges posed by modern firearms, including the ability to require licensing and to limit the possession of firearms in certain locations. In issuing the Order, the district court misapplied *Bruen*, repeatedly faulting defendants for not offering historical evidence to justify assorted CCIA provisions. However, plaintiffs had the burden of showing that the provisions implicated the Second Amendment in the first place, and they failed to do so. The court also improperly passed judgment on each subsection of the sensitive location statute—without regard to whether any plaintiff had standing to challenge it—and erred in invalidating the majority of sensitive places based on historical research and legal theories that plaintiffs had not presented and which defendants lacked a fair opportunity to rebut.

Finally, the court improperly restrained defendants from enforcing the challenged CCIA provisions on a statewide basis. Although the entire

Order should be stayed pending appeal, at a minimum, any relief should be narrowed to the specific plaintiffs as broader relief is grossly disproportionate to the individual harms alleged.

## FACTUAL AND PROCEDURAL BACKGROUND

A. **New York's Concealed Carry Improvement Act**

   1. **The U.S. Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen***

Like dozens of States, New York requires a license to carry a concealed handgun in public. *See, e.g.*, Penal Law § 265.03 (criminalizing possession of a loaded handgun), § 265.20(a)(3) (exempting license holders). New York law has long set forth basic eligibility criteria for a license, including being at least twenty-one years old, not having a felony record, and otherwise having "good moral character." *Id.* § 400.00(1)(a)-(c).

Until recently, New York also required demonstrating "proper cause" to obtain a concealed-carry license. *Id.* § 400.00(2)(f) (effective through June 23, 2022). In *Bruen*, the U.S. Supreme Court concluded that insofar as "proper cause" demanded showing "a special need for self-defense," this requirement infringed the Second Amendment right of law-abiding, responsible citizens to carry arms in public for self-defense,

4

since it was not "consistent with the Nation's historical tradition of fire-arm regulation." 142 S. Ct. at 2122, 2130-31.

*Bruen* recognized the necessity and constitutionality of modern firearms regulation, explicitly endorsing at least two types of restrictions. First, the Court announced that "nothing in [its] analysis" was meant "to suggest the unconstitutionality" of "shall-issue" licensing regimes. *Id.* at 2138 n.9. These laws "often require applicants to undergo a background check or pass a firearms safety course" and "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* (quoting *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)). Second, the Court "assume[d] it settled" that certain areas are "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *Id.* at 2133. The opinion endorsed such bans in schools, legislative assemblies, polling places, and courthouses, while indicating "that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.*

## 2. New York's update of the State's gun-safety laws after *Bruen*

On July 1, 2022, New York's Legislature passed the CCIA, in an extraordinary session convened after *Bruen* was decided. *See* Ch. 371, 2022 N.Y. Laws (N.Y. Legis. Retrieval Serv.) (eff. Sept. 1, 2022).

As relevant here, the CCIA defined the longstanding requirement of "good moral character" for a handgun license to "mean having the essential character, temperament and judgement necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others." Penal Law § 400.00(1)(b). To promote responsible gun use, the CCIA requires concealed-carry permit applicants to complete sixteen hours of training and two hours of live-fire instruction. *See id.* §§ 400.00(1)(o)(iii), 400.00(19).

In addition, every applicant "shall meet in person with the licensing officer for an interview" and submit statutorily specified information, including contact information for any spouse or other adult household members, and whether minor children live at home, *id.* § 400.00(1)(o)(i); at least four character references, *id.* § 400.00(1)(o)(ii); and "a list of former and current social media accounts" for a three-year period, meant

"to confirm the information" otherwise provided about the applicant's "character and conduct," *id.* § 400.00(1)(o)(iv).

The CCIA also codified a set of "sensitive locations" in which carrying "a firearm, rifle or shotgun" would not be allowed, including government buildings such as courthouses; polling places; schools, colleges, and universities; nursery schools, preschools, and playgrounds; places of worship; public transit; public parks and zoos; shelters for the homeless and domestic-violence victims; sites of programs for the disabled; entertainment venues; restaurants serving alcohol; permitted events or any other "gathering of individuals to collectively express their constitutional rights to protest or assemble"; and Times Square, if "identified with signage." *Id.* § 265.01-e(1)-(2). This statute exempts law enforcement officers, military personnel, armed security guards, and persons lawfully hunting. *Id.* § 265.01-e(3).

The CCIA separately bars possessing "a firearm, rifle, or shotgun" in a "restricted location." *Id.* § 265.01-d(1). A person may not carry such a weapon "on or in private property" unless "the owner or lessee" has "given express consent," in a posted sign or verbally. *Id.* This section similarly exempts law enforcement officers. *See id.* § 265.01-d(2).

**B.    The District Court's Jurisdictional Dismissal and Advisory Opinion in *Antonyuk I***

Ten days after the CCIA's enactment, Ivan Antonyuk and two gun-advocacy organizations filed suit under 42 U.S.C. § 1983 in the Northern District of New York, against State Police Superintendent Kevin Bruen, in his official capacity, challenging the above-referenced CCIA provisions under the First, Second, and Fourteenth Amendments. *See* Compl., *Antonyuk v. Bruen* (*Antonyuk I*), No. 22-cv-734 (N.D.N.Y. July 11, 2022), ECF No. 1.[1] Plaintiffs sought a preliminary injunction to block these provisions from taking effect. The State opposed that request and moved to dismiss the case for lack of Article III standing.

Four days before plaintiffs' reply was due, the district court (Suddaby, J.) sua sponte invited "supplemental declarations" from plaintiffs on whether they had suffered specified types of injuries from the CCIA or otherwise had "any intent" to "engage in conduct proscribed by the CCIA." Text Order (Aug. 18, 2022), ECF No. 34.

Notwithstanding these directions, plaintiffs could not make the requisite showings, and the court dismissed the case for lack of standing.

---

[1] The *Antonyuk I* docket sheet is attached as Exhibit A.

*See Antonyuk I*, 2022 WL 3999791, at *1, *16-17 (N.D.N.Y. Aug. 31, 2022).

Despite the absence of a live controversy, the court proceeded to render an advisory opinion describing what "would constitute the Court's holding" on the merits if plaintiffs were "found to, in fact, possess standing."[2] *Id.* at *25; *see id.* at *26-37.

To start, the court called the CCIA "an unconstitutional statute" and likened it to "a wish list of exercise-inhibiting restrictions glued together by a severability clause." *Id.* at *26. The court remarked that the CCIA's definition of "good moral character" excluded anyone who would use a weapon for self-defense, *id.* at *27, an interpretation that plaintiffs had not raised and the State disavowed, *see* Hr'g Tr. (Aug. 23, 2022), ECF No. 46. The court further opined that (i) the "good moral character" standard was impermissibly subjective, *Antonyuk I*, 2022 WL 3999791, at *29; (ii) the social media disclosure requirement compelled the release of "self-incriminating statements" in violation of the Fifth Amendment (another argument the court originated), *id.* at *31; (iii) the

_____

[2] Assuming "[h]ypothetical jurisdiction" so as "to pronounce upon the meaning or the constitutionality of a state" statute is "ultra vires." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101-102 (1998).

list of sensitive places was too expansive and went beyond the select few the Supreme Court had endorsed, *id.* at *32; and (iv) the prohibition on carrying firearms onto private property without consent had an insufficient historical pedigree, *id.* at *35. The court then concluded that plaintiffs (who lacked Article III standing) had made a "strong showing" that equitable concerns favored a preliminary injunction. *Id.* at *36.

## C.    The District Court's Entry of a Temporary Restraining Order in *Antonyuk II*

On September 20, 2022, Antonyuk filed a new § 1983 lawsuit attacking mostly the same CCIA provisions as before, dropping the organizational plaintiffs, adding five other individual plaintiffs, and naming new state and municipal defendants. *See* Compl., *Antonyuk v. Hochul* (*Antonyuk II*), No. 22-cv-986 (N.D.N.Y. Sept. 20, 2022), ECF No. 1.[3] Plaintiffs marked this complaint as related to *Antonyuk I*, *see* Civil Cover Sheet (Sept. 20, 2022), ECF No. 1-11, and Judge Suddaby accepted the case as related, *see* Text Order (Sept. 26, 2022), ECF No. 12.

---

[3] The *Antonyuk II* docket sheet is attached as Exhibit B.

Citing the *Antonyuk I* decision, this complaint (¶¶ 256-265) additionally claimed that having to disclose social media accounts to, or be interviewed by, a licensing officer violates the Fifth Amendment. Plaintiffs also attempted to shore up standing deficiencies by describing how five plaintiffs (with carry licenses) intend to bring weapons into various prohibited locations "in the near future." Mem. in Supp. of Pls.' Mot. for TRO, Prelim. Inj., & Permanent Inj. ("PI Mem.") at 2-5 (Sept. 22, 2022), ECF No. 6-1. A sixth plaintiff lacks a concealed-carry license but alleged that his application will be rejected because he will withhold much of the required information. *See id.* at 7-9.

On September 22, 2022, plaintiffs moved for a temporary restraining order (TRO), preliminary injunction, and permanent injunction. *See id.* at 1. The district court scheduled a hearing as to the TRO request for September 29, with written responses due the day before. In a 53-page opinion issued on October 6, the court granted a TRO with respect to multiple CCIA provisions. Decision & Temporary Restraining Order (Oct. 6, 2022), ECF No. 27.[4]

---

[4] The Order is attached as Exhibit C.

The district court defended its acceptance of this case as related to *Antonyuk I*, which had "resulted in a substantial saving of judicial resources" by allowing the court to issue the Order within a "two-week period." *Id.* at 6 n.1. The court also held that all plaintiffs had standing, that all defendants were proper, and that each of the challenged provisions was a proper subject for adjudication. *Id.* at 14-17.

On the merits, the court rewrote the CCIA's definition of "good moral character" to provide that an applicant is presumed to satisfy this criterion absent a contrary determination supported by a preponderance of the evidence, which may be based only on an applicant's "conduct" and which may not rest on a desire to use a weapon for self-defense. *See id.* at 24-25. In addition, the court restrained enforcement of the concealed-carry application prerequisites of an in-person interview, disclosure of contact information for the applicant's spouse or domestic partner and other adults living in the home, disclosure of whether minor children live with the applicant, and identification of social media accounts, all for a perceived lack of historical analogs.[5] *Id.* at 26-28.

---

[5] The court did not block the CCIA's character reference or training requirements for a concealed-carry license. Order at 25-26, 27-28.

The court then analyzed whether history supported every "sensitive location" in New York's law and held "that most of the CCIA's list of 'sensitive locations' violate the Constitution" because defendants had "not met their burden" of presenting relevant precursors. *Id.* at 31.

The court upheld the restrictions in governmental buildings, such as courthouses (*id.* at 31-32); polling places (*id.* at 32); locations of permitted events (*id.*); houses of worship, with "an exception for those persons who have been tasked with the duty to keep the peace at the place of worship" (*id.* at 32-35); nursery schools, preschools, and educational institutions, "except for the prohibition on concealed carry in 'summer camps'" (*id.* at 36-37); and public assemblies (*id.* at 38). However, the court forbade enforcement of the prohibitions on carrying firearms in public transportation, including subways (*id.* at 37); entertainment venues and establishments serving alcohol (*id.* at 39-42); Times Square (*id.* at 42-43); and "the remaining 10 purported 'sensitive locations' set forth in the CCIA," including public parks, playgrounds, libraries, and zoos, shelters for the homeless and domestic-violence victims, and sites of programs for the disabled (*id.* at 43-44).

In addition, the court restrained enforcement of the statutory prohibition on carrying firearms on private property without the proprietor's express consent, "except with regard to fenced-in farmland owned by another or fenced-in hunting ground owned by another." *Id.* at 45-46.

As in *Antonyuk I*, the court found that plaintiffs had made a "strong showing" that equitable factors supported injunctive relief. *Id.* at 46-48. The court extended the Order beyond the fourteen days permitted in Federal Rule of Civil Procedure 65(b), "pending a hearing and ruling on Plaintiffs' motion for a preliminary injunction." *Id.* at 49. At the state defendants' request, the Order was stayed for three business days to allow an emergency application to this Court. *Id.* at 49-50.

# ARGUMENT

## POINT I

### THE COURT HAS JURISDICTION OVER THIS APPEAL

Although "ordinarily not appealable," a TRO may be appealed when it is effectively "a preliminary injunction," based on "the duration of the order, whether it was issued after notice and hearing, and the type of showing made." *Uniformed Fire Officers Ass'n v. de Blasio*, 973 F.3d 41, 47 (2d Cir. 2020) (quotation marks omitted). Also probative is whether the decision "might have a serious, perhaps irreparable, consequence." *Romer v. Green Point Sav. Bank*, 27 F.3d 12, 15 (2d Cir. 1994) (quotation marks omitted).

Here, the Order bears all the hallmarks of a preliminary injunction. It is a fifty-three-page decision issued after notice, a hearing, and written submissions. The Order also relied on the parties' prior preliminary injunction briefing in *Antonyuk I* (*see* Order at 26) and incorporated much of the court's reasoning from that prior decision. And far from temporary, the Order is indefinite on its face. As a rule, a TRO is "not to exceed 14 days," unless "the court, for good cause, extends it for a like period." Fed. R. Civ. P. 65(b)(2). In this case, the court preemptively extended the

Order beyond the temporal limits of Rule 65, decreeing that the Order "shall be in effect pending a hearing and ruling on Plaintiffs' motion for a preliminary injunction" (Order at 49)—even though no hearing date has yet been scheduled and the district court has not committed to issuing a decision by a date certain. Classifying this "potentially unlimited order as a temporary restraining order seems particularly unjustified." *Sampson v. Murray*, 415 U.S. 61, 87 (1974); *see also Pan Am. World Airways, Inc. v. Flight Eng'rs' Int'l Ass'n*, 306 F.2d 840, 842-43 (2d Cir. 1962).

The Order also well exceeds the ordinary "purpose of a temporary restraining order," which "is to preserve an existing situation *in statu quo* until" a more in-depth preliminary injunction ruling, *Pan Am. World Airways*, 306 F.2d at 842. Here, the Order negates a statute that has already taken effect, forbidding defendants from enforcing, on a state-wide basis, several of the CCIA's critical post-*Bruen* updates governing who may carry a loaded handgun and where. For example, the Order allows a license applicant to withhold key information relevant to assessing "good moral character," Penal Law § 400.00(1)(b), which has supported the disqualification of domestic abusers and individuals

subject to orders of protection.[6] In addition, the Order enjoins the State from enforcing prohibitions on carrying firearms in a variety of locations, increasing the chance that someone will a carry a loaded gun in a subway car, playground, library, fairground, public park, nightclub, or homeless shelter, among many other places. A shooting death (intentional or inadvertent) in any such area "could not be undone, thus rendering the consequences irreparable," *Uniformed Fire Officers*, 973 F.3d at 48.

Research shows that relaxing legal requirements for carrying guns in public results in greater levels of violent crime, gun homicides, and officer-involved shootings. *See* Br. of Giffords Law Center to Prevent Gun Violence as *Amicus Curiae* at 6-11, *Antonyuk I*, No. 22-cv-734 (Aug. 17, 2022), ECF No. 30. "That [a State] may not employ a duly enacted statute to help prevent these injuries constitutes irreparable harm." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., granting stay). The Order's effect on public safety—and the public's sense of safety—may be enormous.

---

[6] *See, e.g.*, *Matter of Rucker v. NYC/NYPD License Div.*, 78 A.D.3d 535, 535 (1st Dep't 2010); *Matter of Cohen v. Kelly*, 30 A.D.3d 170, 170 (1st Dep't 2006).

Moreover, the Order clearly presages a preliminary injunction, if not "final victory in the litigation," *Romer*, 27 F.3d at 15. The district court's views of the CCIA are not a secret. The *Antonyuk I* advisory opinion derided the CCIA as "a wish list of exercise-inhibiting restrictions glued together by a severability clause." 2022 WL 3999791, at *26. Now, the district court has quipped that, rather than "becoming a shall-issue jurisdiction, New York State has further entrenched itself as a shall-not-issue jurisdiction." Order at 22. Ensuing injunctive relief seems inevitable. The Order may and should be reviewed now.

## POINT II

### THE DISTRICT COURT'S ORDER SHOULD BE STAYED PENDING APPEAL

This Court should grant a stay of the Order pending appeal and an interim stay pending resolution of this motion.

Relevant to this inquiry are "the likelihood of success on the merits, irreparable injury if a stay is denied, substantial injury to the party opposing a stay if one is issued, and the public interest." *Mohammed v. Reno*, 309 F.3d 95, 100 (2d Cir. 2002); *see Hassoun v. Searls*, 968 F.3d 190, 195 (2d Cir. 2020). These criteria operate "somewhat like a sliding

scale," with the required chance of success on the merits inversely proportional to the strength of the equities for a stay. *Thapa v. Gonzales*, 460 F.3d 323, 334 (2d Cir. 2006).

## A.  Equitable Factors Overwhelmingly Support a Stay.

The three equitable criteria overwhelmingly favor a stay. Again, the CCIA has taken effect and is now the status quo. *See Pan Am. World Airways*, 306 F.2d at 842. State and local governmental agencies have devoted significant resources to implementing the law and informing the public about it.[7] If the Order remains in effect, these agencies must communicate to the public that guns again are allowed in many of the places where the public was just told guns were *not* allowed—with additional site-specific exceptions. Moreover, the local defendants subject to the injunction constitute a subset of the district attorneys and licensing officials in the State, leading to the possibility of confusing and

---

[7] *See, e.g.*, N.Y. Div. of Crim. Just. Servs., Frequently Asked Questions Regarding Recent Changes to New York State Firearm Laws ("DCJS FAQ") (Aug. 27, 2022); City of New York, *Concealed Carry Firearm Laws in New York City* (Aug. 31, 2022); *see also, e.g.*, Tim Balk, *NYC to Put up 'Gun Free Zone' Signs Throughout Times Square After Supreme Court Ruling*, N.Y. Daily News (Aug. 30, 2022).

inconsistent enforcement of the CCIA as between local jurisdictions. And, in theory, all of this would be subject to revision by a later preliminary injunction ruling or decision on appeal. *See Romer*, 27 F.3d at 16 (confusion and expense of relaying shifting information constituted irreparable harm).

Further, the Order poses an imminent risk to public safety and wellbeing. See *supra* at 17. Even the district court previously conceded the presence of an "associational relationship between some lenient right-to-carry laws and violent crime." *Antonyuk I*, 2022 WL 3999791, at *36. The risk of violence to the public from the Order creates a hardship cognizable on this stay motion. *See King*, 567 U.S. at 1303-04; *cf. Hassoun*, 968 F.3d at 203 (risk of mass casualty event was irreparable harm warranting stay pending appeal).

Exposing eighteen million New Yorkers to a heightened risk of gunfire severely outweighs any prejudice to plaintiffs here from a stay. Five plaintiffs allegedly wish to carry guns into specific sensitive or restricted places, such as the Rosamond Gifford Zoo, the airport for a flight to Tennessee, the church where one plaintiff lives, or Catskills

State Park, through which another plaintiff must drive.[8] *See* PI Mem. at 3-5. Yet the district court restrained defendants from enforcing the challenged CCIA provisions on a statewide basis, as applied *to anyone*— a remedy far beyond what relates to the individual harms alleged.

## B. The District Court's Merits Determinations Cannot Withstand Review.

Where, as here, the balance of hardships "tips decidedly" in the movant's favor, only "some possibility of success" on the merits is needed for an appellate stay. *See Thapa*, 460 F.3d at 335. But even if a "likelihood of success" were required, *Mohammed*, 309 F.3d at 100, that standard would be met.

Plaintiffs bore "the initial burden of establishing a likelihood of success on the merits." *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 281 (2d Cir. 2021) (per curiam), *cert. denied*, 142 S. Ct. 2569 (2022); *see Romer*, 27 F.3d at 16. As plaintiffs concede (PI Mem. at 32-33), only

---

[8] Catskills State Park, a forest preserve, is not itself a sensitive location, although it may contain some interior sensitive locations. *See* DCJS FAQ, *supra*, at 8. And it is not apparent how the CCIA's application requirements could imminently harm plaintiff Sloane, whose application would not likely be decided before any preliminary injunction hearing. *See* Penal Law § 400.00(4-a).

when a challenger shows that "the Second Amendment's plain text covers an individual's conduct" must the government then demonstrate that its regulation is nonetheless "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126, 2129-30. The district court misapplied these fundamental principles, as the following examples illustrate.

***Sensitive locations.*** The Order's forbidding enforcement of much of New York's sensitive location law, Penal Law § 265.01-e, is indefensible for at least three reasons.

First, the district court held that defendants had "simply not met their burden" to offer historical analogs for most of the designations. Order at 30. But plaintiffs never met their initial burden to show that the Second Amendment's "text, as informed by history," plausibly encompassed any of these areas, *Bruen*, 142 S. Ct. at 2127; *see Heller*, 554 U.S. at 595. Carrying weapons in sensitive places has traditionally been "altogether prohibited." *Bruen*, 142 S. Ct. at 2133. These areas thus fall outside the "scope of the Second Amendment," *Heller*, 554 U.S. at 626, and are "an exception to the general right to bear arms" codified therein, *see, e.g.*, David B. Kopel & Joseph G.S. Greenlee, *The 'Sensitive Places'*

*Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 215 (2018), *cited in Bruen*, 142 S. Ct. at 2133.

Plaintiffs' bald statement that "the regulated conduct falls under the phrase 'keep and bear'" (PI Mem. at 33) did not shift the burden to defendants to justify any or every sensitive location, much less to do so in only seven days after the filing of plaintiffs' motion (Order at 12). *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (preliminary injunction demands more than "*some* evidence"); *see also Moore v. Consolidated Edison Co. of N.Y.*, 409 F.3d 506, 510 (2d Cir. 2005). Indeed, an expedited restraining order was independently improper given the time needed to corral the necessary historical sources, including expert testimony, as *Bruen* directs. *See* 142 S. Ct. at 2130 n.6.

Second, the court's analogies were flawed—none more so than for barring weapons on mass transit, which the court held to be inconsistent with nineteenth-century laws authorizing carrying pistols when "'on a journey.'" Order at 37 n.34 (quoting, e.g., 1813 Ky. Acts 100, ch. 89, § 1; 1841 Ala. Acts 148–49, ch. 7, § 4). Old and new regulations may be "relevantly similar" in many ways. *Bruen*, 142 S. Ct. at 2132-33. Comparing hurtling through tunnels in electrically powered cars filled with

thousands of people (including schoolchildren and the elderly) to journeying via horse through the countryside is like saying that "a green truck and a green hat are relevantly similar" because both are green. *Id.* at 2132. "Cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach" than finding that a subway takes you on a journey. *Id.*

Third, the district court itself proffered many of the arguments and historical sources on which it relied. Among other things, the court independently analyzed *every* sensitive location, without regard to whether any plaintiff contested it or had standing to do so.[9] *See United States v. Smith*, 945 F.3d 729, 739 (2d Cir. 2019) (holding that plaintiff lacks standing to challenge statutory subsections "unrelated to the proscription of his conduct"). And the court did so without forewarning, depriving defendants of a fair opportunity to respond to sources and theories plaintiffs had not presented.

***Restricted locations.*** The district court similarly skipped a step in searching for historical analogs to New York's bar on carrying weapons

---

[9] The Order's standing section (at 15) referenced only plaintiff Mann's intention to carry a gun in church.

on private property without affirmative consent. The court never found that carrying firearms onto others' "*private* property," Penal Law § 265.01-d(1) (emphasis added), equates with "carrying handguns *publicly*," *Bruen*, 142 S. Ct. at 2134 (emphasis added), or keeping arms in one's own home, *see Heller*, 554 U.S. at 628.

Nor is such a textual reading supportable. The Second Amendment does not "abrogate[] the right of a *private* property owner . . . to determine for itself whether to allow firearms on its premises and, if so, under what circumstance." *GeorgiaCarry.Org., Inc. v. Georgia*, 687 F.3d 1244, 1251 (11th Cir. 2012), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111. New York's law merely selects a particular default rule regarding consent. And even if this restriction somehow implicated the Second Amendment, there is a longstanding and significant historical tradition of States forbidding persons from carrying guns onto others' property without their permission. *See* Def.'s Mem. in Opp. to Mot. for Prelim. Inj. at 51-54, *Antonyuk I*, No. 22-cv-734 (N.D.N.Y. Aug. 15, 2022), ECF No. 19.

***Good moral character.*** The district court rewrote, but left intact, the requirement of "good moral character" to obtain a handgun license.

Several "shall-issue" licensing regimes that *Bruen* endorsed have similar standards. *See, e.g.*, 11 Del. Code. § 1441(a); Pa. Cons. Stat. § 6109(d)(3). And prior to *Bruen*, this Court correctly held that a less-specific iteration of New York's standard was readily comprehensible and placed only a "modest" burden "on law-abiding, responsible citizens." *Libertarian Party of Erie County v. Cuomo*, 970 F.3d 106, 128 (2d Cir. 2020), *abrogated in part on other grounds by Bruen*, 142 S. Ct. 2111.

The court below enjoined the use of several inputs for review of "good moral character"—the in-person interview, identification of spouses, partners, and other adult household members, disclosure as to the presence of children in the home, and identification of recent social media accounts—for absence of historical precursors. *See* Order at 26-28. But the court did not address whether any of these provisions is "designed to ensure that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens,'" *Bruen,* 142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635), which would validate them without resort to history. On their face, an interview allows an applicant to explain any troublesome revelations in a background check, and a list of adults in the household helps to flag gun purchases for disqualified

buyers. The presence of children implicates safe storage requirements, and the identification of social media accounts helps identify potential instances of threatened harm to the public. These provisions merely facilitate the long-recognized "power to prohibit dangerous people from possessing guns." *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting); *see also id.* at 454-64 (canvassing historical record).

## C.    Any Provisional Relief Should Be Narrowed.

Although the Order should be stayed entirely, at a minimum it should be narrowed to apply only to plaintiffs, which would vindicate any alleged harms for which they have standing.

The district court had no cause to restrain defendants' enforcement of the CCIA as to everyone, everywhere in New York—including in the New York City subway, Central Park, or Times Square, each approximately 250 miles from the Syracuse federal courthouse, none challenged in plaintiffs' complaint, and none a proper subject of injunctive relief here. Narrowing the Order would honor the rule that "injunctive relief should be no more burdensome to the defendant than necessary to

provide complete relief to the plaintiffs." *Kane v. De Blasio*, 19 F.4th 152,

173 (2d Cir. 2021) (quotation marks omitted).

## CONCLUSION

This Court should grant a stay pending appeal, and an interim

administrative stay, of the district court's order.

Dated:  New York, New York
        October 10, 2022

> Respectfully submitted,
>
> LETITIA JAMES
>   *Attorney General*
>   *State of New York*
> Attorney for Appellants
>
>
> By:   */s/ Eric Del Pozo*
>       ERIC DEL POZO
>       Assistant Solicitor General

BARBARA D. UNDERWOOD
  *Solicitor General*
ESTER MURDUKHAYEVA
  *Deputy Solicitor General*
ERIC DEL POZO
  *Assistant Solicitor General*
    *of Counsel*

> 28 Liberty Street
> New York, NY 10005
> (212) 416-8019

## CERTIFICATE OF COMPLIANCE

Pursuant to Rules 27 and 32 of the Federal Rules of Appellate Procedure, Oren L. Zeve, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this document, the document contains 5,191 words and complies with the typeface requirements and length limits of Rules 27(d) and 32(a)(5)-(6).

<u>  /s/ Oren L. Zeve      </u>

# EXHIBIT A

Query    Reports    Utilities    Help    Log Out

CLOSED

# U.S. District Court
# Northern District of New York - Main Office (Syracuse) [NextGen CM/ECF Release 1.7 (Revision 1.7.1)] (Albany)
# CIVIL DOCKET FOR CASE #: 1:22-cv-00734-GTS-CFH

Antonyuk et al v. Bruen

Assigned to: Chief Judge Glenn T. Suddaby

Referred to: Magistrate Judge Christian F. Hummel

related Case: 1:22-cv-00986-GTS-CFH

Cause: 28:1331 Fed. Question

Date Filed: 07/11/2022

Date Terminated: 08/31/2022

Jury Demand: None

Nature of Suit: 950 Constitutional - State Statute

Jurisdiction: Federal Question

**Plaintiff**

**Ivan Antonyuk**

represented by **Stephen D. Stamboulieh**
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS 38654
601-852-3440
Email: stephen@sdslaw.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert J. Olson**
William J. Olson, P.C.
370 Maple Avenue W - Suite 4
Vienna, VA 22180
703-356-5070
Fax: 703-356-5085
Email: rob@wjopc.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Gun Owners of America, Inc.**

represented by **Stephen D. Stamboulieh**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert J. Olson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Gun Owners Foundation**

represented by **Stephen D. Stamboulieh**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert J. Olson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Gun Owners of America New York, Inc.**     represented by **Stephen D. Stamboulieh**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert J. Olson**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Kevin P. Bruen**     represented by **James M. Thompson**
*in his Official Capacity as Superintendent of*     New York State Attorney General - New
*the New York State Police*     York Office
28 Liberty Street
New York, NY 10005
212-416-6656
Email: james.thompson@ag.ny.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael G. McCartin**
Office of Attorney General - Albany
The Capitol
Albany, NY 12224
518-776-2620
Fax: 518-915-7738
Email: michael.mccartin@ag.ny.gov
*ATTORNEY TO BE NOTICED*

**Amicus**

**National Police Association**     represented by **John C. Lennon**
Pierce Couch Hendrickson
1109 N Francis
Oklahoma City, OK 73106
405-235-1611
Email: jlennon@piercecouch.com
*ATTORNEY TO BE NOTICED*

**Amicus**

**Dr. Jaclyn Schildkraut**     represented by **John V. Elmore**
*Ph.D.*     Law Offices of Steve Boyd & John Elmore
40 North Forest Road
Williamsville, NY 14221
716-300-0000
Fax: 716-839-9959
Email: jve@elmore.law

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Giffords Law Center to Prevent Gun**          represented by   **Andrew Leff**
**Violence**                                                      Covington & Burling LLP
223 West 38th St. #90                                            The New York Times Building
New York, NY 10018                                              620 Eighth Avenue
                                                                New York, NY 10018
                                                                212-841-1297
                                                                Email: aleff@cov.com
                                                                *ATTORNEY TO BE NOTICED*


**Amicus**

**Everytown for Gun Safety**                    represented by   **Alla Lefkowitz**
Everytown Law                                                   Everytown Law
P.O. Box 14780                                                  P.O. Box 14780
Washington, DC 20044                                            Washington, DC 20044
202-545-3257, ext. 1007                                        202-545-3257
*Everytown for Gun Safety*                                      Email: alefkowitz@everytown.org
                                                                *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/11/2022 | 1 | COMPLAINT against Kevin P. Bruen (Filing fee $402 receipt number ANYNDC-5963145) filed by Ivan Antonyuk, Gun Owners of America, Inc., Gun Owners of America New York, Inc., Gun Owners Foundation. (Attachments: # 1 Exhibit 1: Concealed Carry Improvement Act Text, # 2 Exhibit 2: Gun Control Bill Memo, # 3 Exhibit 3: Redlines SB51001, # 4 Exhibit 4: Declaration of Erich Pratt, # 5 Exhibit 5: Declaration of William Robinson, # 6 Exhibit 6: Declaration of Ivan Antonyuk, # 7 Civil Cover Sheet)(egr) (Entered: 07/12/2022) |
| 07/12/2022 | 2 | Summons Issued as to Kevin P. Bruen. (Attachments: # 1 Summons Issued as to Kevin Bruen c/o Attorney General Letitia James)(egr) (Entered: 07/12/2022) |
| 07/12/2022 | 3 | G.O. 25 FILING ORDER ISSUED: Initial Conference set for 10/11/2022 10:00 AM in Albany before Magistrate Judge Christian F. Hummel. Civil Case Management Plan must be filed and Mandatory Disclosures are to be exchanged by the parties on or before 10/4/2022. (Pursuant to Local Rule 26.2, mandatory disclosures are to be exchanged among the parties but are NOT to be filed with the Court.) (egr) (Entered: 07/12/2022) |
| 07/12/2022 | 4 | NOTICE OF ADMISSION REQUIREMENT as to Party Ivan Antonyuk, et al.; Attorney Robert J. Olson, William J. Olson, Email address is wjo@mindspring.com. Phone number is 703-356-5070. Notice emailed on 7/12/2022. Admissions due by 7/26/2022. (egr) (Entered: 07/12/2022) |
| 07/15/2022 | 5 | FRCP 7.1 CORPORATE DISCLOSURE STATEMENT by Gun Owners of America, Inc.. (Stamboulieh, Stephen) (Entered: 07/15/2022) |
| 07/15/2022 | 6 | FRCP 7.1 CORPORATE DISCLOSURE STATEMENT by Gun Owners Foundation. (Stamboulieh, Stephen) (Entered: 07/15/2022) |
| 07/15/2022 | 7 | FRCP 7.1 CORPORATE DISCLOSURE STATEMENT by Gun Owners of America New York, Inc.. (Stamboulieh, Stephen) (Entered: 07/15/2022) |
| 07/20/2022 | 8 | SUMMONS Returned Executed by Ivan Antonyuk, Gun Owners of America, Inc., Gun |

| | | |
|---|---|---|
| | | Owners of America New York, Inc., Gun Owners Foundation. Kevin P. Bruen served on 7/13/2022, answer due 8/3/2022. (Attachments: # 1 Declaration Proof of Service on Attorney General)(Stamboulieh, Stephen) (Entered: 07/20/2022) |
| 07/20/2022 | 9 | MOTION for Preliminary Injunction filed by Ivan Antonyuk, Gun Owners Foundation, Gun Owners of America New York, Inc., Gun Owners of America, Inc.. Motion returnable before Judge Glenn T. Suddaby Response to Motion due by 8/10/2022. Reply to Response to Motion due by 8/17/2022 (Attachments: # 1 Memorandum of Law) (Stamboulieh, Stephen) (Entered: 07/20/2022) |
| 07/20/2022 | 10 | Letter Motion from Michael G. McCartin for Kevin P. Bruen requesting more time to respond to the motion for a preliminary injunction submitted to Judge Suddaby . (McCartin, Michael) (Entered: 07/20/2022) |
| 07/21/2022 | 11 | RESPONSE in Opposition re 10 Letter Motion from Michael G. McCartin for Kevin P. Bruen requesting more time to respond to the motion for a preliminary injunction submitted to Judge Suddaby filed by Ivan Antonyuk, Gun Owners Foundation, Gun Owners of America New York, Inc., Gun Owners of America, Inc.. (Stamboulieh, Stephen) (Entered: 07/21/2022) |
| 07/21/2022 | 12 | TEXT ORDER granting in part and denying in part 10 Defendant's letter-motion for an extension of the deadline by which he must respond to Plaintiffs' motion for a preliminary injunction. Although Defendant certainly must (as he argues) review "extensive" history to brief the Court on the relevant historical traditions in his response, he has already gotten a head start in amassing the necessary historical sources in *N.Y. State Rifle & Pistol Assoc., Inc. v. Bruen*, 18-CV-0134 (N.D.N.Y.). Moreover, although Plaintiffs did not also file a motion for emergency relief in the form of a Temporary Restraining Order, the law they challenge does take effect on September 1, 2022: the Court could not grant Defendant the full extension he seeks without shortening (1) the seven-day period for Plaintiffs' reply, (2) the time afforded the Court to review that reply before the hearing, (3) the window of time in which to hold the hearing, and (4) the time afforded the Court (between the hearing and September 1, 2022) to prepare a Decision and Order. In short, the complete relief that Defendant seeks in his letter-motion would deprive Plaintiffs of their right to have their motion for a preliminary injunction fairly and justly decided, if not the very relief they are seeking. As a result, the deadline for Defendant's response to Plaintiffs' motion is extended five days to the end of MONDAY, AUGUST 15, 2022; and the deadline for Plaintiffs' reply is extended five days to the end of MONDAY, AUGUST 22, 2022. Defendant is respectfully advised that the partial granting of his letter-motion is contingent on him making himself available for an in-person hearing at any point between TUESDAY, AUGUST 23, 2022, and the end of FRIDAY, AUGUST 26, 2022. A Decision and Order on Plaintiffs' motion will be issued before the statute in question takes effect on September 1, 2022. SO ORDERED by Chief Judge Glenn T. Suddaby on 7/21/2022. (sal ) (Entered: 07/21/2022) |
| 07/21/2022 | 13 | NOTICE of Appearance by James M. Thompson on behalf of Kevin P. Bruen (Thompson, James) (Entered: 07/21/2022) |
| 07/22/2022 | | TEXT NOTICE re Motion 9 for Preliminary Injunction filed by Ivan Antonyuk, Gun Owners Foundation, Gun Owners of America New York, Inc., and Gun Owners of America, Inc.: An In-Person Motion Hearing is set for 8/23/2022 at 10:30 AM in Syracuse before Chief Judge Glenn T. Suddaby. (sal) (Entered: 07/22/2022) |
| 08/02/2022 | 14 | Letter Motion from Michael G. McCartin for Kevin P. Bruen requesting more time to respond to the Complaint with an Answer or a Motion submitted to Judge Suddaby . (McCartin, Michael) (Entered: 08/02/2022) |
| 08/04/2022 | 15 | TEXT ORDER granting Defendant's 14 letter-motion requesting an extension of time to |

| | | |
|---|---|---|
| | | respond to the Complaint on or before August 15, 2022. SO ORDERED by Chief Judge Glenn T. Suddaby on 8/4/2022. (sal ) (Entered: 08/04/2022) |
| 08/10/2022 | 16 | Letter Motion from James M. Thompson for Kevin P. Bruen requesting Leave To File Excess Pages submitted to Judge Chief Judge Suddaby . (Thompson, James) (Entered: 08/10/2022) |
| 08/10/2022 | 17 | NOTICE of Appearance by Robert J. Olson on behalf of Ivan Antonyuk, Gun Owners Foundation, Gun Owners of America New York, Inc., Gun Owners of America, Inc. (Olson, Robert) (Entered: 08/10/2022) |
| 08/11/2022 | 18 | TEXT ORDER granting 16 letter-motion from James M. Thompson for Kevin P. Bruen requesting permission to file a 65-page memorandum of law in opposition to Plaintiffs' motion 9 for a preliminary injunction. SO ORDERED by Chief Judge Glenn T. Suddaby on 8/11/2022. (sal) (Entered: 08/11/2022) |
| 08/15/2022 | 19 | RESPONSE in Opposition re 9 MOTION for Preliminary Injunction filed by Ivan Antonyuk, Gun Owners Foundation, Gun Owners of America New York, Inc., Gun Owners of America, Inc.. Motion returnable before Judge Glenn T. Suddaby filed by Kevin P. Bruen. (Thompson, James) (Entered: 08/15/2022) |
| 08/15/2022 | 20 | AFFIDAVIT in Opposition re 9 MOTION for Preliminary Injunction filed by Ivan Antonyuk, Gun Owners Foundation, Gun Owners of America New York, Inc., Gun Owners of America, Inc.. Motion returnable before Judge Glenn T. Suddaby *Declaration of James M. Thompson* filed by Kevin P. Bruen. (Attachments: # 1 Exhibit(s) 1 - State Senate Sponsor Memo, # 2 Exhibit(s) 2 - Feb. 2007 Pistol License Application, # 3 Exhibit(s) 3 - 1648 Massachusetts General Court Order, # 4 Exhibit(s) 4 - 1763 Pennsylvania Law On Selling Guns to Native Americans, # 5 Exhibit(s) 5 - 1642 Virginia Law On Selling Guns to Native Americans, # 6 Exhibit(s) 6 - 1707 South Carolina Law on Selling Guns to Native Americans, # 7 Exhibit(s) 7 - 1637 Massachusetts Law Disarming Named Followers of Dissident Preacher, # 8 Exhibit(s) 8 - English Militia Act of 1662, # 9 Exhibit(s) 9 - 1688 English Act Disarming Papists, # 10 Exhibit(s) 10 - 1756 Virginia Act Disarming Papists, # 11 Exhibit(s) 11 - 1776 Massachusetts Act Disarming Persons Disaffected to the Cause of America, # 12 Exhibit(s) 12 - 1777 Pennsylvania Act Obliging Assurances of Allegiance, # 13 Exhibit(s) 13 - 1777 Maryland Act For the Better Security of the Government, # 14 Exhibit(s) 14 - 1777 North Carolina Act Preventing the Dangers Which May Arise From Persons Disaffected to the State, # 15 Exhibit(s) 15 - 1777 Virginia Act Obliging Assurances of Allegiance, # 16 Exhibit(s) 16 - 1776 Resolution of the New York Committee of Safety, # 17 Exhibit(s) 17 - 1792 Federal Militia Act, # 18 Exhibit(s) 18 - 1775 Massachusetts Militia Act, # 19 Exhibit(s) 19 - 1778 New Jersey Militia Act, # 20 Exhibit(s) 20 - 1785 Virginia Militia Act, # 21 Exhibit(s) 21 - 1786 New York Militia Act, # 22 Exhibit(s) 22 - 1780 New York Militia Act, # 23 Exhibit(s) 23 - 1782 New York Militia Act, # 24 Exhibit(s) 24 - 1806 New Jersey Militia Act, # 25 Exhibit(s) 25 - 1822 Pennsylvania Militia Act, # 26 Exhibit(s) 26 - 1892 Federal Act to Punish the Carrying or Selling of Deadly or Dangerous Weapons Within the District of Columbia, # 27 Exhibit(s) 27 - 1881 New York City Pistol Licensing Law, # 28 Exhibit(s) 28 - 1878 New York City Proceedings Adopting Pistol Licensing Law, # 29 Exhibit(s) 29 - 1880 Ohio Act to Suppress Tramps, # 30 Exhibit(s) 30 - 1879 Tennessee Act Forbidding Carrying Pistols, # 31 Exhibit(s) 31 - 1876 Wyoming Act Prohibiting Firearms Within A City, Town, or Village, # 32 Exhibit(s) 32 - 1881 Arkansas Act to Preserve the Public Peace and Prevent Crime, # 33 Exhibit(s) 33 - 1871 Texas Act to Regulate the Keeping and Bearing of Deadly Weapons, # 34 Exhibit(s) 34 - Application for a Pennsylvania License to Carry Firearms, # 35 Exhibit(s) 35 - 2022 Interim Report of the Texas House Investigative Committee on the Robb Elementary Shooting, # 36 Exhibit(s) 36 - Florida Law Enforcement Report on Parkland Shooter's Troubling Behavior, # 37 Exhibit(s) 37 - 1776 Delaware Constitution Forbidding Arms at Elections, # 38 Exhibit(s) 38 - 1786 |

| | | |
|---|---|---|
| | | Virginia Law Forbidding Arms in Fairs or Markets, # 39 Exhibit(s) 39 - 1824 UVA Board Minutes Banning Weapons at the University, # 40 Exhibit(s) 40 - 1861 Board of Commissioners Report Including Ban on Guns in Central Park, # 41 Exhibit(s) 41 - 1870 Texas Law Prohibiting Weapons in Vulnerable Places, # 42 Exhibit(s) 42 - 1883 Missouri Law Prohibiting Weapons in Vulnerable Places, # 43 Exhibit(s) 43 - 1869 Tennessee Law Prohibiting Weapons in Fairs or Public Assemblies, # 44 Exhibit(s) 44 - 1870 Georgia Law Prohibiting Wseapon In Vulnerable Places, # 45 Exhibit(s) 45 - 1873 Pennsylvania Law Prohibiting Weapons in City of Harrisburg, # 46 Exhibit(s) 46 - 1721 Pennsylvania Law Prohibiting Carrying Guns on Others' Private Property, # 47 Exhibit(s) 47 - 1741 New Jersey Law Prohibiting Carrying Guns on Others' Private Property, # 48 Exhibit(s) 48 - 1715 Maryland Law Prohibiting Carrying Guns on Others' Private Property, # 49 Exhibit(s) 49 - 1771 New Jersey Law Prohibiting Carrying Guns on Others' Private Property, # 50 Exhibit(s) 50 - 1866 Texas Law Prohibiting Carrying Guns on Others' Private Property, # 51 Exhibit(s) 51 - 1893 Oregon Law Prohibiting Carrying Guns on Others' Private Property, # 52 Exhibit(s) 52 - Von Steuben's Regulations for the Order and Discipline of the Troops of the United States, # 53 Exhibit(s) 53 - Liber Albus: the White Book of the City of London, # 54 Exhibit(s) 54 - Treatise of the Pleas of the Crown) (Thompson, James) (Entered: 08/15/2022) |
| 08/15/2022 | 21 | MOTION to Dismiss for Lack of Subject Matter Jurisdiction filed by Kevin P. Bruen. Motion returnable before Judge Suddaby Response to Motion due by 9/6/2022. Reply to Response to Motion due by 9/12/2022 (Attachments: # 1 Declaration of Michael G. McCartin, # 2 Exhibit(s) A (Bill Sponsor Memo for CCIA), # 3 Exhibit(s) B (PP-3 Form), # 4 Memorandum of Law) (McCartin, Michael) (Entered: 08/15/2022) |
| 08/15/2022 | 22 | MOTION for Leave to File filed by National Police Association. Response to Motion due by 9/6/2022 (Attachments: # 1 Exhibit(s) Ex 1 Brief of Amicus Curiae) (Lennon, John) (Entered: 08/15/2022) |
| 08/16/2022 | 23 | TEXT ORDER granting 22 the NPA's motion for leave to file an amicus brief for the reasons stated therein, and directing the Clerk of Court to file Dkt. No. 22 , Attach. 1 as that amicus brief. SO ORDERED by Chief Judge Glenn T. Suddaby on 8/16/2022. (sal ) (Entered: 08/16/2022) |
| 08/16/2022 | 24 | AMICUS BRIEF in Support of Plaintiffs' Prayers for Declaratory and Injunctive Relief filed by National Police Association. (sal ) (Entered: 08/16/2022) |
| 08/17/2022 | 25 | First MOTION for Leave to File *Amicus Curiae* filed by Dr. Jaclyn Schildkraut, Ph.D. Response to Motion due by 9/7/2022 (Attachments: # 1 Memorandum of Law, # 2 Proposed Order/Judgment) (Elmore, John) (Entered: 08/17/2022) |
| 08/17/2022 | 26 | TEXT ORDER granting Dr. Jacklyn Schildkraut's 25 motion for leave to file an amicus brief to the extent it is relevant to the public-interest prong of the standard governing Plaintiffs' motion for a preliminary injunction, and directing the Clerk of Court to file Dkt. No. 25 , Attach. 1 as that amicus brief. SO ORDERED by Chief Judge Glenn T. Suddaby on 8/17/2022. (sal) (Entered: 08/17/2022) |
| 08/17/2022 | 27 | AMICUS BRIEF in Response to Plaintiffs' Motion for Preliminary Injunction filed by Dr. Jaclyn Schildkraut, Ph.D.. (sal) (Entered: 08/17/2022) |
| 08/17/2022 | 28 | MOTION for Leave to File *Amicus Brief* filed by Giffords Law Center to Prevent Gun Violence. Response to Motion due by 9/7/2022 (Attachments: # 1 Proposed Amicus Brief, # 2 Proposed Order) Motions referred to Christian F. Hummel. (Leff, Andrew) (Entered: 08/17/2022) |
| 08/17/2022 | 29 | TEXT ORDER granting 28 the Giffords Law Center's motion for leave to file an amicus brief to the extent it is relevant to the public-interest prong of the standard governing |

| | | |
|---|---|---|
| | | Plaintiffs' motion for a preliminary injunction, and directing the Clerk of Court to file Dkt. No. 28 , Attach. 1 as that amicus brief. SO ORDERED by Chief Judge Glenn T. Suddaby on 8/17/2022. (sal ) (Entered: 08/17/2022) |
| 08/17/2022 | 30 | AMICUS BRIEF in Support of Defendant's Opposition to the Motion for a Preliminary Injunction filed by Giffords Law Center to Prevent Gun Violence. (sal) (Entered: 08/17/2022) |
| 08/17/2022 | 31 | MOTION for Leave to File *Amicus Brief* filed by Everytown for Gun Safety. Response to Motion due by 9/7/2022 (Attachments: # 1 Proposed Amicus Brief) (Lefkowitz, Alla) (Entered: 08/17/2022) |
| 08/18/2022 | 32 | TEXT ORDER granting Everytown for Gun Safety's 31 motion for leave to file an amicus brief for the reasons stated therein, and directing the Clerk of Court to file Dkt. No. 31 , Attach. 1 as that amicus brief. SO ORDERED by Chief Judge Glenn T. Suddaby on 8/18/2022. (sal ) (Entered: 08/18/2022) |
| 08/18/2022 | 33 | AMICUS BRIEF in Support of Defendants' Opposition to Plaintiff's Motion for a Preliminary Injunction filed by Everytown for Gun Safety. (sal) (Entered: 08/18/2022) |
| 08/18/2022 | 34 | TEXT ORDER granting Plaintiffs leave to file, along with their reply papers by the end of August 22, 2022, additional or supplemental declarations, including those detailing (1) any hours and resources spent by the organizational Plaintiffs handling communications from aggrieved members and supporters (and/or any anticipated loss of financial support and resulting interference with ability to function as organizations), and (2) any intent by Plaintiff Antonyuk to engage in conduct proscribed by the CCIA (e.g., carrying a concealed handgun into a gas station or store that is not specifically posted with a sign allowing him to carry there), assuming that such declarants are made available for cross-examination at the hearing on August 23, 2022. Additionally, the parties are directed to file any Witness Lists and Exhibit Lists by the end of Monday, August 22, 2022. SO ORDERED by Chief Judge Glenn T. Suddaby on 8/18/2022. (sal) (Entered: 08/18/2022) |
| 08/18/2022 | 35 | *Unopposed* Letter Motion from Stephen D. Stamboulieh for Ivan Antonyuk, Gun Owners Foundation, Gun Owners of America New York, Inc., Gun Owners of America, Inc. requesting File Reply Not Exceeding 40 Pages submitted to Judge Glenn T. Suddaby . (Stamboulieh, Stephen) (Entered: 08/18/2022) |
| 08/19/2022 | 36 | Letter Motion from James M. Thompson for Kevin P. Bruen requesting Clarification of August 18, 2022 Order Permitting Additional Standing-related Declarations submitted to Judge Glenn T. Suddaby . (Thompson, James) (Entered: 08/19/2022) |
| 08/19/2022 | 37 | TEXT ORDER granting Plaintiffs' # 35 letter-motion for an enlargement of the page limitation on their reply memorandum of law to FORTY (40) pages for the reasons stated therein. SO ORDERED by Chief Judge Glenn T. Suddaby on 8/19/2022. (kee) (Entered: 08/19/2022) |
| 08/19/2022 | 38 | TEXT ORDER granting # 36 Defendant's letter-motion for clarification. The Court hereby amends its Text Order of 08/18/2022 (Dkt. No. 34) so as to permit additional or supplemental declarations that regard ONLY the issues of standing or justiciability. In response to Defendant's challenge to the propriety of Plaintiff Antonyuk using a new declaration to "allege[ ] for the first time that [he] intends to violate a specific subsection of the CCIA," Defendant is respectfully advised that Plaintiff Antonyuk has already alleged what would happen if he were to carry his handgun into a gas station or store that is not specifically posted with a sign allowing him to carry there, the latter of which is something he "currently" does (Dkt. No. 1, at 112, 114; Dkt. No. 1, Attach. 6, at 14-18), and, as indicated in the Court's Text Order of 08/18/2022, he will indeed be able to further particularize allegations of fact supportive of his claims (e.g., by adducing additional |

| | | |
|---|---|---|
| | | declaration testimony regarding any intent he has to engage in conduct proscribed by the CCIA). Finally, Defendant is respectfully reminded that the brevity of time between the filing of Plaintiffs' reply and the hearing in this matter is due primarily to Defendant's own request for an extension of the deadline by which to file his opposition papers. SO ORDERED By Chief Judge Glenn T. Suddaby on 8/19/2022.(kee) (Entered: 08/19/2022) |
| 08/19/2022 | 39 | **AMENDED TEXT ORDER** granting # 36 Defendant's letter-motion for clarification. The Court hereby amends its Text Order of 08/18/2022 (Dkt. No. 34) so as to permit additional or supplemental declarations that regard ONLY the issues of standing or justiciability. Such declarations may also detail the fair traceability of Plaintiffs' alleged injuries to Defendant (as distinguishable from the factual allegations in Libertarian Party of Erie Cnty. v. Cuomo, 15-CV-0654, Amended Complaint, at Para. 123 [W.D.N.Y. filed Dec. 23, 2015]). In response to Defendant's challenge to the propriety of Plaintiff Antonyuk using a new declaration to "allege[ ] for the first time that [he] intends to violate a specific subsection of the CCIA," Defendant is respectfully advised that Plaintiff Antonyuk has already alleged what would happen if he were to carry his handgun into a gas station or store that is not specifically posted with a sign allowing him to carry there, the latter of which is something he "currently" does (Dkt. No. 1, at Para(s). 112, 114; Dkt. No. 1, Attach. 6, at Para(s). 14-18), and, as indicated in the Court's Text Order of 08/18/2022, he will indeed be able to further particularize allegations of fact supportive of his claims (e.g., by adducing additional declaration testimony regarding any intent he has to engage in conduct proscribed by the CCIA). Finally, Defendant is respectfully reminded that the brevity of time between the filing of Plaintiffs' reply and the hearing in this matter is due primarily to Defendant's own request for an extension of the deadline by which to file his opposition papers. SO ORDERED by Chief Judge Glenn T. Suddaby on 8/19/2022. (kee) (Entered: 08/19/2022) |
| 08/22/2022 | 40 | REPLY to Defendant' Opposition to Plaintiff's 9 Motion for Preliminary Injunction filed by Ivan Antonyuk, Gun Owners Foundation, Gun Owners of America New York, Inc., Gun Owners of America, Inc.. (Stamboulieh, Stephen) Modified on 8/23/2022 to change from a response to a reply (sal ). (Entered: 08/22/2022) |
| 08/22/2022 | 41 | AFFIDAVIT in Support of 40 Plaintiff's Reply in Opposition to Defendant's Response to Plaintiff's 9 Motion for Preliminary Injunction filed by Ivan Antonyuk, Gun Owners Foundation, Gun Owners of America New York, Inc., Gun Owners of America, Inc.. (Attachments: # 1 Declaration Declaration of Erich Pratt, # 2 Declaration Declaration of William Robinson, # 3 Declaration Declaration of Ivan Antonyuk)(Stamboulieh, Stephen) Modified on 8/23/2022 to link to appropriate document (sal ). (Entered: 08/22/2022) |
| 08/22/2022 | 42 | Witness List by Ivan Antonyuk, Gun Owners Foundation, Gun Owners of America New York, Inc., Gun Owners of America, Inc.. (Stamboulieh, Stephen) (Entered: 08/22/2022) |
| 08/22/2022 | 43 | Exhibit List *for 8/23/22 PI Hearing* by Kevin P. Bruen. (McCartin, Michael) (Entered: 08/22/2022) |
| 08/22/2022 | 44 | Witness List by Kevin P. Bruen. (McCartin, Michael) (Entered: 08/22/2022) |
| 08/23/2022 | 45 | TRANSCRIPT REQUEST by Kevin P. Bruen for proceedings held on August 23, 2022 before Judge Glenn T. Suddaby.. (Thompson, James) (Entered: 08/23/2022) |
| 08/23/2022 | | TEXT Minute Entry for proceedings held before Chief Judge Glenn T. Suddaby: Motion Hearing held on 8/23/2022 re Plaintiffs' 9 Motion for Preliminary Injunction filed by Ivan Antonyuk, Gun Owners Foundation, Gun Owners of America New York, Inc., and Gun Owners of America, Inc.. Plaintiffs' counsel calls Erich M. Pratt as a witness who appears via video through Microsoft Teams. Plaintiffs' counsel rests on Mr. Pratt's Declaration filed in this action. Attorney McCartin cross-examines this witness. Re-direct by Plaintiffs' counsel. 10:55 AM - Plaintiffs' counsel calls William Robinson as witness. Plaintiffs' |

| | | |
|---|---|---|
| | | counsel rests on Mr. Robinson's Declaration filed in this action. Attorney McCartin cross-examines this witness. Re-direct by Plaintiffs' counsel. 11:07 AM - Plaintiffs' counsel calls Ivan Antonyuk as a witness. Plaintiffs' counsel rests on Mr. Antonyuk's Affidavit filed in this action. 11:19 AM - Plaintiffs' counsel cross-examines this witness. 11:19 AM - Plaintiffs' counsel intended to call Kevin Bruen as a witness, however, he is not present for today's proceeding. Defendant's counsel was previously advised by the Court that it is their decision as to whether or not Kevin Bruen should be present for this hearing. Chief Judge Suddaby notes that a subpoena can be issued for this witness to testify and today's hearing can be adjourned, however, Plaintiffs' counsel no longer requests Kevin Bruen's appearance. Oral argument is heard by Plaintiffs' counsel. 11:33 AM - Oral argument is heard by Defendant's counsel. 12:13 PM - Plaintiffs' counsel argues in reply to Defendant's argument. 12:12 PM - Defendant's counsel argues in reply to Plaintiffs' argument. 12:24 PM - Chief Judge Suddaby reserves decision and a written decision will be forthcoming. Court is adjourned. APP: Stephen Stamboulieh, Esq. for Plaintiffs. Michael McCartin, AAG & James Thompson, AAG for Defendant. (Court Reporter Jodi Hibbard) (sal) (Entered: 08/23/2022) |
| 08/25/2022 | 46 | TRANSCRIPT of Proceedings: Motion Hearing held on 8/23/2022 before Judge Glenn T. Suddaby, Court Reporter: Jodi L. Hibbard, Telephone number: (315) 234-8547. IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS: In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/15/2022. Redacted Transcript Deadline set for 9/26/2022. Release of Transcript Restriction set for 11/23/2022. Notice of Intent to Redact due by 8/30/2022 (jlh, ) (Entered: 08/25/2022) |
| 08/25/2022 | 47 | TRANSCRIPT REQUEST by Ivan Antonyuk, Gun Owners Foundation, Gun Owners of America New York, Inc., Gun Owners of America, Inc. for proceedings held on 8/23/2022 before Judge Chief Judge Suddaby.. (Stamboulieh, Stephen) (Entered: 08/25/2022) |
| 08/31/2022 | 48 | DECISION AND ORDER that Plaintiffs' Complaint (Dkt. No. 1 ) is *sua sponte* DISMISSED without prejudice for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(h)(3}. Plaintiffs' motion for a preliminary injunction (Dkt. No. 9 ) is denied without prejudice as moot. Defendant's motion to dismiss for lack of subject-matter jurisdiction (Dkt. No. 21 ) is denied without prejudice as moot. The Clerk is directed to close this action. Signed by Chief District Judge Glenn T. Suddaby on 8/31/2022. (sal ) (Entered: 08/31/2022) |
| 08/31/2022 | 49 | JUDGMENT that, pursuant to the Decision and Order (Dkt. No. 48 ) issued on August 31, 2022 by the Honorable Glenn T. Suddaby, Plaintiffs' Complaint (Dkt. No. 1 ) is *sua sponte* DISMISSED without prejudice for lack of subject- matter jurisdiction pursuant to Fed. R. Civ. P. 12(h)(3). Plaintiffs' motion for a preliminary injunction is DENIED without prejudice as moot. Defendant's motion to dismiss for lack of subject-matter jurisdiction (Dkt. No. 21 ) is DENIED without prejudice as moot. The Clerk is directed to close this action. All of the above pursuant to the Decision and Order dated August 31, 2022 issued by the Honorable Glenn T. Suddaby. Dkt. No. 48 . (sal) (Entered: 08/31/2022) |

**PACER Service Center**

# EXHIBIT B

**Query**   **Reports**   **Utilities**   **Help**   **Log Out**

APPEAL

# U.S. District Court
# Northern District of New York - Main Office (Syracuse) [NextGen CM/ECF Release 1.7 (Revision 1.7.1)] (Albany)
# CIVIL DOCKET FOR CASE #: 1:22-cv-00986-GTS-CFH

Antonyuk et al v. Hochul et al                          Date Filed: 09/20/2022
Assigned to: U.S. District Judge Glenn T. Suddaby      Jury Demand: None
Referred to: Magistrate Judge Christian F. Hummel      Nature of Suit: 950 Constitutional - State
related Case:  1:22-cv-00734-GTS-CFH                   Statute
Cause: 42:1983 Civil Rights Act                        Jurisdiction: Federal Question

**Plaintiff**

**Ivan Antonyuk**                          represented by   **Robert J. Olson**
                                                            William J. Olson, P.C.
                                                            370 Maple Avenue W - Suite 4
                                                            Vienna, VA 22180
                                                            703-356-5070
                                                            Fax: 703-356-5085
                                                            Email: rob@wjopc.com
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Stephen D. Stamboulieh**
                                                            Stamboulieh Law, PLLC
                                                            P.O. Box 428
                                                            Olive Branch, MS 38654
                                                            601-852-3440
                                                            Email: stephen@sdslaw.us
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Corey Johnson**                          represented by   **Robert J. Olson**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Stephen D. Stamboulieh**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Alfred Terrille**                        represented by   **Robert J. Olson**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Stephen D. Stamboulieh**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Joseph Mann**                    represented by    **Robert J. Olson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen D. Stamboulieh**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Leslie Leman**                    represented by    **Robert J. Olson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen D. Stamboulieh**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Lawrence Sloane**                  represented by    **Robert J. Olson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen D. Stamboulieh**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

<u>**Defendant**</u>

**Kathleen Hochul**                  represented by    **James M. Thompson**
*in her Official Capacity as Governor of the*         New York State Attorney General - New
*State of New York*                                   York Office
28 Liberty Street
New York, NY 10005
212-416-6656
Email: james.thompson@ag.ny.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael G. McCartin**

Office of Attorney General - Albany
The Capitol
Albany, NY 12224
518-776-2620
Fax: 518-915-7738
Email: michael.mccartin@ag.ny.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Kevin P. Bruen**
*in his Official Capcity as Superintendent of
the New York State Police*

represented by **James M. Thompson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael G. McCartin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Judge Matthew J. Doran**
*in his Official Capacity as the Licensing-
official of Onondaga County*

represented by **James M. Thompson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael G. McCartin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**William Fitzpatrick**
*in his Official Capacity as the Onondaga
County District Attorney*

represented by **John E. Heisler , Jr.**
Onondaga County Department of Law
John H. Mulroy Civic Center
421 Montgomery Street, 10th Floor
Syracuse, NY 13202
315-435-2170
Fax: 315-435-5729
Email: johnheislerjr@ongov.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Eugene Conway**
*in his Official Capacity as the Sheriff of
Onondaga County*

represented by **John E. Heisler , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Joseph Cecile**
*in his Official Capacity as the Chief of
Police of Syracuse*

represented by **Todd M. Long**
City of Syracuse Law Department
233 East Washington Street
300 City Hall
Syracuse, NY 13202
315-448-8400
Fax: 315-448-8381

Email: tlong@syrgov.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Danielle R. Smith**
City of Syracuse Corporation Counsel
233 East Washington Street
Room 300 City Hall
Syracuse, NY 13202
315-448-8400
Fax: 315-448-8381
Email: DSmith@syrgov.net
*ATTORNEY TO BE NOTICED*

**Defendant**

**P. David Soares**
*in his Official Capacity as the District*
*Attorney of Albany County*

**Defendant**

**Gregory Oakes**                          represented by     **Edward G. Melvin**
*in his Official Capacity as the District*                    Barclay Damon LLP - Syracuse Office
*Attorney of Oswego County*                                   Barclay Damon Tower
                                                              125 East Jefferson Street
                                                              Syracuse, NY 13202
                                                              315-425-2783
                                                              Email: emelvin@barclaydamon.com
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **John Joseph Pelligra**
                                                              Barclay Damon LLP - Syracuse Office
                                                              Barclay Damon Tower
                                                              125 East Jefferson Street
                                                              Syracuse, NY 13202
                                                              315-425-2773
                                                              Email: jpelligra@barclaydamon.com
                                                              *ATTORNEY TO BE NOTICED*

**Defendant**

**Don Hilton**                             represented by     **Edward G. Melvin**
*in his Official Capacity as the Sheriff of*                  (See above for address)
*Oswego County*                                               *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **John Joseph Pelligra**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

**Defendant**

**Joseph Stanzione**                       represented by     **Edward I. Kaplan**
*in his Official Capacity as the District*                    PO Box 155
*Attorney of Greene County*                                   Hunter, NY 12442

518-821-5070
Email: edkap2002@yahoo.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/20/2022 | 1 | COMPLAINT against Kevin P. Bruen, Joseph Cecile, Eugene Conway, William Fitzpatrick, Don Hilton, Kathleen Hochul, Doran J. Matthew, Gregory Oakes, P. David Soares, Joseph Stanzione (Filing fee $402 receipt number 6039505) filed by Alfred Terrille, Leslie Leman, Lawrence Sloane, Corey Johnson, Joseph Mann. (Attachments: # 1 Decleration of Stephen D. Stamboulieh, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Civil Cover Sheet)(jdp ) (Entered: 09/21/2022) |
| 09/20/2022 | 2 | Summons Issued as to Kevin P. Bruen, Joseph Cecile, Eugene Conway, William Fitzpatrick, Don Hilton, Kathleen Hochul, Doran J. Matthew, Gregory Oakes, P. David Soares, Joseph Stanzione. (Attachments: # 1 Summons Issued, # 2 Summons Issued, # 3 Summons Issued, # 4 Summons Issued, # 5 Summons Issued, # 6 Summons Issued, # 7 Summons Issued, # 8 Summons Issued, # 9 Summons Issued)(jdp ) (Entered: 09/21/2022) |
| 09/20/2022 | 3 | G.O. 25 FILING ORDER ISSUED: Initial Conference set for 12/20/2022 10:00 AM in Albany before Magistrate Judge Christian F. Hummel. Civil Case Management Plan must be filed and Mandatory Disclosures are to be exchanged by the parties on or before 12/13/2022. (Pursuant to Local Rule 26.2, mandatory disclosures are to be exchanged among the parties but are NOT to be filed with the Court.) (jdp ) (Entered: 09/21/2022) |
| 09/22/2022 | 4 | Letter Motion from Stephen D. Stamboulieh for Ivan Antonyuk, Corey Johnson, Leslie Leman, Joseph Mann, Lawrence Sloane, Alfred Terrille requesting Excess Pages submitted to Judge Hon. Judge Suddaby . (Stamboulieh, Stephen) (Entered: 09/22/2022) |
| 09/22/2022 | 5 | TEXT ORDER granting Plaintiffs' 4 letter-motion requesting to file a Memorandum of Law in support of their anticipated Motion for a Temporary Restraining Order, Preliminary Injunction and/or Permanent Injunction not to exceed forty (40) pages in length, which is fifteen (15) pages in excess of the Local Rule. SO ORDERED by U.S. District Judge Glenn T. Suddaby on 9/22/2022. (sal) (Entered: 09/22/2022) |
| 09/22/2022 | 6 | Emergency MOTION for Temporary Restraining Order , MOTION for Preliminary Injunction filed by Ivan Antonyuk, Corey Johnson, Leslie Leman, Joseph Mann, Lawrence Sloane, Alfred Terrille. Motion returnable before Judge Glenn T. Suddaby by Ivan Antonyuk, Corey Johnson, Leslie Leman, Joseph Mann, Lawrence Sloane, Alfred Terrille. (Attachments: # 1 Memorandum of Law Memorandum of Law, # 2 Declaration Attorney's Affirmation, # 3 Proposed Order/Judgment Proposed Order to Show Cause)(Stamboulieh, Stephen) (Entered: 09/22/2022) |
| 09/22/2022 | 7 | NOTICE by Ivan Antonyuk, Corey Johnson, Leslie Leman, Joseph Mann, Lawrence Sloane, Alfred Terrille re 6 Emergency MOTION for Temporary Restraining Order MOTION for Preliminary Injunction filed by Ivan Antonyuk, Corey Johnson, Leslie Leman, Joseph Mann, Lawrence Sloane, Alfred Terrille. Motion returnable before Judge Glenn T. Suddaby *Errata (copy of Complaint per LR 65.1)* (Attachments: # 1 Exhibit(s) Copy of Filed Compaint with exhibits)(Stamboulieh, Stephen) (Entered: 09/22/2022) |
| 09/23/2022 | 8 | TEXT ORDER denying 6 Plaintiffs' application for an Order to Show Cause as unsupported by the affidavit required by Local Rule 7.1(e) of the Local Rules of Practice for this Court, and reserving decision on 6 Plaintiffs' motion for a temporary restraining order and 6 their motion for preliminary injunction pending further briefing and oral |

| | | |
|---|---|---|
| | | argument. Defendants' response to Plaintiffs' motion for a temporary restraining order is due by the end of WEDNESDAY, SEPTEMBER 28, 2022, and may come in the form of a letter-brief (or letter-briefs). Oral argument (without witness testimony) on Plaintiffs' motion for a temporary restraining order is scheduled for 11:00 a.m. on THURSDAY, SEPTEMBER 29, 2022, before the undersigned in Syracuse, New York. Defendants' response to Plaintiffs' motion for a preliminary injunction is due by the end of THURSDAY, OCTOBER 13, 2022; and Plaintiffs' reply to Defendants' response is due by the end of THURSDAY, OCTOBER 20, 2022. An in-person hearing on Plaintiffs' motion for a preliminary injunction (at which testimony will be adduced) shall be scheduled in a future Text Order. SO ORDERED by U.S. District Judge Glenn T. Suddaby on 9/23/2022. (sal ) (Entered: 09/23/2022) |
| 09/23/2022 | | Reset Deadlines as to 6 Emergency Motion for Temporary Restraining Order and Motion for Preliminary Injunction filed by Ivan Antonyuk, Corey Johnson, Leslie Leman, Joseph Mann, Lawrence Sloane, Alfred Terrille: As to the 6 Motion for Temporary Restraining Order, response due 9/28/2022 and oral argument set for 9/29/2022 at 11:00 AM in Syracuse before U.S. District Judge Glenn T. Suddaby. As to the 6 Motion for Preliminary Injunction, response due 10/13/2022 and reply due by 10/20/2022. An in-person hearing will be scheduled as to the 6 Motion for Preliminary Injunction in due course. (sal) (Entered: 09/23/2022) |
| 09/23/2022 | 9 | TEXT ORDER : Plaintiffs' counsel is directed to serve a copy of the Text Order entered on 09/23/2022, Dkt. No. 8, upon Defendants or counsel. SO ORDERED by U.S. District Judge Glenn T. Suddaby on 9/23/2022. (sal) (Entered: 09/23/2022) |
| 09/23/2022 | 10 | SUMMONS Returned Executed by Alfred Terrille, Ivan Antonyuk, Leslie Leman, Lawrence Sloane, Corey Johnson, Joseph Mann. Kevin P. Bruen served on 9/22/2022, answer due 10/13/2022; Joseph Cecile served on 9/22/2022, answer due 10/13/2022; Eugene Conway served on 9/22/2022, answer due 10/13/2022; William Fitzpatrick served on 9/22/2022, answer due 10/13/2022; Don Hilton served on 9/22/2022, answer due 10/13/2022; Kathleen Hochul served on 9/22/2022, answer due 10/13/2022; Doran J. Matthew served on 9/22/2022, answer due 10/13/2022; Gregory Oakes served on 9/22/2022, answer due 10/13/2022; P. David Soares served on 9/22/2022, answer due 10/13/2022. (Attachments: # 1 Affidavit Affidavit of Service on Cecile, # 2 Affidavit Affidavit of Service on Conway, # 3 Affidavit Affidavit of Service on Doran, # 4 Affidavit Affidavit of Service on Fitzpatrick, # 5 Affidavit Affidavit of Service on Hilton, # 6 Affidavit Affidavit of Service on Hochul, # 7 Affidavit Affidavit of Service on Oakes, # 8 Affidavit Affidavit of Service on Soares)(Stamboulieh, Stephen) (Entered: 09/23/2022) |
| 09/26/2022 | | TEXT Notice pursuant to General Order 12 of Potential Related Case(s), submitted to District Judge for review and determination. Potential Related cases: 1:22-CV-734. (jdp ) (Entered: 09/26/2022) |
| 09/26/2022 | 11 | NOTICE of Appearance by James M. Thompson on behalf of Kevin P. Bruen, Judge Matthew J. Doran, Kathleen Hochul (Thompson, James) (Entered: 09/26/2022) |
| 09/26/2022 | 12 | TEXT ORDER granting direct assignment to District Judge Glenn T. Suddaby and Magistrate Judge Christian F. Hummel. This case is deemed related to 1:22-cv-00734-GTS-CFH, Antonyuk et al v. Bruen. SO ORDERED by U.S. District Judge Glenn T. Suddaby on 9/26/2022. (sal) (Entered: 09/26/2022) |
| 09/26/2022 | 13 | SUMMONS Returned Executed by Alfred Terrille, Ivan Antonyuk, Leslie Leman, Lawrence Sloane, Corey Johnson, Joseph Mann. Joseph Stanzione served on 9/22/2022, answer due 10/13/2022. (Stamboulieh, Stephen) (Entered: 09/26/2022) |
| 09/26/2022 | 14 | NOTICE of Appearance by Edward G. Melvin on behalf of Don Hilton, Gregory Oakes (Melvin, Edward) (Entered: 09/26/2022) |

| 09/26/2022 | 15 | NOTICE of Appearance by John Joseph Pelligra on behalf of Don Hilton, Gregory Oakes (Pelligra, John) (Entered: 09/26/2022) |
| --- | --- | --- |
| 09/28/2022 | 16 | NOTICE of Appearance by Michael G. McCartin on behalf of Kevin P. Bruen, Judge Matthew J. Doran, Kathleen Hochul (McCartin, Michael) (Entered: 09/28/2022) |
| 09/28/2022 | 17 | RESPONSE in Opposition to Plaintiffs' 6 Emergency Motion for Temporary Restraining Order filed by Don Hilton, Gregory Oakes. (Pelligra, John) Modified on 9/28/2022 to change from a letter brief to a response (sal). (Entered: 09/28/2022) |
| 09/28/2022 | 18 | RESPONSE in Opposition to Plaintiffs' 6 Emergency Motion for Temporary Restraining Order filed by by Kevin P. Bruen, Judge Matthew J. Doran, Kathleen Hochul. (Thompson, James) Modified on 9/29/2022 to change from a letter brief to a response (sal ). (Entered: 09/28/2022) |
| 09/29/2022 | | TEXT Minute Entry for proceedings held before U.S. District Judge Glenn T. Suddaby: Motion Hearing held on 9/29/2022 re 6 Emergency Motion for a Temporary Restraining Order filed by Ivan Antonyuk, Corey Johnson, Leslie Leman, Joseph Mann, Lawrence Sloane, and Alfred Terrille. Oral argument is heard by counsel. District Judge Suddaby RESERVES DECISION and a written decision on the 6 Emergency Motion for a Temporary Restraining Order will be forthcoming. Briefing has been set on the 6 Motion for a Preliminary Injunction and a hearing will be scheduled on that portion of the motion in due course. APP: Stephen D. Stamboulieh, Esq. for Plaintiffs. James M. Thompson, Esq. and Michael G. McCartin, Esq. for NYS Defendants. Edward Melvin, Esq. for Oswego County Defendants. Time: 11:10 AM - 12:25 PM. (Court Reporter Jodi Hibbard) (sal) (Entered: 09/29/2022) |
| 09/29/2022 | 19 | TRANSCRIPT REQUEST by Kevin P. Bruen, Judge Matthew J. Doran, Kathleen Hochul for proceedings held on September 29, 2022 before Judge Glenn T. Suddaby.. (Thompson, James) (Entered: 09/29/2022) |
| 09/29/2022 | 20 | RESPONSE in Opposition re 6 Emergency MOTION for Temporary Restraining Order MOTION for Preliminary Injunction filed by Ivan Antonyuk, Corey Johnson, Leslie Leman, Joseph Mann, Lawrence Sloane, Alfred Terrille. Motion returnable before Judge Glenn T. Suddaby *just as to the Emergency MOTION for Temporary Restraining Order* filed by Joseph Cecile. (Long, Todd) (Entered: 09/29/2022) |
| 09/29/2022 | 21 | NOTICE of Appearance by Todd M. Long on behalf of Joseph Cecile (Long, Todd) (Entered: 09/29/2022) |
| 09/29/2022 | 22 | NOTICE of Appearance by Danielle R. Smith on behalf of Joseph Cecile (Smith, Danielle) (Entered: 09/29/2022) |
| 09/30/2022 | 23 | TRANSCRIPT of Proceedings: Motion Hearing held on 9/29/2022 before Judge Glenn T. Suddaby, Court Reporter: Jodi L. Hibbard, Telephone number: (315) 234-8547. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/21/2022. Redacted Transcript Deadline set for 10/31/2022. Release of Transcript Restriction set for 12/29/2022. Notice of Intent to Redact due by 10/5/2022 (jlh, ) (Entered: 09/30/2022) |

| 09/30/2022 | 24 | NOTICE of Appearance by John E. Heisler, Jr on behalf of William Fitzpatrick (Heisler, John) (Entered: 09/30/2022) |
|---|---|---|
| 10/03/2022 | 25 | NOTICE of Appearance by John E. Heisler, Jr on behalf of Eugene Conway (Heisler, John) (Entered: 10/03/2022) |
| 10/03/2022 | 26 | NOTICE of Appearance by Edward I. Kaplan on behalf of Joseph Stanzione (Kaplan, Edward) (Entered: 10/03/2022) |
| 10/06/2022 | 27 | DECISION AND TEMPORARY RESTRAINING ORDER that Plaintiffs' motion for a Temporary Restraining Order (Dkt. No. 6 ) is GRANTED in part and DENIED in part in accordance with this Decision. Defendants, as well as their officers, agents, servants, employees, and attorneys (and any other persons who are in active concert or participation with them) are TEMPORARILY RESTRAINED from enforcing the following provisions of the Concealed Carry Improvement Act, 2022 N.Y. Sess. Laws ch. 371 ("CCIA"): (1) the provisions contained in Section 1 of the CCIA requiring "good moral character" EXCEPT to the extent it is construed to mean that a license shall be issued or renewed except for an applicant who has been found, by a preponderance of the evidence based on his or her conduct, to not have "good moral character," which is defined as "having the essential character, temperament and judgment necessary... to use [the weapon entrusted to the applicant] only in a manner that does not endanger oneself or others, other than in self-defense"; (2) the provision contained in Section 1 of the CCIA requiring that the applicant "meet in person with the licensing officer for an interview"; (3) the provision contained in Section 1 of the CCIA requiring the "names and contact information for the applicant's current spouse, or domestic partner, any other adults residing in the applicant's home, including any adult children of the applicant, and whether or not there are minors residing, full time or part time, in the applicants home"; (4) the provision contained in Section 1 of the CCIA requiring "a list of former and current social media accounts of the applicant from the past three years"; and (5) the "sensitive locations" provision contained in Section 4 of the CCIA EXCEPT with regard to the following sensitive locations (where the restrictions remain): (a) "any place owned or under the control of federal, state or local government, for the purpose of government administration, including courts" (as contained in paragraph "2(a)" of Section 4); (b) "any location being used as a polling place" (as contained in paragraph "2(q)" of Section 4); (c) "any public sidewalk or other public area restricted from general public access for a limited time or special event that has been issued a permit for such time or event by a governmental entity, or subject to specific, heightened law enforcement protection, or has otherwise had such access restricted by a governmental entity, provided such location is identified as such by clear and conspicuous signage" (as contained in paragraph "2(r)" of Section 4); (d) "any place of worship or religious observation" (as contained in paragraph "2(c)" of Section 4), EXCEPT for those persons who have been tasked with the duty to keep the peace at the place of worship or religious observation; (e) "nursery schools" and "preschools" (as contained in paragraph "2(f)" of Section 4); (f) "any building or grounds, owned or leased, of any educational institutions, colleges and universities, licensed private career schools, school districts, public schools, private schools licensed under article one hundred one of the education law, charter schools, non-public schools, board of cooperative educational services, special act schools, preschool special education programs, private residential or non-residential schools for the education of students with disabilities, and any state-operated or state-supported schools" (as contained in paragraph "2(m)" of Section 4); (g) "any gathering of individuals to collectively express their constitutional rights to protest or assemble" (as contained in paragraph "2(s)" of Section 4); and (6) the "restricted locations" provision contained in Section 5 of the CCIA EXCEPT for fenced-in farmland owned by another or fenced-in hunting ground owned by another (where the restriction stands). Plaintiffs are EXCUSED from giving security. This Temporary Restraining Order shall REMAIN IN EFFECT pending a hearing and ruling on Plaintiffs' motion for a preliminary injunction |

| | | |
|---|---|---|
| | | (Dkt. No. 6 ). This Temporary Restraining Order is STAYED for THREE (3) BUSINESS DAYS, from the date of this Decision, to allow Defendants to seek emergency relief in the Second Circuit. Counsel for Plaintiffs shall promptly and personally serve this Decision and Temporary Restraining Order on Defendant Soares (who has not yet appeared through counsel in this action). Signed by U.S. District Judge Glenn T. Suddaby on 10/6/2022. (sal) (Entered: 10/06/2022) |
| 10/06/2022 | 28 | NOTICE OF APPEAL as to 27 Order,,,,,,,,,,,,,,,,,,,,, *Decision and Temporary Restraing Order* by Kevin P. Bruen, Judge Matthew J. Doran, Kathleen Hochul. Filing fee $ 505, receipt number ANYNDC-6060619. (Thompson, James) (Entered: 10/06/2022) |
| 10/07/2022 | 29 | TRANSCRIPT REQUEST by Ivan Antonyuk, Corey Johnson, Leslie Leman, Joseph Mann, Lawrence Sloane, Alfred Terrille for proceedings held on September 29, 2022 before Judge Hon. Glenn T. Suddaby.. (Stamboulieh, Stephen) (Entered: 10/07/2022) |
| 10/07/2022 | 30 | ELECTRONIC NOTICE AND CERTIFICATION sent to US Court of Appeals regarding the # 28 Notice of Appeal. (map) (Entered: 10/07/2022) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 10/08/2022 21:31:31 | | |
| **PACER Login:** | edelpozo | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-00986-GTS-CFH |
| **Billable Pages:** | 8 | **Cost:** | 0.80 |

# EXHIBIT C

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

IVAN ANTONYUK; COREY JOHNSON; ALFRED
TERRILLE; JOSEPH MANN; LESLIE LEMAN; and
LAWRENCE SLOANE,

                             Plaintiffs,

v.

KATHLEEN HOCHUL, in her Official Capacity as
Governor of the State of New York; KEVIN P. BRUEN,
in his Official Capacity as Superintendent of the New
York State Police; JUDGE MATTHEW J. DORAN, in
His Official Capacity as Licensing-Official of Onondaga
County; WILLIAM FITZPATRICK, in His Official
Capacity as the Onondaga County District Attorney;
EUGENE CONWAY, in his Official Capacity as the
Sheriff of Onondaga County; JOSEPH CECILE, in his
Official Capacity as the Chief of Police of Syracuse;
P. DAVID SOARES, in his Official Capacity as the
District Attorney of Albany County; GREGORY
OAKES, in his Official Capacity as the District Attorney
of Oswego County; DON HILTON, in his Official
Capacity as the Sheriff of Oswego County; and JOSEPH
STANZIONE, in his Official Capacity as the District
Attorney of Greene County,

                             Defendants.

1:22-CV-0986
(GTS/CFH)

_____

APPEARANCES:

STAMBOULIEH LAW, PLLC
   Counsel for Plaintiff
P.O. Box 428
Olive Branch, MS 38654

WILLIAM J. OLSON, P.C.
   Co-Counsel for Plaintiff
370 Maple Avenue W, Suite 4
Vienna, VA 22180

OF COUNSEL:

STEPHEN D. STAMBOULIEH, ESQ.

ROBERT J. OLSON, ESQ.

| | |
|---|---|
| HON. LETITIA A. JAMES<br>Attorney General for the State of New York<br>   Counsel for the State Defendants<br>The Capitol<br>Albany, NY 12224 | MICHAEL G. McCARTIN, ESQ.<br>JAMES M. THOMPSON, ESQ.<br>Assistants Attorney General |
| BARCLAY DAMON LLP<br>   Counsel for Oswego County Defendants<br>Barclay Damon Tower<br>125 East Jefferson Street<br>Syracuse, NY 13202 | EDWARD G. MELVIN, ESQ.<br>JOHN JOSEPH PELLIGRA, ESQ. |
| HON. SUSAN R. KATZOFF<br>Corporation Counsel for the City of Syracuse<br>   Counsel for City of Syracuse Defendants<br>233 East Washington Street<br>300 City Hall<br>Syracuse, NY 13202 | TODD M. LONG, ESQ.<br>DANIELLE R. SMITH, ESQ.<br>Assistants Corporation Counsel |
| ONONDAGA COUNTY DEPT. OF LAW<br>   Counsel for Onondaga County Defendants<br>John H. Mulroy Civic Center, 10th Floor<br>421 Montgomery Street<br>Syracuse, NY 13202 | JOHN E. HEISLER, JR. |
| HON. EDWARD I. KAPLAN<br>Greene County Attorney<br>   Counsel for Defendant Stanzione<br>411 Main Street, Suite 443<br>Catskill, NY 12414 | EDWARD I. HAPLAN, ESQ. |

GLENN T. SUDDABY, United States District Judge

## DECISION and TEMPORARY RESTRAINING ORDER

Currently before the Court, in this civil rights action by the six above-captioned individuals ("Plaintiffs") against the ten above-captioned employees of the State of New York or one of its counties or cities ("Defendants"), is Plaintiffs' motion for a Temporary Restraining Order. (Dkt. No. 6.) For the reasons set forth below, Plaintiffs' motion is granted in part and denied in part.

## TABLE OF CONTENTS

I.     RELEVANT BACKGROUND ..................................................................4
II.    GOVERNING LEGAL STANDARD.......................................................6
       A.    Procedural Standard ..................................................................6
       B.    Substantive Standard.................................................................12
III.   ANALYSIS................................................................................................14
       A.    Standing ....................................................................................14
       B.    Substantial Likelihood of Success on the Merits .....................17
             1.    "Good Moral Character"..................................................20
             2.    List of Four Character References ...................................25
             3.    List of Family Members and Cohabitants........................26
             4.    List Social Media Accounts for Past Three Years ..........26
             5.    "Such Other Information Required by the Licensing Officer"....................27
             6.    Eighteen Hours of Firearm Training................................27
             7.    In-Person Meeting ...........................................................28
             8.    Prohibition in "Sensitive Locations" ..............................28
                   a.    Places Controlled by Federal, State or Local Government...............31
                   b.    Polling Places........................................................31
                   c.    Public Areas Restricted from General Public Access for a Limited Time by a Government Entity.............................32
                   d.    Places of Worship or Religious Observation ....................................32
                   e.    Schools, Colleges and Universities.................35
                   f.    Places or Vehicles Used for Public Transportation ..........................37
                   g.    Public Assemblies..........................................38
                   h.    Places Used for Entertainment or Amusement and Places Where Alcoholic Beverages Are Consumed ....................38
                   i.    Times Square .................................................42
                   j.    All Other "Sensitive Locations" ....................42
             9.    Prohibition in "Restricted Locations"............................44
       C.    Strong Showing of Irreparable Harm ........................................46
       D.    Balance of Equities and Service of Public Interest....................48
       E.    Other Considerations ................................................................48
             1.    Security ...........................................................................48
             2.    Duration ..........................................................................49
             3.    Stay Pending Appeal........................................................49

I.      **RELEVANT BACKGROUND**

On June 23, 2022, the Supreme Court held that N.Y. Penal Law § 400.00(2)(f), which conditioned the issuance of an unrestricted license to carry a handgun in public on the existence of "proper cause," violated the Second and Fourteenth Amendments by impermissibly granting a licensing officer the discretion to deny a license to a law-abiding, responsible New York State citizen based on a perceived lack of a special need for self-protection distinguishable from that of the general community. *N.Y. State Rifle & Pistol Assoc., Inc. v. Bruen*, 142 S. Ct. 2111, 2156 (2022) ("*NYSRPA*").

On July 1, 2022, New York State passed the Concealed Carry Improvement Act ("CCIA"), which generally replaced the "proper cause" standard with (1) a definition of the "good moral character" that is required to complete the license application or renewal process, (2) the requirement that the applicant provide a list of current and past social-media accounts, the names and contact information of family members, cohabitants, and at least four character references, and "such other information required by the licensing officer," (3) a requirement that the applicant attend an in-person interview, (4) the requirement of 18 hours of in-person and "live-fire" firearm training in order to complete the license application or renewal process, and (5) a list of "sensitive locations" and "restricted locations" where carrying arms is prohibited. 2022 N.Y. Sess. Laws ch. 371.

The current action is the second attempt by Plaintiff Antonyuk to challenge certain provisions of the CCIA. The first attempt, made by him alone against Defendant Bruen alone, resulted in a dismissal without prejudice for lack of standing. *See Antonyuk v. Bruen*, 22-CV-0734, 2022 WL 3999791, at *15-16 (N.D.N.Y. Aug. 31, 2022) (hereinafter referred to as

"*Antonyuk I*"). In his second attempt, Plaintiff Antonyuk stands with five like-minded

individuals, and asserts essentially the same claims as in *Antonyuk I* but against nine additional

Defendants. (Dkt. No. 1.) *Cf. Antonyuk I*, 22-CV-0732, Complaint (N.D.N.Y. filed July 11,

2022).

Generally, in their Complaint, Plaintiffs assert three claims against Defendants: (1) a

claim for violating the Second Amendment (as applied to the states through the Fourteenth

Amendment), pursuant to 42 U.S.C. § 1983; (2) a claim for violating the First Amendment

pursuant to 42 U.S.C. § 1983; and (3) a claim for violating the Fifth Amendment pursuant to 42

U.S.C. § 1983. (*Id*.) Each of these claims challenge one or more of the following nine aspects in

the revised law: (a) its definition of "good moral character"; (b) its requirement that the applicant

disclose a list of his or her "former and current social media accounts . . . from the past three

years to confirm the information regarding applicant's character and conduct as required

[above]"; (c) its requirement that the applicant list the names and contact information of family

members and cohabitants; (d) its requirement that the applicant list at least four "character

references" who can attest to the applicant's "good moral character"; (e) its requirement that the

applicant provide "such other information" required by the licensing officer"; (f) its requirement

that the applicant attend an in-person interview by the licensing officer; (g) its requirement that

the applicant receive a minimum of 16-hours of in-person firearm training and two-hours of

"live-fire" firearm training, at his or her own expense (which they estimate to be "around $400");

(h) its definition of "sensitive locations"; and (i) its definition of "restricted locations." (*Id*.)[1]

---

[1]     Because of the similarity between *Antonyuk I* and this case, the Court accepted the
assignment of this case as being "related" to *Antonyuk I* under General Order 12 of this District.
The Court rejects the State Defendants' argument that it erred by accepting the assignment of

On September 22, 2022, Plaintiffs filed the current motion for a Temporary Restraining Order and motion for a Preliminary Injunction. (Dkt. No. 6.)   On September 28, 2022, the State Defendants and the Oswego County Defendants submitted their briefs in opposition to Plaintiffs' motion for a Temporary Restraining Order. (Dkt. Nos. 17, 18.) On September 29, 2022, the Court conducted oral argument. (Dkt. No. 23.) At the end of oral argument, the Court reserved decision and stated that a decision would follow. This is that decision.[2]

## II.    GOVERNING LEGAL STANDARD

### A.    Procedural Standard

---

this case. (Dkt. No. 18, at 10.) In support of their argument, the State Defendants cite only the portion of the governing standard. (Dkt. No. 18, at 10, citing N.D.N.Y. Gen. Ord. 12(G)(3) for the language, "A civil case shall not be deemed related to another civil case merely because the civil case: (a) involves similar legal issues, or (b) involves the same parties."].) The omitted portion of the governing standard states as follows: "A civil case is 'related' to another civil case for purposes of this guideline when, because of the similarity of facts and legal issues or because the cases arise from the same transaction or events, a substantial saving of judicial resources is likely to result from assigning the case to the same Judge and Magistrate Judge."   N.D.N.Y. Gen. Ord. 12(G)(3). Here, the two cases at issue involve more than "similar legal issues" or "the same parties." They involve almost entirely the *same* legal issues (the second case asserting the same claims as the first case under the First, Second, and Fourteenth Amendments, along with a recharacterized claim under the Fifth Amendment). They also involve two of the same parties and many of the same factual issues, arising from largely the same transaction or events (the most important of which is the passage of the CCIA). All of these facts have resulted in a substantial saving of judicial resources to the Court during the two-week period since Plaintiffs' motion was filed.

[2]    The Court notes that, after oral argument on September 29, 2022, the City Defendants filed a brief in opposition to Plaintiffs' motion. (Dkt. No. 20.) Although the City Defendants' brief violates the Court's prohibition against incorporating by reference arguments in other briefs, the Court has considered the City Defendants' brief. The Court notes also that, on September 30, 2022, counsel for Defendant Fitzpatrick, Conway and Stanzione filed a Notice of Appearance (although they did not file opposing briefs). (Dkt. Nos. 24, 25, 26.) Finally, Defendant Soares has neither appeared through counsel nor filed a brief in opposition to Plaintiffs' motion. (*See generally* Docket Sheet.)

Rule 65 of the Federal Rules of Civil Procedure governs temporary restraining orders and preliminary injunctions. Fed. Rule Civ. P. 65(a), (b). In the Second Circuit, the standard for issuance of a temporary restraining order is the same as the standard for a preliminary injunction. *Fairfield Cnty. Med. Ass'n v. United Healthcare of New England*, 985 F. Supp. 2d 262, 270 (D. Conn. 2013), *aff'd as modified sub nom. Fairfield Cnty. Med. Ass'n v. United Healthcare of New England, Inc.*, 557 F. App'x 53 (2d Cir. 2014); *AFA Dispensing Grp. B.V. v. Anheuser–Busch, Inc.*, 740 F. Supp. 2d 465, 471 (S.D.N.Y. 2010) ("It is well established that the standard for an entry of a temporary restraining order is the same as for a preliminary injunction.").

Generally, in the Second Circuit, a party seeking a preliminary injunction must establish the following three elements: (1) that there is either (a) a likelihood of success on the merits and a balance of equities tipping in the party's favor or (b) a sufficiently serious question as to the merits of the case to make it a fair ground for litigation and a balance of hardships tipping decidedly in the party's favor; (2) that the party will likely experience irreparable harm if the preliminary injunction is not issued; and (3) that the public interest would not be disserved by the relief. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (reciting standard limited to first part of second above-stated element and using word "equities" without the word "decidedly"); *accord, Glossip v. Gross*, 135 S. Ct. 2726, 2736-37 (2015); *see also Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 825 (2d Cir. 2015) (reciting standard including second part of second above-stated element and using words "hardships" and "decidedly"); *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 38 (2d Cir. 2010) (holding that "our venerable standard for assessing a movant's probability of success on the merits remains valid [after the Supreme Court's decision in *Winter*]").

With regard to the first part of the first element, a "likelihood of success" requires a demonstration of a "better than fifty percent" chance of success. *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985), *disapproved on other grounds, O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349, n.2 (1987). "A balance of equities tipping in favor of the party requesting a preliminary injunction" means a balance of the hardships against the benefits. *See, e.g., Ligon v. City of New York,* 925 F. Supp.2d 478, 539 (S.D.N.Y. 2013) (characterizing the balancing "hardship imposed on one party" and "benefit to the other" as a "balanc[ing] [of] the equities"); *Jones v. Nat'l Conference of Bar Examiners,* 801 F. Supp. 2d 270, 291 (D. Vt. 2011) (considering the harm to plaintiff and any "countervailing benefit" to plaintiff in balancing the equities); *Smithkline Beecham Consumer Healthcare, L.P. v. Watson Pharm., Inc.,* 99-CV-9214, 1999 WL 34981557, at *4-5 (S.D.N.Y. Sept. 13, 1999) (considering the harm to defendant and the "benefit" to consumers in balancing the equities); *Arthur v. Assoc. Musicians of Greater New York*, 278 F. Supp. 400, 404 (S.D.N.Y. 1968) (characterizing "balancing the equities" as "requiring plaintiffs to show that the benefit to them if an injunction issues will outweigh the harm to other parties"); *Rosenstiel v. Rosenstiel*, 278 F. Supp. 794, 801-02 (S.D.N.Y. 1967) (explaining that, in order to "balance the equities," the court "will consider the hardship to the plaintiff . . . , the benefit to [the] plaintiff . . . , and the relative hardship to which a defendant will be subjected") [internal quotation marks omitted].[3]

With regard to the second part of the first element, "[a] sufficiently serious question as to the merits of the case to make it a fair ground for litigation" means a question that is so

---

[3]     *See also Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12, n.2 ( 7th Cir. 1992) ("Weighing the equities as a whole favors X, making preliminary relief appropriate, even though the *undiscounted* balance of harms favors Y.") [emphasis added].

"substantial, difficult and doubtful" as to require "a more deliberate investigation." *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953); *accord, Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197, 1205-06 (2d Cir. 1970).[4] "A balance of hardships tipping decidedly toward the party requesting a preliminary injunction" means that, as compared to the hardship suffered by the other party if the preliminary injunction is granted, the hardship suffered by the moving party if the preliminary injunction is denied will be so much greater that it may be characterized as a "real hardship," such as being "driven out of business . . . before a trial could be held." *Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*, 601 F.2d 48, 58 (2d Cir. 1979); *Int'l Bus. Mach. v. Johnson*, 629 F. Supp.2d 321, 333-34 (S.D.N.Y. 2009); *see also Semmes Motors, Inc.,* 429 F.2d at 1205 (concluding that the balance of hardships tipped decidedly in favor of the movant where it had demonstrated that, without an injunctive order, it would have been forced out of business as a Ford distributor).[5]

---

[4]     *See also Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997); *Rep. of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988); *City of Chanute v. Kansas Gas and Elec. Co.,* 754 F.2d 310, 314 (10th Cir. 1985); *R.R. Yardmasters of Am. v. Penn. R.R. Co.*, 224 F.2d 226, 229 (3d Cir. 1955).

[5]     The Court notes that, under the Second Circuit's formulation of this standard, the requirement of a balance of *hardships* tipping *decidedly* in the movant's favor is apparently added only to the second part of the first element (i.e., the existence of a sufficiently serious question as to the merits of the case to make it a fair ground for litigation), and not also to the first part of the first element (i.e., the existence of a likelihood of success on the merits), which (again) requires merely a balance of *equities* (i.e., hardships and benefits) tipping in the movant's favor. *See Citigroup Global Markets, Inc.*, 598 F.3d at 36 ("Because the moving party must not only show that there are 'serious questions' going to the merits, but must additionally establish that 'the balance of hardships tips decidedly' in its favor . . . , its overall burden is no lighter than the one it bears under the 'likelihood of success' standard.") (internal citation omitted); *cf. Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp.2d 186, 192 (E.D.N.Y. 2013) ("[T]he *Winter* standard . . . requires the balance of equities to tip in the movant's favor, though not necessarily 'decidedly' so, even where the movant is found likely to succeed on the merits.").

With regard to the second element, "irreparable harm" is "certain and imminent harm for which a monetary award does not adequately compensate." *Wisdom Import Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 113 (2d Cir. 2003). Irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chem., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999).

With regard to the third element, the "public interest" is defined as "[t]he general welfare of the public that warrants recognition and protection," and/or "[s]omething in which the public as a whole has a stake[,] esp[ecially], an interest that justifies governmental regulation." *Black's Law Dictionary* at 1350 (9th ed. 2009).

The Second Circuit recognizes three limited exceptions to the above-stated general standard. *Citigroup Global Markets, Inc.*, 598 F.3d at 35, n.4.

First, where the moving party seeks to stay government action taken in the public interest pursuant to a statutory or regulatory scheme, the district court should not apply the less-rigorous "serious questions" standard but should grant the injunction only if the moving party establishes, along with irreparable injury, a likelihood that he will succeed on the merits of his claim. *Id.* (citing *Able v. United States*, 44 F.3d 128, 131 [2d Cir. 1995]); *see also Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014) ("A plaintiff cannot rely on the 'fair-ground-for-litigation' alternative to challenge governmental action taken in the public interest pursuant to a statutory or regulatory scheme.") (internal quotation marks omitted). This is because "governmental policies implemented through legislation or regulations

developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." *Able,* 44 F.3d at 131.

Second, a heightened standard–requiring both a "clear or substantial" likelihood of success and a "strong" showing of irreparable harm"–is required when the requested injunction (1) would provide the movant with all the relief that is sought and (2) could not be undone by a judgment favorable to the non-movant on the merits at trial. *Citigroup Global Markets, Inc.*, 598 F.3d at 35, n.4 (citing *Mastrovincenzo v. City of New York*, 435 F.3d 78, 90 [2d Cir. 2006]); *New York v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) ("When either condition is met, the movant must show [both] a 'clear' or 'substantial' likelihood of success on the merits . . . *and* make a 'strong showing" of irreparable harm' . . . .") (emphasis added).

Third, the above-described heightened standard may also be required when the preliminary injunction is "mandatory" in that it would "alter the status quo by commanding some positive act," as opposed to being "prohibitory" by seeking only to maintain the *status quo*. *Citigroup Global Markets, Inc.*, 598 F.3d at 35, n.4 (citing *Tom Doherty Assocs. v. Saban Entm't*, 60 F.3d 27, 34 [2d Cir. 1995]).[6]  As for the point in time that serves as the *status quo*, the Second Circuit has defined this point in time as "the last actual, peaceable uncontested status which preceded the pending controversy." *LaRouche v. Kezer*, 20 F.3d 68, 74, n.7 (2d Cir. 1994); *accord, Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014); *Actavis PLC*, 787 F.3d at 650.

---

[6]     Alternatively, in such a circumstance, the "clear or substantial likelihood of success" requirement may be dispensed with if the movant shows that "extreme or very serious damage will result from a denial of preliminary relief." *Citigroup Global Markets, Inc.*, 598 F.3d at 35, n.4 (citing *Tom Doherty Assocs. v. Saban Entm't*, 60 F.3d 27, 34 [2d Cir. 1995]).

Finally, the Court rejects the State Defendants' suggestion that the determinations rendered in this Decision are more appropriate for a decision on a motion for a preliminary injunction, because (on such a motion) they would have a sufficient opportunity to adduce historical analogues or expert testimony. (Dkt. No. 23, at 31 [Oral Argument Tr.].) As an initial matter, temporary restraining orders do not actually require an opportunity for such opposition papers or evidence. *See, e.g.,* Fed. R. Civ. P. 65(b)(2) (permitting such orders even without notice to the adverse party). In any event, the State Defendants had a reasonable opportunity, in their opposition papers and oral argument, to advise the Court of all historical statutes they believe to be analogues (including those presented to the Court in *Antonyuk I*). (Dkt. No. 8 [Text Order of Sept. 23, 2022, setting the deadline for the State Defendants' opposition papers as a full seven days after the filing of Plaintiffs' motion].) They simply chose not to do so (possibly because they knew the Court would take notice of those statutes anyway, as it has done). Moreover, although the oral argument scheduled in this action precluded the submission of testimony, the State Defendants had a reasonable opportunity (i.e., seven days) to include the declaration of an expert in their opposition papers (supporting their reliance on purported historical analogues and correcting any errors in the Court's dictum analysis on *Antonyuk I*).[7]

**B.    Substantive Standard**

The Second and Fourteenth Amendments protect an individual's right to "keep and bear arms for self-defense." *NYSRPA v. Bruen*, 142 S. Ct. 2111, 2125 (2022) (citing *D.C. v. Heller*,

---

[7]      Although the Court does not rely on this fact, it notes that the State Defendants had notice of the need for an expert *29 days* before the deadline for their opposition papers in this action, when they learned of the dismissal without prejudice of *Antonyuk I* (and the Court's dictum finding flaws in the CCIA) on August 31, 2022.

128 S. Ct. 2783 [2008] and *McDonald v. City of Chicago*, 130 S. Ct. 3020 [2010]). "[The] definition of 'bear' naturally encompasses public carry." *NYSRPA*, 142 S. Ct. at 2134.

"[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id*. at 2126, 2129-30. "To justify its [firearm] regulation, the government may not simply posit that the regulation promotes an important interest." *Id*. at 2126. Rather, the government must demonstrate that the firearm "regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. at 2126, 2130-31.

"[T]his historical inquiry . . . will often involve reasoning by analogy . . . ." *NYSRPA*, 142 S. Ct. at 2132. Such "analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id*. at 2133. On the other hand, "courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted.'" *Id*. at 2133 (internal quotation marks omitted).

To "enabl[e] [courts] to assess which similarities are important and which are not" during this analogical inquiry, they must use at least "two metrics," which are "central" considerations to that inquiry: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *NYSRPA*, 142 S. Ct. at 2132-33. More specifically, courts must consider the following: (1) "whether modern and historical regulations impose a comparable burden on the right of armed self-defense"; and (2) "whether that [regulatory] burden is comparably justified." *Id.* at 2133.

Granted, in some cases, this inquiry "will be fairly straightforward." *NYSRPA*, 142 S. Ct. at 2131. For example, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id*. "Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id*. "And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality." *Id*.

However, "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *NYSRPA*, 142 S. Ct. at 2132. This is because "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id*. Nonetheless, "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id*.

## III.   ANALYSIS

### A.   Standing

After carefully considering the matter, the Court finds that Plaintiffs have sufficiently shown that they each have standing and that each Defendant is a proper party for the reasons stated in their Complaint, declarations, motion papers, and oral argument. (*See, e.g.,* Dkt. No. 1, at ¶¶ 2-18, 132-232 [Plfs.' Compl.]; Dkt. No. 1, Attach. 3 [Johnson Decl.]; Dkt. No. 1, Attach. 4 [Sloane Decl.]; Dkt. No. 1, Attach. 5 [Leman Decl.]; Dkt. No. 1, Attach. 8 [Antonyuk Decl.];

Dkt. No. 1, Attach. 9 [Mann Decl.]; Dkt. No. 1, Attach. 10 [Terrille Decl.]; Dkt. No. 6, Attach. 1, at 3-14 [attaching pages "1" through "12" of Defs.' Memo. of Law]; Dkt. No. 23, at 4-21, 41-48 [Oral Argument Tr.].) To those reasons, the Court adds the following analysis.

With regard to all Plaintiffs, the Court observes that only "one plaintiff [need] have standing to seek each form of relief requested in the complaint." *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734 (2008). Here, the Court finds that, with regard to each form of relief requested in the complaint, at least one Plaintiff has standing for the reasons stated by Plaintiffs.

With regard to the Oswego County Defendants' argument that Plaintiff Mann lacks standing, Plaintiff Mann has alleged—and repeatedly sworn in a declaration—that he possesses a concrete intention to carry his firearm in his church (which is adjacent to his residence, where he possesses that firearm). (Dkt. No. 1, at ¶¶ 183-84, 188, 191-95 [Compl.]; Dkt. No. 1, Attach. 9, at ¶¶ 4, 12, 16, 20, 25, 28, 30-33 [Mann Decl.].) Plaintiffs have also adduced evidence that, on July 13, 2022, Defendant Hilton publicly stated that he would be enforcing the CCIA (albeit "conservative[ly]"); on July 20, 2022, Defendant Hilton publicly stated, "Under the new law, taking a legally licensed firearm into any sensitive area–such as a … church …[–]is a felony punishable by up to 1 1/3 to 4 years in prison"; and on August 31, 2022, Defendant Hilton publicly stated, "If you own a firearm please be aware of these new laws as they will effect [sic] all gun owners whether we agree with them or not." (Dkt. No. 1, Attach. 9, ¶ 24 [Mann Decl.].) This is sufficient to establish a credible threat of prosecution under the case law cited in *Antonyuk I*, 2022 WL 3999791, at *15-16.

With regard to the Oswego County Defendants' argument that Defendant Hilton is not a proper Defendant, the Court rejects that argument because of his particular duty (and

willingness) to enforce the CCIA in Oswego County (including Plaintiff Man's church). (Dkt. No. 1, Attach. 9, ¶ 24 [Mann Decl.].) As his defense counsel acknowledged during oral argument, "[T]hat's his job." (Dkt. No. 23, at 40 [Oral Argument Tr.)[8]

With regard to the State Defendants' argument that Defendants Hochul, Bruen and Doran are improper Defendants, the Court finds that, although the Court certainly may ultimately find that Defendant Hochul is not a proper party,[9] that issue is more appropriately left for consideration on a more-fully briefed motion for a preliminary injunction; and Plaintiffs have alleged and shown their injuries to be fairly traceable to Defendants Bruen and Doran. Defendant Bruen is a proper Defendant to the extent explained in *Antonyuk I*, 2022 WL 3999791, at *10-15, i.e., due to his involvement of the enforcement of the CCIA's sensitive-location provision and restricted-location provision by state police members, and his involvement in requiring a certification of competition of 18-hours of firearm training in concealed-carry applications).

Furthermore, Defendant Doran is a proper Defendant because he is a relevant licensing officer, as was New York State Supreme Court Justice Richard J. McNally, Jr., in *N.Y. State Rifle & Pistol Assoc., Inc. v. Bruen*, 142 S. Ct. 2111 (2022) ("*NYSRPA*") ("Respondents are the superintendent of the New York State Police, who oversees the enforcement of the State's licensing laws, and a New York Supreme Court justice, who oversees the processing of licensing applications in Rensselaer County."). In response to the State Defendants' argument that

---

[8]     The Court notes that, during oral argument, counsel for the Oswego County Defendants stated that they are not disputing that Defendant Oakes (the District Attorney of Oswego County) is a proper Defendant. (Dkt. No. 23, at 53 [Oral Argument Tr.].)

[9]     *See Antonyuk I*, 2022 WL 3999791, at *14 ("Authority exists for the point of law that the Governor … might *not* be proper defendants (regardless of whether they were named solely in his or her official capacity).") (collecting cases; emphasis in original).

Defendant Doran has not yet actually denied the application of one of the Plaintiffs, the Court

finds that (to the extent the filing of such an application is required to establish standing) such an

application would be futile for each of two independent reasons.

First, the State Defendants appeared to acknowledge during oral argument that Defendant

Doran would essentially be *required* to deny an application that omits a list of social media

accounts, character references and family members (*see, e.g.,* Dkt. No. 23, at 28, 37 [Oral

Argument Tr.]), as Plaintiff Sloane has sworn that his application will (Dkt. No. 1, Attach. 4, at

¶¶ 7, 10, 15-16 [Sloane Decl.]). Second, in any event, Plaintiffs have adduced evidence that

Defendant Conway (the Sheriff of Onondaga County) would not even be considering such an

application until October of 2023 due to a lack of available appointments (Dkt. No. 1, Attach. 4,

at ¶ 23 [Sloane Decl.]), which delay (regardless of how routine it may be in New York State)

would effectively deny him his Second Amendment right. *See NYSRPA*, 142 S. Ct. at 2138, n.9

("That said, because any permitting scheme can be put toward abusive ends, we do not rule out

constitutional challenges to shall-issue regimes where, for example, lengthy wait times in

processing license applications . . . deny ordinary citizens their right to public carry.").

B.      **Substantial Likelihood of Success on the Merits**

Before analyzing Plaintiffs' substantial likelihood of success on the merits of their

claims, the Court makes two observations.

First, with regard to which historical statutes constitute analogues, the Court

acknowledges (as stated above in Part II.B. of this Decision) that a "historical twin" is not

required. However, because the title "analogue" generally requires a thing to be so similar to

another thing as to be useful for some purpose (such as a determination of whether the two things form part of the same tradition),[10] generally, a historical statute cannot earn the title "analogue" if it is clearly more distinguishable than it is similar to the thing to which it is compared. *See id.* ("[C]ourts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted."). More specifically, as stated above in Part II of this Decision, an assessment of "which similarities are important and which are not" depends on (1) "whether modern and historical regulations impose a comparable burden on [a law-abiding citizen's] right of armed self-defense," and (2) "whether that [regulatory] burden is comparably justified." *Id.* at 2132-33.

Second, with regard to how many historical analogues constitute a "tradition," the Court declines to adopt a "majority of states" standard.[11] *Cf. Firearms Policy Coalition v. McGraw,*

---

[10]     *See, e.g., Webster's New College Dictionary* 41 (3d ed. Houghton Mifflin Harcourt 2008) (defining "analogue" as "[o]ne that bears an analogy to another," defining "analogous" as "[c]orresponding in a way that allows the drawing of an analogy," and defining "analogy" as "[c]orrespondence in some respects between otherwise dissimilar things" or "[a] form of logical inference, or an instance of it, based on the assumption that if two things are known to be alike in some respects, then they must be alike in other respects"); *The New Oxford American Dictionary* 54-55 (Oxford Univ. Press 2001) (defining "analogue" as "a person or thing seen as comparable to another," defining "analogous" as "comparable in certain respects, typically in a way that makes clearer the nature of the things compared," and defining "analogy" as "a comparison between two things, typically on the basis of their structure and for the purpose of explanation or clarification").

[11]     The Court notes that, in *Antonyuk I*, the Court took notice of the law in the "vast majority" of other states, not merely "the majority" of other states. *Antonyuk,* 2022 WL 3999791, at *34 ("Although Defendant cites some historical analogs for restricting firearms at some of the above-listed locations, he often ignores the fact that [the] *vast* majority of the other states (of which there were 14 in 1791 and 37 in 1868) did not have statutes restricting firearms at those very locations (suggesting that Defendant's 'historical analogs' might represent exceptions to a tradition more than a tradition), and that some of the states even had contrary statutes (for example, statutes regarding carrying in places of worship and educational institutions.").

18

21-CV-1245, 2022 WL 3656996, at *11 (N.D. Tex. Aug. 31, 2022) the ("[H]istorical record

before the Court establishes (at most) that between 1856 and 1892, approximately twenty

jurisdictions (of the then 45 states) enacted laws that restricted the ability of those under 21 to

'purchase or use firearms.'"). However, the Court observes that the definition of a "tradition"

often involves the passing on of a belief or custom from one generation to another.[12]  As a result,

generally, one historical analogue (especially if relatively short-lived)[13]  would not seem to

suffice, appearing more as an aberration or anomaly than as a tradition (with no followers).[14]

Furthermore, while two such historical analogues can come closer to constituting a tradition,

they can also appear as a mere trend.[15]  As a result, the Court generally has looked to instances

where there have been three or more such historical analogues (specifically, three or more

---

[12]     *See, e.g., Webster's New College Dictionary* 1196 (3d ed. Houghton Mifflin Harcourt 2008) (defining "tradition" as "[a] mode of thought or behavior passed from one generation to another," or "[c]ustoms and usages transmitted from one generation to another and viewed as a coherent body of precedents influencing the present"); *The New Oxford American Dictionary* 1974 (Oxford Univ. Press 2001) (defining "tradition" as "the transmission of customs or beliefs from generation to generation, or the fact of being passed on in this way"); *cf. Peabody Twentymile Mining, LLC v. Sec'y of Labor*, 931 F.3d 992, 997 (10th Cir. 2019) (defining "tradition" as "[a] long established and generally accepted custom or method of procedure, having almost the force of a law" or "[a] time-honored practice.").

[13]     *See NYSRPA*, 142 S. Ct. at 2155 ("[T]hese territorial restrictions deserve little weight because they were . . . short lived.").

[14]     *See D.C. v. Heller*, 554 U.S. 570, 632 (2008) ("[W]e would not stake our interpretation of the Second Amendment upon a single law ... that contradicts the overwhelming weight of other evidence....").

[15]     *See Ezell v. City of Chicago*, 651 F.3d 684, 706 (7th Cir. 2011) (finding that two historical statutes "falls far short of establishing that [a regulated activity] is wholly outside the Second Amendment as it was understood" in 1791"); *Illinois Ass'n of Firearms Retailers*, 961 F. Supp. 2d 928, 937 (N.D. Ill. 2014) ("[C]itation to a few isolated statutes—even to those from the appropriate time period—fall[s] far short of establishing that gun sales and transfers were historically unprotected by the Second Amendment") (internal quotation marks omitted).

historical analogues from states, given that such analogues from territories deserve less weight under *NYSRPA*, 142 S. Ct. at 2154-55).

With these observations in mind, the Court proceeds to an analysis of the merits of Plaintiffs' constitutional challenges.

### 1. "Good Moral Character"

The CCIA's "good moral character" standard appears fatally flawed in two respects. First, it omits the qualifying phrase "other than in self-defense" for the reasons described in *Antonyuk I*, 2022 WL 3999791, at *26-29.[16] Second, and more importantly, the Court interprets the Supreme Court's decision in *NYSRPA* as endorsing a standard that effectively compels (or at least expressly permits) a state to issue a carry license unless the licensing officer finds that the applicant is likely to use the handgun in a manner that endangers oneself or others (other than in self-defense) according to a standard that can fairly be called "objective" (e.g., by a preponderance of the evidence[17] based on the applicant's conduct).[18] However, instead, the

---

[16]    The Court rejects the State Defendants' argument that the Court's analysis here "runs afoul of the doctrine of constitutional avoidance" (Dkt. No. 18, at 6 [State Defs.' Opp'n Brief]), because the construction proffered by the State Defendants is implausible, given (1) the otherwise-detailed nature of the CCIA, (2) the omission of the "other than in self-defense" exception from the CCIA's express language, and (3) the important role that the idea of "self-defense" plays when one is construing the Second Amendment. With regard to the State Defendants' similar argument that no omission of this exception actually exists because N.Y. Penal Law § 35.15(1) essentially permits a person to use a gun in self-defense (*id.*), the Court rejects that argument for the same three reasons, in addition to the fact that the inquiry on an application to carry concealed is different from the inquiry in a criminal proceeding.

[17]    *See, e.g.,* Ga. Code Ann. § 16-11-129 (Supp. 2021) ("The court shall grant the petition for relief if such court finds *by a preponderance of the evidence* that the person will not likely act in a manner dangerous to public safety in carrying a weapon and that granting the relief will not be contrary to the public interest."); 430 Ind. Code 66 § 20 (2021) (permitting denial of an application "[i]f the Board determines *by a preponderance of the evidence* that the applicant

CCIA expressly *prohibits* the issuance of a license unless the licensing officer finds (meaning

---

poses a danger to himself or herself or others, or is a threat to public safety …") (emphasis added); Va. Code. § 18.2-308.09(13) (allowing a judge to reject a licensing request if "the court finds, *by a preponderance of the evidence*, based on specific acts by the applicant," that the applicant "is likely to use a weapon unlawfully or negligently to endanger others") (emphasis added); *cf*. Minn. Stat. § 624.714 (2020) ("The court must issue its writ of mandamus directing that the permit be issued … unless the sheriff establishes by *clear and convincing evidence* … that there exists a substantial likelihood that the applicant is a danger to self or the public if authorized to carry a pistol under a permit.") (emphasis added).

18      *See, e.g.,* Colo. Rev. Stat. § 18-12-203(2) (allowing a sheriff to deny a permit if he or she "has a reasonable belief that *documented previous behavior by the applicant* makes it likely the applicant will present a danger to self or others if the applicant receives a permit") (emphasis added); Iowa Code § 724.8 (2022) (allowing the denial of a license where "[p]robable cause exists to believe, based *upon documented specific actions of the person*, where at least one of the actions occurred within two years immediately preceding the date of the permit application, that the person is likely to use a weapon unlawfully or in such other manner as would endanger the person's self or others") (emphasis added); Me. Rev. Stat. Ann., Tit. 25, § 2003(4) (Cum. Supp. 2022) (defining "good moral character" based on the "reckless or negligent *conduct*" of the applicant" and "information of record relative to *incidents*" involving the applicant) (emphasis added); Minn. Stat. § 624.714 (2020) (providing that "*[i]ncidents of alleged criminal misconduct that are not investigated and documented may not be considered*" during a danger assessment) (emphasis added); Mo. Rev. Stat. § 571.101 (2016) (requiring a permit to be issued if the applicant "[h]as not engaged in a pattern of *behavior*, *documented* in public or closed records, that causes the sheriff to have a reasonable belief that the applicant presents a danger to himself or others") (emphasis added); Utah Code § 53-5-704(3) (2022) (permitting the denial of a "firearm permit if it has reasonable cause to believe that the applicant or permit holder has been or is a danger to self or others *as demonstrated by evidence*, including … past *pattern of behavior* involving unlawful violence or threats of unlawful violence [or] … past *participation in incidents* involving unlawful violence or threats of unlawful violence") (emphasis added); Va. Code. § 18.2-308.09(13) (allowing a judge to reject a licensing request if "the court finds, by a preponderance of the evidence, *based on specific acts by the applicant*," that the applicant "is likely to use a weapon unlawfully or negligently to endanger others") (emphasis added); Wyo. Stat. Ann. § 6-8-104 (2021) ("The [sheriff's] written report shall state facts known to the sheriff which establish reasonable grounds to believe that the applicant has been or is reasonably likely to be a danger to himself or others, or to the community at large as a result of the applicant's mental or psychological state, as *demonstrated by a past pattern or practice of behavior*, or *participation in [certain] incidents* …").The Court notes that, as interpreted by Connecticut's highest court, Conn. Gen. Stat. § 29-28(b) (2021) permits a license unless the licensing officer finds that applicant's "*conduct* has shown them" to be lacking the essential character of temperament necessary to be entrusted with a weapon. *NYSRPA*, 142 S. Ct. at 2123, n.1 (emphasis added).

unless the applicant *persuades* him or her through providing much information, including "such other information required by review of the licensing application that is reasonably necessary and related to the review of the licensing application") that the applicant is of "good moral character," which involves undefined assessments of "temperament," "judgment" and "[]trust[]." Setting aside the subjective nature of these assessments, shouldering an applicant with the burden of showing that he or she is of such "good moral character" (in the face of a de facto presumption that he or she is *not*) is akin to shouldering an applicant with the burden of showing that he or she has a special need for self-protection distinguishable from that of the general community, which is prohibited under *NYSRPA*. In essence, New York State has replaced its requirement that an applicant show a special need for self-protection with its requirement that the applicant rebut the presumption that he or she is a danger to himself or herself, while retaining (and even expanding) the open-ended discretion afforded to its licensing officers.

Simply stated, instead of moving toward becoming a shall-issue jurisdiction, New York State has further entrenched itself as a shall-not-issue jurisdiction. And, by doing so, it has further reduced a first-class constitutional right to bear arms in public for self-defense (which, during the 19th and 18th centuries in America, generally came with an assumption that law-abiding responsible citizens were not a danger to themselves or others unless there was specific ground for a contrary finding) into a mere request (which is burdened with a presumption of dangerousness and the need to show "good moral character"). *See NYSRPA*, 142 S. Ct. at 2156 ("The constitutional right to bear arms in public for self-defense is not a

second-class right, subject to an entirely different body of rules than the other Bill of Rights

guarantees.") (internal quotation marks omitted).

In support of the CCIA's "good moral character" requirement, the State Defendants rely

on precedent permitting them to deny firearms to those posing a danger to themselves or others

(other than in self-defense). (*See, e.g.,* Dkt. No. 18, at 4-6 [State Defs.' Opp'n Brief]; Dkt. No.

23, at 25-27 [Oral Argument Tr.].) However, generally, the historical statues forming the basis of

that precedent treated people as being entitled to a firearm unless they pose (or more specifically

are *found* by the government to pose) such a danger.[19]  The CCIA, on the other hand, as stated

above, provides that people are *not* entitled to carry concealed unless they can *persuade* a

licensing officer (who possesses enormous discretion) that they are not such a danger.

Defendants argue that Plaintiffs' facial challenge must be rejected unless they establish

"that no set of circumstances exists under which the regulation would be valid." *Jacoby &*

*Meyers, LLP v. Presiding Justices*, 83 F.3d 178, 184 (2d Cir. 2017).[20]  Defendants further argue

---

[19]      *See, e.g.,* Act of Mar. 14, 1776, ch. VII, 1775-1776 Mass. Act at 31-32, 35
(recommending "the disarming of such persons … *who refuse to associate to defend by arms the*
*United American Colonies*, against the hostile attemps of the British fleets and armies …")
(emphasis added); 1777 Pa. Laws 61 An Act, Obliging the Male White Inhabitants of this State
to Give Assurances of Allegiance to the Same, ch. XXI, § 4 ("That every person above the age
aforesaid *refusing or neglecting to take and subscribe the said oath or affirmation* … shall be
disarmed by the lieutenant or sublieutenants of the city or countries respectively.") (emphasis
added); Va. Act of May 5, 1777, ch. 3 in 9 Hening's Statutes at Large 281-82 (1821) ("And the
justices tendering such oath or affirmation [of Allegiance] are hereby directed to deliver a list of
the names of such *recusants* to the county lieutenant, or chief commanding officer of the militia,
who is hereby authorised and directed forthwith to cause such recusants to be disarmed.")
(emphasis added).

[20]      For the sake of brevity, the Court will assume this standard applies, although the Supreme
Court has allowed a facial challenge to a statute when the statute would unconstitutionally
impact a fundamental right in "a large fraction" of the cases to which the statute applies. *See*
*Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 895 (1992) ("The unfortunate

Plaintiffs have not made this showing because a circumstance can exist in which (1) the licensing officer understands that the "good moral character" provision of the CCIA essentially ends in the words "other than in self-defense," and (2) the licensing officer applies the "good moral character" provision of the CCIA as if it operates more as a "shall issue" regime that is more objective in nature. Unfortunately for Defendants, the Court finds that those are the *only* circumstances under which the "good moral character" provision may be valid under the Constitution. More specifically, the Court finds that the "good moral character" provision of the CCIA can be rendered constitutional only if it were considered as containing the following changes (with deleted words being struck out and new words being underlined):

> ~~No~~ A license shall be issued or renewed except for an applicant . . . who has been found, by a preponderance of the evidence based on his or her conduct,[21]

---

yet persisting conditions we document above will mean that in a large fraction of the cases in which § 3209 is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion. It is an undue burden, and therefore invalid."), *overruled on other grounds*, Dobbs v. Jackson Women's Health Organization, 142 S. Ct. 2228 (2022).

[21]     The Court notes that such a "preponderance of the evidence" standard appears akin to those historical analogues that condition the denial of a right to be arms on a *likelihood* of danger (which is essentially a finding that there is more evidence that danger will occur than there is evidence that it will not occur). *See, e.g.,* 1855 Ill. Criminal Code 365, Offenses Against the Persons of Individuals, Div. V, § 43 (proscribing instances in which a person "shall willfully and maliciously, or by agreement, fight a duel or single combat with any engine, instrument or weapon, the *probable* consequence of which might be the death of either party …"). Such historical analogues include those based on what counsel for the State Defendants have called "a continued belief that Catholics were *likely* to engage in conduct that would harm themselves or others and upset the peace." *Antonyuk I*, 22-CV-0734, Def.'s Opp'n Memo. of Law, at 27-28 (N.D.N.Y. filed Aug. 15, 2022) (emphasis added) (citing statutes). Less deserving of weight, of course, are those later historical analogues from territories. *See, e.g.,* William Lair Hill, *Ballinger's Annotated Codes and Statutes of Washington* (Vol. 2, 1897), 1881 Flourishing Deadly Weapon ("Every person who shall in a manner *likely* to cause terror to the people passing, exhibit or flourish, in the streets of an incorporated city or unincorporated town, any dangerous weapon, shall be deemed guilty of a misdemeanor …." ) (emphasis added); Bruce L. Keenan, *Book of Ordinances of the City of Wichita* Carrying Unconcealed Deadly Weapons, § 2 (1899) ("Any person who shall in the city of Wichita carry unconcealed, any fire-arms,

<u>to not be</u> of good moral character, which . . . shall mean having the essential character, temperament and judgment necessary . . . to use [the weapon entrusted to the applicant] only in a manner that does not endanger oneself or others, <u>other than in self-defense</u>.

N.Y. Penal Law § 400.00(1)(b). As a result, the Court orders Defendants to so construe those provisions when performing their duties in their official capacities.

### 2.    List of Four Character References

The Court begins its analysis of this provision by acknowledging the apparent dearth of historical analogues requiring a responsible, law-abiding citizen to provide character references in order to be permitted to carry a gun.[22] However, just as lacking, it appears, are historical analogues requiring a responsible, law-abiding citizen to even *apply* to be able to carry a gun.

---

slungshot, sheath or dirk knife, or any other weapon, which when used is *likely* to produce death or great bodily harm, shall upon conviction, be fined not less than one dollar nor more than twenty-five dollars.") (emphasis added). Taken together, however, the Court finds that these historical analogues suffice to establish a tradition of requiring a likelihood of danger. Finally, the Court notes that such a standard carries the added benefit of providing for a more-meaningful review during any appeal from such a finding.

[22]    *See* 1832 Del. Laws 208, § 1 ("[I]f upon application of any such free negro or free mulatto to one of the justices of the peace of the county in which such free negro or free mulatto resides, it shall satisfactorily appear upon the *written certificate of five or more respectable and judicious citizens of the neighborhood*, that such free negro or free mulatto is a person of *fair character*, and that the circumstances of his case justify his keep and using a gun, then and in every such case it shall and may be lawful for such justice to issue a license or permit under his hand and authorizing such free negro or free mulatto to have use and keep in his posession a gun or fowling piece") (emphasis added); Ordinances of Jersey City, Passed By The Board Of Aldermen March 31, 1871, § 3 ("[I]n all cases the court shall require *a written endorsement of the propriety of granting a permit from at least three reputable freeholder*s ….") (emphasis added); 1881 Ordinances of the Mayor, Aldermen and Commonalty of the City of New York art. XXVII, § 265 ("[T]he officer in command at the station-house … shall give said person *a recommendation* to the superintendent of police, or the inspector in command at the central office in the absence of the superintendent ….") (emphasis added). The Court notes that it relies on the first above-cited statute despite how much it may find that statute to be racist and abhorrent.

The Court imagines that historically this application requirement was not common only because the need to restrict gun possession in a geographical area rarely existed. In any event, in those instances where the need did exist (for whatever reason), it is difficult to imagine the absence of an accompanying need to *verify* the statements made in the application (through one or more character references). Indeed, in each of these three historical analogues cited above in note 22 of this Decision, a reference requirement accompanied the application requirement. For these reasons, the Court lets this provision stand.

### 3.      List of Family and Cohabitants

Far more invasive and onerous than a demand for a list of character references, however, appears to be a demand for the "names and contact information for the applicant's current spouse, or domestic partner, any other adults residing in the applicant's home, including any adult children of the applicant, and whether or not there are minors residing, full time or part time, in the applicant's home" (as set forth in Section 1 of the CCIA). Indeed, none of the three historical analogues cited above in note 22 of this Decision contain such a demand. Moreover, the Court finds that no such circumstances exist under which this provision would be valid (other than a circumstance in which the provision was not enforced, which of course is no circumstance at all). As a result, the Court orders its enforcement temporarily restrained.

### 4.      List Social Media Accounts for Past Three Years

Based on the briefing so far in this action (and the briefing in *Antonyuk I*), the Court finds that an insufficient number of historical analogues exists requiring a list of social media accounts for the past three years, for purposes of Section 1 of the CCIA. For example, Defendants have adduced no historical analogues requiring persons to disclose the pseudonyms they have used

while publishing political pamphlets or newspaper articles (which might be considered to be akin to requiring the disclosure of all one's social-media accounts).[23] Moreover, the Court finds that no such circumstances exist under which this provision would be valid (other than a circumstance in which the provision was not enforced). As a result, the Court orders its enforcement temporarily restrained.

### 5.   "Such Other Information Required by the Licensing Officer"

Although the Court can find no historical analogues supporting this requirement (other than perhaps the three historical analogues cited above in note 22 of this Decision), and although this requirement certainly appears to exacerbate the open-ended discretion referenced above in Part III.B.1. of this Decision, the Court can imagine a set of circumstances in which it is constitutionally valid (other than non-enforcement): for example, if the licensing officer were to require only very minor follow-up information from an applicant (such as identifying information). As a result, the Court will let this provision stand for now, although it is willing to revisit the issue during the briefing and hearing on Plaintiffs' motion for a Preliminary Injunction.

### 6.   Eighteen Hours of Firearm Training

The Court has been persuaded by Defendants that historically Americans' familiarity with firearms was far more common than it is today; and it is has not yet been persuaded by Plaintiffs that the CCIA's firearm-training requirements are so onerous as to fall within the scope of what the Supreme Court in *Bruen* called "exorbitant." *NYSRPA*, 142 S. Ct. at 2138, n.9 ("That

---

[23]     Indeed, such historical analogue would be surprising given that the Constitution—and sometimes the Bill of Rights—was vigorously debated in public by individuals who both used pseudonyms and carried guns.

said, because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or *exorbitant* fees deny ordinary citizens their right to public carry.") (emphasis added). As a result, the Court lets that provision stand for now.

### 7.   In-Person Meeting

Unlike an application without character references, the Court can easily imagine an application without an in-person meeting. Indeed, in only one of the three historical analogues cited above in note 22 of this Decision was a reference requirement accompanied by an in-person-meeting requirement. Moreover, that analogue was a city statute,[24] the general reliance on which the Supreme Court has expressed disapproval. *See NYSRPA*, 142 S. Ct. at 2154 ("[T]he bare existence of these localized restrictions cannot overcome the overwhelming evidence of an otherwise enduring American tradition permitting public carry."). Moreover, the Court finds that no such circumstances exist under which this provision would be valid (other than a circumstance in which the provision was not enforced). As a result, the Court orders this provision's enforcement temporarily restrained.

### 8.   Prohibition in "Sensitive Locations"

The CCIA sets forth the following list of "sensitive locations" where concealed carry is prohibited:

---

[24]    *See* Ordinances of Jersey City, Passed By The Board Of Aldermen March 31, 1871, § 3. ("All applications for permits shall be made *in open court*, by the applicant *in person*, and in all cases the court shall require a written endorsement of the propriety of granting a permit from at least three reputable freeholders ....") (emphasis added).

(a) any place owned or under the control of federal, state or local government, for the purpose of government administration, including courts;

(b) any location providing health, behavioral health, or chemical dependance care or services;

(c) any place of worship or religious observation;

(d) libraries, public playgrounds, public parks, and zoos;

(e) the location of any program licensed, regulated, certified, funded, or approved by the office of children and family services that provides services to children, youth, or young adults, any legally exempt childcare provider; a childcare program for which a permit to operate such program has been issued by the department of health and mental hygiene pursuant to the health code of the city of New York;

(f) nursery schools, preschools, and summer camps;

(g) the location of any program licensed, regulated, certified, operated, or funded by the office for people with developmental disabilities;

(h) the location of any program licensed, regulated, certified, operated, or funded by office of addiction services and supports;

(i) the location of any program licensed, regulated, certified, operated, or funded by the office of mental health;

(j) the location of any program licensed, regulated, certified, operated, or funded by the office of temporary and disability assistance;

(k) homeless shelters, runaway homeless youth shelters, family shelters, shelters for adults, domestic violence shelters, and emergency shelters, and residential programs for victims of domestic violence;

(l) residential settings licensed, certified, regulated, funded, or operated by the department of health;

(m) in or upon any building or grounds, owned or leased, of any educational institutions, colleges and universities, licensed private career schools, school districts, public schools, private schools licensed under article one hundred one of the education law, charter schools, non-public schools, board of cooperative educational services, special act schools, preschool special education programs, private residential or non-residential schools for the education of students with disabilities, and any state-operated or state-supported schools;

(n) any place, conveyance, or vehicle used for public transportation or public transit, subway cars, train cars, buses, ferries, railroad, omnibus, marine or aviation transportation; or any facility used for or in connection with service in the transportation of passengers, airports, train stations, subway and rail stations, and bus terminals;

(o) any establishment issued a license for on-premise consumption pursuant to article four, four-A, five, or six of the alcoholic beverage

control law where alcohol is consumed and any establishment licensed
under article four of the cannabis law for on-premise consumption;

(p) any place used for the performance, art entertainment, gaming,
or sporting events such as theaters, stadiums, racetracks, museums,
amusement parks, performance venues, concerts, exhibits, conference
centers, banquet halls, and gaming facilities and video lottery terminal
facilities as licensed by the gaming commission;

(q) any location being used as a polling place;

(r) any public sidewalk or other public area restricted from general
public access for a limited time or special event that has been issued a
permit for such time or event by a governmental entity, or subject to
specific, heightened law enforcement protection, or has otherwise had
such access restricted by a governmental entity, provided such location is
identified as such by clear and conspicuous signage;

(s) any gathering of individuals to collectively express their
constitutional rights to protest or assemble;

(t) the area commonly known as Times Square, as such area is
determined and identified by the city of New York; provided such area
shall be clearly and conspicuously identified with signage.

2022 N.Y. Sess. Laws ch. 371, § 4 (codified at N.Y. Penal Law § 265.01-e[2]).

Before proceeding to an analysis of the historical justification for the CCIA's list of

sensitive locations, the Court makes two observations. First, although the Supreme Court has not

altogether barred the expansion of sensitive locations beyond schools, government buildings,

legislative assemblies, polling places and courthouses, it has indicated a skepticism of such an

expansion based on the historical record. *See NYSRPA*, 142 S. Ct. 2133 ("[T]he historical record

yields *relatively few* 18th- and 19th-century 'sensitive places' where weapons were altogether

prohibited . . . [other than, for example, legislative assemblies, polling places, and

courthouses].") (emphasis added); *Heller*, 554 U.S. at 626 ("Although we do not undertake an

exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our

opinion should be taken to *cast doubt* on longstanding prohibitions on . . . laws forbidding the

carrying of firearms in sensitive places such as schools and government buildings . . . .")
(emphasis added).

Second, although this Court has found that most of the CCIA's list of "sensitive
locations" violate the Constitution, the Court does so not because the list (or a portion of the list)
must rise or fall in its entirety but because Defendants have simply not met their burden of
"sift[ing] the historical materials for evidence to sustain New York State's statute." *NYSRPA*, 142
S. Ct. at 2150. The Court respectfully reminds Defendants that, because the Second
Amendment's plain text covers the conduct in question (carrying a handgun in public for
self-defense), "the Constitution presumptively protects that conduct." *NYSRPA*, 142 S. Ct. at
2126. Defendants must then rebut the presumption by "demonstrate[ing] that the regulation is
consistent with this Nation's historical tradition of firearm regulation." *Id*. This they have not yet
done.

a.      **Places Controlled by Federal, State or Local Government**

Fortunately, the Court need not collect in a footnote citations to the many historical
analogues restraining the right to carry a firearm in "any place owned or under the control of
federal, state or local government, for the purpose of government administration, including
courts" as stated in paragraph "2(a)" of Section 4. This is because the Supreme Court has already
expressly acknowledged the permissibility of these restrictions. *See NYSRPA*, 142 S. Ct. 2133
("[T]he historical record yields relatively few 18th- and 19th-century 'sensitive places' where
weapons were altogether prohibited . . . [other than, for example, *legislative assemblies*, polling
places, and *courthouses*].") (emphasis added); *Heller*, 554 U.S. at 626 ("[N]othing in our opinion
should be taken to cast doubt on longstanding prohibitions on . . . laws forbidding the carrying of

firearms in sensitive places such as . . . government buildings . . . .”). As a result, this provision

may stand.

### b.     Polling Places

Just as common in the historical record as the exception for government buildings

(discussed above in Park III.B.7.a. of this part of the Decision) is the exception for locations

“being used as a polling place, as contained in paragraph “2(q)” of Section 4. *See NYSRPA*, 142

S. Ct. 2133 (“[T]he historical record yields relatively few 18th- and 19th-century ‘sensitive

places’ where weapons were altogether prohibited . . . [other than, for example, legislative

assemblies, *polling places*, and courthouses].”) (emphasis added). As a result, this provision may

stand.

### c.     Public Areas Restricted from General Public Access for a Limited Time by a Government Entity

For similar reasons as stated above in Part III.B.7.a. of this Decision, the Court finds that

grounds exist to also let stand for now the provision of the CCIA prohibiting concealed carry in

“any public sidewalk or other public area restricted from general public access for a limited time

or special event that has been issued a permit for such time or event by a governmental entity, or

subject to specific, heightened law enforcement protection, or has otherwise had such access

restricted by a governmental entity, provided such location is identified as such by clear and

conspicuous signage” (as provided in paragraph “2(r)” of Section 4).

### d.     Places of Worship or Religious Observation

Based on the historical analogues, it is permissible for New York State to *generally*

restrict concealed carry in “any place of worship or religious observation” (as contained in

32

paragraph "2(c)" of Section 4.[25]  The Court emphasizes the word "generally" because, of the six

historical analogues the Court has located, half of them contain one or more of the following four

exceptions: (1) for those bound by "duty" to bear arms at the place of worship;[26]  (2) for those

possessing "good and sufficient cause" to carry a gun at the place of worship;[27]  (3) for those

---

[25]      *See* 1870 Ga. Laws 421 ("[N]o person in said State of Georgia be permitted or allowed to
carry about his or her person any ... pistol, or revolver ... to ... any place of public worship....");
1870 Tex. Laws 63 ("That if any person shall go into any church or religious assembly, ... and
shall have about his person ... fire-arms, whether known as a six shooter, gun or pistol of any
kind, such person so offending shall be deemed guilty of a misdemeanor, and on conviction
thereof shall be fined in a sum not less than fifty or more than five hundred dollars ...."); 1877 Va.
Acts 305, Offenses Against The Peace, § 21 ("If any person carrying any gun, pistol, … or other
dangerous weapon, to any place of worship while a meeting for religious purposes is being held
at such place, or without good and sufficient cause therefor, shall carry any such weapon on
Sunday at any place other than his own premises, shall be fined not less than twenty dollars. If
any offense under this section be committed at a place of religious worship, the offender may be
arrested on the order of a conservator of the peace, without warrant, and held until warrant can
be obtained, but not exceeding three hours."); 1883 Mo. Laws 76 ("If any person shall ... go into
any church or place where people have assembled for religious worship, ... having upon or about
his person any kind of fire-arms, ... he shall, upon conviction, be punished by a fine of not less
than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not
less than five days or more six months, or by both such fine and imprisonment."); 1889 Ariz.
Sess. Laws 16-17 ("If any person shall go into any church or religious assembly … and shall
have or carry about his person a pistol or other firearm … he shall be punished by a fine not less
than fifty nor more than five hundred dollars, and shall forfeit to the County the weapon or
weapons so found on his person."); The Statutes of Oklahoma, 1890, § 7 ("It shall be unlawful
for any person, except a peace officer, to carry into any church or religious assembly ... any of
the weapons designated in sections one and two of this article.").

[26]      *See* 1870 Tex. Laws 63 ("[T]his act shall *not apply to any person or persons whose duty
it is to bear arms* on such occasions in discharge of duties imposed by law.").

[27]      *See* 1877 Va. Acts 305, Offenses Against The Peace, § 21 ("If any person carrying any
gun, pistol, … or other dangerous weapon, to any place of worship while a meeting for religious
purposes is being held at such place*, or without good and sufficient cause therefor*, shall carry
any such weapon on Sunday at any place other than his own premises, shall be fined not less
than twenty dollars."); *cf.* The Revised Ordinances of the City of Huntsville, Missouri, of 1894, §
2 ("[I]it shall be good defense to the charge of carrying such weapon [in any church or place
where people have assembled for religious worship], if the defendant shall show that he has been

serving as "peace officers" at the place of worship;[28] and (4) for those for whom the place of worship is "his own premises."[29]  Together, these historical statutes suggest that there also exists a tradition of permitting an exception to this prohibition for those persons who have been tasked with the duty to keep the peace at the place of worship (particularly when the place of worship can fairly be characterized as those persons' "own premises").

This exception appears even more historically justified when one considers three facts: (1) the fact that the vast majority of the states in 1868 did *not* have this restriction at all (which appears to be what the Supreme Court might call a piece of "overwhelming evidence of an otherwise enduring American tradition" permitting the carrying of firearms in places of worship);[30] (2) the fact that one historical analogue exists actually *requiring* the carrying of firearms to church (at least to the extent that a church congregation may be characterized as a

---

threatened with great bodily harm, or had *good reason* to carry the same in the necessary *defense* of his home, *person or property*.").

[28]     *See* The Statutes of Oklahoma, 1890, § 7 ("It shall be unlawful for any person, *except a peace officer*, to carry into any church or religious assembly ... any of the weapons designated in sections one and two of this article.") (emphasis added); *cf.* The Revised Ordinances of the City of Huntsville, Missouri, of 1894, § 2 ("The … preceding section [prohibiting concealed carry any church or place where people have assembled for religious worship] shall not apply to … persons whose duty it is to … *suppress breaches of the peace* ….") (emphasis added).

[29]     *See* 1877 Va. Acts 305, Offenses Against The Peace, § 21 ("If any person carrying any gun, pistol, … or other dangerous weapon, to any place of worship while a meeting for religious purposes is being held at such place, or without good and sufficient cause therefor, shall carry any such weapon on Sunday at any place *other than his own premises*, shall be fined not less than twenty dollars.").

[30]     *See NYSRPA*, 142 S. Ct. at 2154 (balancing historical analogues restricting public carry against "the overwhelming evidence of an otherwise enduring American tradition permitting public carry").

"public meeting");[31] and (3) the fact that not recognizing such an exception treads close to infringing one's First Amendment right to practice religion by attending congregate religious services.

For all of these reasons, the Court finds that the Constitution demands that this provision contain an exception for those persons who have been tasked with the duty to keep the peace at the place of worship or religious observation. The Court therefore orders Defendants to so construe this provision when performing their duties in their official capacities.[32]

---

[31]     *See Records of the Colony of Rhode Island and Providence Plantations, in New England* 94 (John Russell Bartlett ed., 1856) ("[N]oe man shall go two miles from the Towne unarmed, eyther with Gunn or Sword; and that none shall come to *any public Meeting* without his weapon."). The Court acknowledges that this statute is somewhat farther removed from the relevant time periods (1791 or 1868) than the other historical statutes cited in this Decision. However, the Court does not construe *NYSRPA* as treating relevance as controlled by an on-off switch (permitting historical analogues from one year to be considered, but prohibiting consideration of those from the year before). Rather, the Court construes *NYSRPA* as treating relevance as controlled by a sort of dimmer switch whose slide lever darkens a room at the top and bottom of the control panel but fills the room with light as it approaches the middle (representing our insight into the public understanding of the amendments that were ratified by three-fourths of the state legislatures in 1791 and 1868). For these reasons, the Court finds that the above-cited analogue may be considered but as having less weight. The Court also notes that it does not base its Decision on the historical statutes from the 1600s (even though they may arguably show how "enduring" the tradition was in 1791). *See* 1 William Waller Hening, *The Statutes at Large: Being a Collection of all the Laws of Virginia, from the First Session of the Legislature* 126, 173, 263 (1808) (citing 1632 Virginia statute providing that "ALL men that are fittinge to beare armes, shall bringe their pieces to the church," 1632 Virginia statute providing that "masters of every family shall bring with them to church on Sundays one fixed and serviceable gun with sufficient powder and shott," 1643 Virginia statute requiring that "masters of every family shall bring with them to church on Sundays one fixed and serviceable gun with sufficient powder and shott," and similar 1676 Virginia law).

[32]     The Court notes that, although it is unclear whether this prohibition applies to Plaintiff Mann while he is in his residence (which is part of the same structure than encloses his church), it is also true that a reasonable licensing officer could properly apply the prohibition as not applying to him while he is in that residence. A closer question is presented with regard to whether the prohibition applies to Plaintiff Mann while he is overseeing "Bible studies, meetings of elders, and other church gatherings" in his residence. (Dkt. No. 1, Attach. 9, at ¶ 13 [Mann

e.        **Schools, Colleges, and Universities**

Based on the historical analogues, it appears permissible for New York State to restrict

concealed carry in the following two places: (1) "nursery schools" and "preschools" (as

contained in paragraph "2(f)" of Section 4); and (2) "any building or grounds, owned or leased,

of any educational institutions, colleges and universities, licensed private career schools, school

districts, public schools, private schools licensed under article one hundred one of the education

law, charter schools, non-public schools, board of cooperative educational services, special act

schools, preschool special education programs, private residential or non-residential schools for

the education of students with disabilities, and any state-operated or state-supported schools" (as

contained in paragraph "2(m)" of Section 4).[33]   *See Heller*, 554 U.S. at 626 ("[N]othing in our

---

Decl.].) However, again, the Court finds that a reasonable licensing officer could properly apply
the prohibition as not applying to him in such circumstances.

[33]      *See* 1870 Tex. Laws 63 ("That if any person shall go into ... any school room or other
place where persons are assembled for educational, literary or scientific purposes, ... and shall
have about his person ... fire-arms, whether known as a six shooter, gun or pistol of any kind,
such person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof
shall be fined in a sum not less than fifty or more than five hundred dollars...."); 1883 Mo. Laws
76 ("If any person shall ... go ... into any school-room or place where people are assembled for
educational, literary or social purposes, ... having upon or about his person any kind of firearms,
... he shall, upon conviction, be punished by a fine of not less than twenty-five nor more than two
hundred dollars, or by imprisonment in the county jail not less than five days or more six
months, or by both such fine and imprisonment."); 1889 Ariz. Sess. Laws 16-17 ("If any person
shall go into … any school room, or other place where persons are assembled for amusement or
for educational or scientific purposes … and shall have or carry about his person a pistol or other
firearm… he shall be punished by a fine not less than fifty nor more than five hundred dollars,
and shall forfeit to the County the weapon or weapons so found on his person."); The Statutes of
Oklahoma, 1890, § 7 ("It shall be unlawful for any person, except a peace officer, to carry into
any ... any school room or other place where persons are assembled for ... for educational ...
purposes ... any of the weapons designated in sections one and two of this article."); *cf.* Univ. of
Va. Bd. of Visitors Minutes (Oct. 4-5, 1824) ("No *student* shall, within the precincts of the
university ... keep or use weapons or arms of any kind, or gunpowder.") (emphasis added); 1878
Miss. Laws, An Act To Prevent The Carrying Of Concealed Weapons And For Other Purposes,

opinion should be taken to cast doubt on longstanding prohibitions on . . . laws forbidding the carrying of firearms in sensitive places such as . . . schools . . . .”). However, the Court cannot find these historical statutes analogous to a prohibition on “summer camps” (as contained in paragraph “2(f)” of Section 4).

As a result, this provision may stand for now (except for the prohibition on concealed carry in “summer camps.”).

### f.    Places or Vehicles Used for Public Transportation

Based on the historical analogues located thus far, it does not appear permissible for New York State to restrict concealed carry in “any place, conveyance, or vehicle used for public transportation or public transit, subway cars, train cars, buses, ferries, railroad, omnibus, marine or aviation transportation; or any facility used for or in connection with service in the transportation of passengers, airports, train stations, subway and rail stations, and bus terminals.” (as stated subsection “2(n)” of Section 4 of the CCIA). Indeed, historical analogues exist containing specific exceptions permitting the carrying firearms while travelling (presumably because of danger often inherent during travel).[34]

---

ch. 46, § 4 (“[A]ny *student* of any university, college or school, who shall carry *concealed*, in whole or in part, any weapon of the kind or description in the first section of this Act described, or any teacher, instructor, or professor who shall, knowingly, suffer or permit any such weapon to be carried by any student or pupil, shall be deemed guilty of a misdemeanor ….”) (emphasis added).

[34]    *See, e.g.,* 1813 Ky. Acts 100, An Act to Prevent Persons in this Commonwealth from Wearing Concealed Arms, Except in Certain Cases, ch. 89, § 1 (“[A]ny person in this Commonwealth, who shall hereafter wear a pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon, unless when travelling on a journey, shall be fined ….”); Robert Looney Caruthers, *A Compilation of the Statutes of Tennessee* (1836), An Act of 1821, § 1 (“Every person so degrading himself by carrying … belt or pocket pistols, either public or private, shall pay a fine of five dollars for every such offence …: Provided, that nothing herein contained shall

g.      **Public Assemblies**

Based on the historical analogues, it appears permissible for New York State to restrict

concealed carry in "any gathering of individuals to collectively express their constitutional rights

to protest or assemble" (as contained in paragraph "2(s)" of Section 4).[35]  As a result, this

provision may stand.

---

affect any person that may be on a journey to any place out of his county or state."); Josiah
Gould, *A Digest of the Statutes of Arkansas, All Laws of a General and Permanent Character in
Force the Close of the Session of the General Assembly* 381-82 (1837) ("Every person who shall
wear any pistol … concealed as a weapon, unless upon a journey, shall be adjudged guilty of a
misdemeanor."); 1841 Ala. Acts 148–49, Of Miscellaneous Offences, ch. 7, § 4 ("Everyone who
shall hereafter carry concealed about his person, a … pistol or any species of firearms, or air gun,
unless such person shall … be travelling, or setting out on a journey, shall on conviction, be
fined not less than fifty nor more than three hundred dollars …."); 1844 Mo. Laws 577, An Act
To Restrain Intercourse With Indians, ch. 80, § 4 ("[N]o person shall … give … to any Indian …
any … gun … unless such Indian shall be traveling through the state …."); 1871 Tex. Laws 25,
An Act to Regulate the Keeping and Bearing of Deadly Weapons ("[T]his section shall not be so
construed as to … prohibit persons traveling in the State from keeping or carrying arms with
their baggage …."); 1878 Miss. Laws 175, An Act To Prevent The Carrying Of Concealed
Weapons And For Other Purposes, ch. 46, § 1 ("[A]ny person not … traveling (not being a
tramp) or setting out on a long journey … , who carries concealed, in whole or in part, any …
pistol, … shall be deemed guilty of a misdemeanor …."); 1899 Annotated Statutes of the Indian
Territory (Oklahoma), Carrying Weapons, § 1250 ("[N]othing in this act be so construed as to
prohibit any person from carrying any weapon when upon a journey …."); *cf.* Charters and
Ordinances of the City of Memphis, from 1826 to 1867 ("Any person who … gives to any minor
a pistol …, except a … weapon for defense in traveling, is guilty of a misdemeanor.").

[35]      *See* 1869-70 Tenn. Pub. Acts 23-24 ("[I]t shall not be lawful ... for any person attending
any ... public assembly of the people, to carry about his person, concealed or otherwise, any
pistol ...."); 1870 Ga. Laws 421 ("[F]rom and immediately after the passage of this act, no person
in said State of Georgia be permitted or allowed to carry about his or her person any ... pistol, or
revolver … to … any … public gathering in this State, except militia muster-grounds."); 1870
Tex. Gen. Laws 63, An Act Regulating The Right To Keep And Bear Arms, Chap. 46, § 1 ("That
if any person shall go into … any … public assembly, and shall have about his person …
fire-arms, whether known as a six shooter, gun or pistol of any kind, such person so offending
shall be deemed guilty of a misdemeanor ...."); 1883 Mo. Laws 76 (prohibiting anyone from
"having upon or about his person any kind of firearms" in areas including "any other public
assemblage of persons met for any lawful purpose other than for militia drill"); 1889 Ariz. Sess.
Laws 16-17 ("If any person shall go into … any … public assembly… and shall have or carry

### h.    Places Used for Entertainment or Amusement and Places Where Alcoholic Beverages Are Consumed

Based on the historical analogues located thus far, it does not appear permissible for New York State to restrict concealed carry in the following two places: (1) "any place used for the performance, art entertainment, gaming, or sporting events such as theaters, stadiums, racetracks, museums, amusement parks, performance venues, concerts, exhibits, conference centers, banquet halls, and gaming facilities and video lottery terminal facilities as licensed by the gaming commission" (as stated in subsection "2(p)" of the CCIA), and (2) "any establishment issued a license for on-premise consumption pursuant to article four, four-A, five, or six of the alcoholic beverage control law where alcohol is consumed and any establishment licensed under article four of the cannabis law for on-premise consumption" (as stated in subsection "2(o)" of the CCIA).

For example, a historical statute exists prohibiting persons from carrying firearms in establishments where alcoholic beverages are consumed (analogous to subsection "2(o)" of Section 4 of the CCIA).[36]  However, setting aside the fact that Oklahoma was merely a territory

---

about his person a pistol or other firearm… he shall be punished by a fine not less than fifty nor more than five hundred dollars, and shall forfeit to the County the weapon or weapons so found on his person."); The Statutes of Oklahoma, 1890, § 7 ("It shall be unlawful for any person, except a peace officer, to carry into any … any political convention, or to any other public assembly, ... any of the weapons designated in sections one and two of this article.").

[36]     *See* The Statutes of Oklahoma, 1890, § 7 ("It shall be unlawful for any person, except a peace officer, to carry into … any place where intoxicating liquors are sold ... any of the weapons designated in sections one and two of this article.").

in 1890 (thus depriving this statute of any more than "little weight," pursuant to *NYSRPA*),[37] one

example does not a tradition make.

Similarly, three historical statutes exist prohibiting persons from carrying firearms in

"ball rooms" or "social parties" (arguably analogous to the CCIA's ban on guns in "amusement

parks, performance venues, concerts, exhibits, conference centers, banquet halls, and gaming

facilities" as stated in subsection "2(p)" of the CCIA).[38]  However, even setting aside the obvious

distinctions between a private dinner party and a public water park, two of the three statutes were

from territories.

Granted, one might argue that a gathering in a theater or bar is an "assembly" in that it is

a collection of three or more individuals at the same place, and that it is "public" in that it is

created by and in front of people (and thus such locations are among those that comprise the

"public assemblies" discussed above in Part III.B.7.g. of this Decision). However, the historical

statutes do not appear to support such an argument. Furthermore, while the Court has located

---

[37]    *See NYSRPA*, 142 S. Ct. at 2154-55 (finding the statutes of territories deserving of "little weight" because they were "localized," "rarely subject to judicial scrutiny" and "short lived").

[38]    *See* 1870 Tex. Gen. Laws 63, An Act Regulating The Right To Keep An d Bear Arms, Chap. 46, § 1 ("That if any person shall go into … a ballroom, social party or other social gathering composed of ladies and gentlemen, … and shall have about his person … fire-arms, whether known as a six shooter, gun or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor …."); 1889 Ariz. Sess. Laws 16-17 ("If any person shall go into any … place where persons are assembled … for amusement, … or into any circus, show or public exhibition of any kind, or into any ball room, or any social party or social gathering … and shall have or carry about his person a pistol or other firearm… he shall be punished by a fine not less than fifty nor more than five hundred dollars, and shall forfeit to the County the weapon or weapons so found on his person."); The Statutes of Oklahoma, 1890, § 7 ("It shall be unlawful for any person, except a peace officer, to carry into any … place where persons are assembled … for amusement, … or into any circus, show or public exhibition of any kind, or into any ball room, or any social party or social gathering ... any of the weapons designated in sections one and two of this article.").

nineteenth-century dictionaries defining the word "assembly," it has not yet located a

nineteenth-century dictionary defining the more-specialized term "public assembly."[39] To the

extent the term "public assembly" appears somewhat like the term "popular assembly," it is

worth acknowledging that, in the nineteenth century, the term "popular assembly" was defined

differently than the word "assembly."[40] Moreover, this nineteenth-century definition of the term

"popular assembly," similar to how the Court has construed the term "public assembly" in this

Decision, appears to involve a focus on one's constitutional rights.[41]

---

[39]     *See, e.g., Webster's Complete Dictionary* 83 (Chauncey Goodrich & Noah Porter 1886)
(defining "assembly" as "[a] company of persons collected together in one place, and usually for
some common purpose").

[40]     *See, e.g., Bouvier Law Dictionary* 156 (Childs & Peterson 1856) (defining "assembly" as
"[t]he union of a number of persons in the same place," while defining "popular assembly" as
assemblies "where the people meet to deliberate upon their rights; these are guaranteed by the
constitution"); *Blacks Law Dictionary* 78-79 (T.H. Flood and Co. 1889) (defining "assembly" as
"[a]n intentional meeting, gathering, or concourse of people; of three or more persons in one
body; . . . of any number of persons in one place," while defining "popular assembly" as "[a]ny
meeting of the people to deliberate over their rights and duties with respect to government . . .
."); Henry Champbell Black, *Dictionary of Law* 95 (West Pub. 1891) (defining "assembly" as
"[t]he concourse or meeting together of a considerable number of persons at the same place,"
while defining "popular assembly" as "those where the people meet to deliberate upon their
rights").

[41]     Not surprisingly, twentieth-century cases defining "public assembly" vary widely (in
addition to being more than a century out of date). *See, e.g., Smith v. City of Montgomery*, 251 F.
Supp. 849, 853 (M.D. Ala. 1966) (analyzing a city ordinance that defined a "public assembly" as
"any parade, march, formation, procession, picket, group of pickets, pickets, picket line,
demonstration, movement, assemblage, muster or display of persons, animals, floats,
motor-vehicles or combinations thereof on the public sidewalks, streets, highways or other public
ways, for the purpose of presenting a cause; or for the purpose of expressing an opinion to the
general public on any particular issue; or for the purpose of protesting or influencing any state of
affairs or decision rendered or to be rendered thereon, whether political, economic or social; or
for the purpose of celebrating, marking or commemorating any past, present, or future event or
occurrence, whether historical or otherwise ..."); *City of Syracuse v. Farmers Elevator, Inc.*, 182
Neb. 783, 786 (Neb. 1968) ("While the defendants sought to restrict the meaning of 'Public
assembly,' we interpret it to mean a company of persons collected together in one place, which is

As a result, the Court orders the enforcement of these two provisions temporarily restrained.

### i.  Times Square

Based on the historical analogues located thus far, it does not appear permissible for New York State to restrict concealed carry in the following place: "the area commonly known as Times Square, as such area is determined and identified by the city of New York; provided such area shall be clearly and conspicuously identified with signage" (as stated in subsection "2(t) of the CCIA). Granted, one might argue that historical statutes banning the carrying of guns in "fairs or markets" are analogous to this prohibition. However, thus far, only two such statutes have been located.[42] Setting aside the fact that the first one appears to apply only to carrying a gun offensively ("in terror of the Country"), and the fact that the second one appears to depend on royal reign, as stated before, two statues do not make a tradition.

---

the definition given in Webster's New International Dictionary (2d Ed., Unabridged), p. 165."); *Rapaport v. Messina*, 262 N.Y.S. 815, 817 (N.Y. Sup. Ct., Westchester Cnty. 1965) (defining "place of public assembly," in accordance with N.Y. Labor Law, as including "(1) a theatre, (2) moving picture house, (3) assembly halls maintained or leased for pecuniary gain where one hundred or more persons may assemble for amusement or recreation, except (a) halls owned by churches, religious organizations, grange and public association and free libraries as defined by section two hundred fifty-three of the education law, (b) hotels having fifty or more rooms, (c) state and county fair grounds and buildings connected therewith, (d) grounds or buildings of agricultural societies or associations receiving state aid"); *cf. A Quaker Action Group v. Hickel*, 421 F.2d 1111, 1113, n.1 (D.C. Cir. 1969) (analyzing a Department of Interior regulation that defines "public gathering" as meaning "parades, ceremonies, entertainments, meetings, assemblies, and demonstrations. It does not include events for commercial purposes").

[42]     *See* 1786 Va. Laws 33, ch. 21, An Act Forbidding and Punishing Affrays ("[N]o man, great nor small, [shall] go nor ride armed by night nor by day, in *fair or markets … in terror of the Country* ….") (emphasis added); Francois Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina, 60-61 (Newbern 1792) ("[N]o man great nor small ... except the King's servants in his presence ... be so hardy to ... ride armed by night nor by day, in fairs [or] markets ….").

As a result, the Court orders the enforcement of this provision temporarily restrained.

**j.      All Other "Sensitive Locations"**

Based on the historical analogues presented to the Court thus far, the Court finds it impermissible for New York State to restrict concealed carry in the remaining 10 purported "sensitive locations" set forth in the CCIA: (1) "any location providing health, behavioral health, or chemical dependance care or services" (as stated in subsection "2(b)" of the CCIA); (2) "libraries, public playgrounds, public parks, and zoos" (as stated in subsection "2(d)" of the CCIA); (3) "the location of any program licensed, regulated, certified, funded, or approved by the office of children and family services that provides services to children, youth, or young adults, any legally exempt childcare provider; a childcare program for which a permit to operate such program has been issued by the department of health and mental hygiene pursuant to the health code of the city of New York" (as stated in subsection "2(e)" of the CCIA); (4) "summer camps" (as stated in subsection "2(f)" of the CCIA); (5) "the location of any program licensed, regulated, certified, operated, or funded by the office for people with developmental disabilities" (as stated in subsection "2(g)" of the CCIA); (6) "the location of any program licensed, regulated, certified, operated, or funded by office of addiction services and supports" (as stated in subsection "2(h)" of the CCIA); (7) "the location of any program licensed, regulated, certified, operated, or funded by the office of mental health" (as stated in subsection "2(i)" of the CCIA); (8) "the location of any program licensed, regulated, certified, operated, or funded by the office of temporary and disability assistance" (as stated in subsection "2(j)" of the CCIA); (9) "homeless shelters, runaway homeless youth shelters, family shelters, shelters for adults,

domestic violence shelters, and emergency shelters, and residential programs for victims of domestic violence" (as stated in subsection "2(k)" of the CCIA); and (10) "residential settings licensed, certified, regulated, funded, or operated by the department of health" (as stated in subsection "2(l)" of the CCIA).

Setting aside the lack of historical analogues supporting these particular provisions, in the Court's view, the common thread tying them together is the fact that they all regard locations where (1) people typically congregate or visit and (2) law-enforcement or other security professionals are--presumably--readily available. This is precisely the definition of "sensitive locations" that the Supreme Court in *NYSRPA* considered and rejected:

> In [Respondents'] view, 'sensitive places' where the government may lawfully disarm law-abiding citizens include all 'places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available.' . . . It is true that people sometimes congregate in 'sensitive places,' and it is likewise true that law enforcement professionals are usually presumptively available in those locations. But expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly. Respondents' argument would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense.

*NSYRPA*, 142 S. Ct. at 2133-34. Although historical analogues certainly exist prohibiting carrying firearms in specific places, no historical analogues have been provided prohibiting carrying firearms virtually everywhere, as the CCIA does.

As a result, the Court orders the enforcement of these remaining provisions temporarily restrained.

### 9.    Prohibition in "Restricted Locations"

During oral argument, counsel for the State Defendants defended the CCIA's "restricted location" provision (which prohibits license holders from carrying in other persons' buildings and or on their land, enclosed or not, unless expressly permitted to do so) on the ground that it enables a "homeowner . . . to make an informed decision" regarding who is and who is not allowed to bring a gun onto his or her property. (Dkt. No. 23, at 32-33 [Oral Argument Tr.].) The Court respectfully disagrees with that argument, because (through this prohibition) the State of New York is now making a decision for private property owners that they are perfectly able to make for themselves (and, in fact, did before the CCIA was enacted), as well as arguably compelling speech on a sensitive issue. In any event, however, this policy dispute is irrelevant, because it does not regard the Supreme Court's "historical tradition" standard.

The sole historical analogues provided for the CCIA's "restricted location" provision (which prohibit license holders from carrying in other persons' buildings and or on their land, enclosed or not, unless expressly permitted to do so) are three statutes prohibiting carrying firearms on other people's "inclosed" lands.[43] However, on their face, the *purpose*[44] of those

---

[43]     *See* James T. Mitchell et al., Statutes at Large of Pennsylvania from 1682 to 1801 vol III, p. 254 (Clarence M. Busch, Printer, 1896) (reprinting 1721 Pennsylvania statute reading, "[I]f any person or persons shall presume, ... to carry any gun or hunt on the improved or inclosed lands of any plantation other than his own, unless he have license or permission from the owner of such lands or plantation ... he shall for every such offense forfeit the sum of ten shillings"); 1741 N.J. Laws 101 ("[I]f any Person or Persons shall presume, at any Time after the Publication hereof, to carry any Gun, or hunt on the improved or inclosed Lands in any Plantation, other than his own, unless he have License or Permission from the Owner of such Lands or Plantation ... he shall, for every such Offence, forfeit the Sum of Fifteen Shillings, with Costs attending such Conviction."); 4 Digest of the Laws of Texas Containing the Laws in Force, and the Repealed Laws on Which Rights Rest, from 1754 to 1875 (reprinting 1866 Texas statute reading, "[I]t shall not be lawful for any person or persons to carry firearms on the inclosed premises or plantation of any citizen, without the consent of the owner or proprietor").

statutes appears to be merely to stop poaching. If this were not the case, then why did those statutes require the farmland to be enclosed? Defendants have not persuasively answered this question, and (again) it is their burden to do so; that is the unavoidable effect of the presumption recognized in *NYSRPA*.[45] As a result, the Court orders the enforcement of this provision temporarily restrained, except with regard to fenced-in farmland owned by another or fenced-in hunting ground owned by another.

### C.     Strong Showing of Irreparable Harm

Plaintiffs have made a strong showing that they will likely experience irreparable harm if the Temporary Restraining Order is not issued for the reasons stated in their motion papers and declarations, and the reasons stated in the Court's Decision and Order in *Antonyuk I*, 2022 WL 3999791, at *36.

Granted, due to the comparative lengths of time involved, a stronger likelihood exists that Defendants would be charged with violating the CCIA during the period between the Court's Decision on Plaintiffs' motion for a Preliminary Injunction and the final disposition of this action than during the period of the Court's Decision on Plaintiffs' motion for a Temporary Restraining Order and a decision on their motion for a Preliminary Injunction. However, a presumption of irreparable harm ordinarily arises from a strong showing of a constitutional deprivation "even when the violation persists for 'minimal periods' of time." *A.H. v. French*, 985 F.3d 165, 176,

---

[44]     *See NYSRPA*, 142 S. Ct. at 2132-33 (demanding a focus on "why the regulations burden a law-abiding citizen's right to armed self-defense") (emphasis added).

[45]     The Court notes that its reading of these cases is in accord with a decision from the Northern District of Illinois. *See Solomon v. Cook Cnty. Bd. of Comm'rs*, 559 F. Supp. 3d 675, 690-91 (N.D. Ill. 2021) (finding that the 1721 Pennsylvania statute and 1741 New Jersey statute both "primarily regulated hunting, not carrying for self-defense").

184 (2d Cir. 2021). This means (among other things) that the presumption arises regardless of *when* during the litigation that deprivation occurs (i.e., before a decision on a motion for a preliminary injunction or before the final disposition of an action).[46] Here, the Court has found that Plaintiffs have made such a strong showing of a constitutional injury for the reasons stated above in Part III.B. of this Decision.

Moreover, this presumption has not been rebutted. Four of the six Plaintiffs have alleged and sworn a concrete intention to violate the law in the immediate future. (*See, e.g.,* Dkt. No. 1, Attach. 3, at ¶¶ 8, 10-13, 16-17, 19, 21, 24 [Johnson Decl.]; Dkt. No. 1, Attach. 5, at ¶¶ 20-22, 32 [Leman Decl.]; Dkt. No. 1, Attach. 9, at ¶¶ 4, 12, 16, 20, 25, 28, 30-33 [Mann Decl.]; Dkt. No. 1, Attach. 10, at ¶¶ 7-9, 11-12, 15-16, 19-20 [Terrille Decl.].) They have also alleged and sworn most if not all of the Defendants' expressed willingness (to varying degrees) to enforce the challenged provisions of the CCIA. (Dkt. No. 1, at ¶¶ 9, 12-14, 17 [Compl.]; Dkt. No. 1, Attach. 3, at ¶¶ 22-23 [Johnson Decl.]; Dkt. No. 1, Attach. 5, at ¶ 22 [Leman Decl.]; Dkt. No. 1, Attach 6 [Notice of CCIA]; Dkt. No. 1, Attach 7 [Legal Bureau Bulletin]; Dkt. No. 1, Attach. 9, at ¶¶ 22-24 [Mann Decl.]; Dkt. No. 1, Attach. 10, at ¶ 21 [Terrille Decl.].) Finally, a fifth Plaintiff has alleged and sworn that applying for such a license in Onondaga County would be futile in the

---

[46] *See, e.g., Moxie Owl, Inc. v. Cuomo,* 21-CV-0194, 2021 WL 677915, at *3 (N.D.N.Y. Feb. 22, 2021) (D'Agostino, J.) (recognizing that this presumption applies when a plaintiff has shown a likelihood of success on the merits of his constitutional claim on a motion for a temporary restraining order, although subsequently finding that the plaintiff has not shown such a likelihood of success); *Kelly v. Santiago*, 18-CV-1796, 2019 WL 3574631, at *14 (D. Conn. Aug. 6, 2019) (applying this presumption on a motion for a temporary restraining order, although subsequently denying that motion based on the balance-of-hardships factor); *Smalls v. Wright*, 16-CV-2089, 2017 WL 2200909, at *2 (D. Conn. May 19, 2017) (presuming irreparable harm based on the alleged violation of constitution right on a motion for a temporary restraining order).

future (including the period of time before the Court decides Plaintiffs' motion for a Preliminary Injunction). (Dkt. No. 1, at ¶¶ 225-29 [Compl.]; Dkt. No. 1, Attach. 4, at ¶¶ 21, 23 [Sloane Decl.].) Defendants have not controverted these factual assertions. (*See generally* Dkt. Nos. 17, 18, 20, 23.)

Under the circumstances, the fact that Plaintiffs may stand an even greater chance of being arrested (or having an application ignored) later (during the period of time between a hearing on their motion for a Preliminary Injunction and the final disposition of this action) than now (during the period of time between now and when their motion for a Temporary Restraining Order) in no way diminishes the fact that they stand a sufficient chance of being arrested or having their application ignored now.

**D.     Balance of Equities and Service of Public Interest**

Plaintiffs have made a strong showing that balance of equities tips in their favor and that the public interest would not be disserved by the Court's granting of their motion for a Temporary Restraining Order for the reasons stated in their motion papers (Dkt. No. 6, Attach. 1, at 38-41 [attaching pages "36" through "39" of Plfs.' Memo. of Law]), and in the Court's Decision and Order in *Antonyuk I,* 2022 WL 3999791, at *36.

**E.     Other Considerations**

**1.     Security**

Plaintiffs should be, and are, excused from giving security because there has been no proof of any "costs and damages" that would have been sustained by any Defendant "found to have been wrongfully enjoined or restrained" under Fed. R. Civ. P. 65(c).[47]

### 2.    Duration

Good cause exists to extend the duration of this Temporary Restraining Order beyond the fourteen (14) days referenced in Fed. R. Civ. P. 65(b)(2) for such temporary restraining orders issued "without notice." More specifically, based on the strong showing made by Plaintiffs, and Defendants' unpersuasive response, this Temporary Restraining Order shall be in effect pending a hearing and ruling on Plaintiffs' motion for a preliminary injunction (which shall occur as expeditiously as possible based on that motion's briefing schedule). Currently, that briefing is scheduled to conclude on October 20, 2022.

### 3.    Stay Pending Appeal

Although the State Defendants have not persuaded the Court that this Temporary Restraining Order should be limited to the moving parties, the State Defendants have persuaded the Court that this Temporary Restraining Order should be stayed three business days to allow

---

[47]    *See Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir.1997) (affirming district court decision to not require a franchisor-plaintiff to post a bond for either of its injunctions because the franchisee-defendants "would not suffer damage or loss from being forced to arbitrate in lieu of prosecuting their state-court cases"); *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) ("Defendants have not shown that they will likely suffer harm absent the posting of a bond by [Plaintiff]."); *Clarkson Co. v. Shaheen*, 544 F.2d 624, 632 (2d Cir.1976) ("[B]ecause, under Fed. R. Civ. P. 65[c], the amount of any bond to be given upon the issuance of a preliminary injunction rests within the sound discretion of the trial court, the district court may dispense with the filing of a bond."); *Ferguson v. Tabah*, 288 F.2d 665, 675 (2d Cir.1961) ("[The phrase 'in such sum as the court deems proper'] indicates that the District Court is vested with wide discretion in the matter of security and it has been held proper for the court to require no bond where there has been no proof of likelihood of harm, or where the injunctive order was issued "to aid and preserve the court's jurisdiction over the subject matter involved.").

them to seek emergency relief in the Second Circuit. (Dkt. No. 18, at 10; Dkt. No. 23, at 19-20 [Oral Argument Tr.].) The Court finds that the State Defendants' exercise of their right to seek an immediate review by the Second Circuit is appropriate.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiffs' motion for a Temporary Restraining Order (Dkt. No. 6) is **GRANTED in part** and **DENIED in part** in accordance with this Decision; and it is further

**ORDERED** that Defendants, as well as their officers, agents, servants, employees, and attorneys (and any other persons who are in active concert or participation with them) are **TEMPORARILY RESTRAINED** from enforcing the following provisions of the Concealed Carry Improvement Act, 2022 N.Y. Sess. Laws ch. 371 ("CCIA"):

(1) the provisions contained in Section 1 of the CCIA requiring "good moral character" **EXCEPT** to the extent it is construed to mean that a license ***shall be*** issued or renewed except for an applicant who has been found, ***by a preponderance of the evidence based on his or her conduct***, to ***not*** have "good moral character," which is defined as "having the essential character, temperament and judgment necessary . . . to use [the weapon entrusted to the applicant] only in a manner that does not endanger oneself or others, ***other than in self-defense***";

(2) the provision contained in Section 1 of the CCIA requiring that the applicant "meet in person with the licensing officer for an interview";

(3) the provision contained in Section 1 of the CCIA requiring the "names and contact information for the applicant's current spouse, or domestic partner, any other adults residing in the applicant's home, including any adult children of the applicant, and whether or not there are minors residing, full time or part time, in the applicant's home";

(4) the provision contained in Section 1 of the CCIA requiring "a list of former and current social media accounts of the applicant from the past three years"; and

(5) the "sensitive locations" provision contained in Section 4 of the CCIA **EXCEPT** with regard to the following sensitive locations (where the restrictions remain):

(a) "any place owned or under the control of federal, state or local government, for the purpose of government administration, including courts" (as contained in paragraph "2(a)" of Section 4);

(b) "any location being used as a polling place" (as contained in paragraph "2(q)" of Section 4);

(c) "any public sidewalk or other public area restricted from general public access for a limited time or special event that has been issued a permit for such time or event by a governmental entity, or subject to specific, heightened law enforcement protection, or has otherwise had such access restricted by a governmental entity, provided such location is

identified as such by clear and conspicuous signage" (as contained in paragraph "2(r)" of Section 4);

(d) "any place of worship or religious observation" (as contained in paragraph "2(c)" of Section 4), **EXCEPT** for those persons who have been tasked with the duty to keep the peace at the place of worship or religious observation;

(e) "nursery schools" and "preschools" (as contained in paragraph "2(f)" of Section 4);

(f) "any building or grounds, owned or leased, of any educational institutions, colleges and universities, licensed private career schools, school districts, public schools, private schools licensed under article one hundred one of the education law, charter schools, non-public schools, board of cooperative educational services, special act schools, preschool special education programs, private residential or non-residential schools for the education of students with disabilities, and any state-operated or state-supported schools" (as contained in paragraph "2(m)" of Section 4);

(g) "any gathering of individuals to collectively express their constitutional rights to protest or assemble" (as contained in paragraph "2(s)" of Section 4); and

(6) the "restricted locations" provision contained in Section 5 of the CCIA **EXCEPT** for fenced-in farmland owned by another or fenced-in hunting ground owned by another (where the restriction stands); and it is further

ORDERED that Plaintiffs are **EXCUSED** from giving security; and it is further

ORDERED that this Temporary Restraining Order shall **REMAIN IN EFFECT**

pending a hearing and ruling on Plaintiffs' motion for a preliminary injunction (Dkt. No. 6); and

it is further

ORDERED that this Temporary Restraining Order is **STAYED** for **THREE (3)**

**BUSINESS DAYS**, from the date of this Decision, to allow Defendants to seek emergency relief

in the Second Circuit; and it is further

ORDERED that counsel for Plaintiffs shall promptly and personally serve this Decision

and Temporary Restraining Order on Defendant Soares (who has not yet appeared through

counsel in this action).

Dated: October 6, 2022

Glenn T. Suddaby
U.S. District Judge