# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

_____

IVAN ANTONYUK, et al.,

          Plaintiffs-Appellees,

v.

KATHLEEN HOCHUL, STEVEN A. NIGRELLI,     No. 22-2379
and MATTHEW J. DORAN,

          Defendants-Appellants,

WILLIAM FITZPATRICK, et al.,

          Defendants.

_____


## RESPONSE IN OPPOSITION TO DEFENDANTS-APPELLANTS' MOTION FOR A STAY PENDING APPEAL AND AN ADMINISTRATIVE STAY PENDING RESOLUTION OF THE MOTION

Stephen D. Stamboulieh     Robert J. Olson (VA # 82488)
Stamboulieh Law, PLLC     William J. Olson, PC
P.O. Box 428     370 Maple Ave. West, Suite 4
Olive Branch, MS  38654     Vienna, VA 22180-5615
(601) 852-3440     703-356-5070 (T)
stephen@sdslaw.us     703-356-5085 (F)
*Attorneys for Appellees*     wjo@mindspring.com
     *Application for admission forthcoming*

**Dated: October 11, 2022**

# TABLE OF CONTENTS

Introduction...................................................................................................1

Argument......................................................................................................2

I.      The District Court's Partial Grant of a Limited Temporary Restraining Order Is Not Appealable...............................................................2

     A.     The TRO Will Cause No Irreparable Harm to Appellants or the Public..............................................................................................3

     B.     Seeking a Stay of the TRO Is Far from the Only Way for Appellants to Challenge the District Court's Ruling.......................7

     C.     The District Court's Temporary Restraining Order Is Not an Order that Can be Properly Reviewed by this Court................................10

II.     Appellants Have Not Shown Entitlement to a Stay Pending Appeal.......12

     A.     Appellants Offer No Plausible Explanation as to How they Might Succeed on the Merits.....................................................................13

     B.     The Remaining Factors Do Not Support a Stay.............................17

III.    Appellants' Delay in Seeking Relief Weighs in Favor of Denying their Request for an Emergency Interim Administrative Stay........................19

Conclusion...................................................................................................20

Certificate of Compliance...........................................................................22

# TABLE OF AUTHORITIES

## Cases

*Airbnb, Inc. v. City of N.Y.*, 373 F. Supp. 3d 467 (S.D.N.Y. 2019)...........................6

*Antonyuk v. Bruen*, No. 22-cv-734, 2022 U.S. Dist. LEXIS 157874 (N.D.N.Y. Aug. 31, 2022) (*Antonyuk I*) ...................................................... 4, 8, 9, 10, 15, 20

*Carson v. American Brands, Inc*., 450 U.S. 79 (1981)..........................................3, 8

*ContiChem LPG v. Parsons Shipping Co.*, 229 F.3d 426 (2d Cir. 2000).................3

*D.C. v. Heller*, 554 U.S. 570 (2008) ..................................................................6, 14

*Dzhabrailov v. Decker*, No. 20-cv-3118 (PMH), 2020 U.S. Dist. LEXIS 91892 (S.D.N.Y. May 26, 2020) ..........................................................................6

*Leopard Marine & Trading, Ltd. v. Easy St. Ltd.*, 896 F.3d 174 (2d Cir. 2018) ....13

*Long Island R. Co. v. International Ass'n of Machinists*, 874 F.2d 901 (2d Cir. 1989) .............................................................................................9

*Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558 (6th Cir. 1982) ...................6

*McDonald v. Chicago*, 561 U. S. 742 (2010) ..........................................................6

*N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483 (2d Cir. 2013) ........................6

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) ................... passim

*Nken v. Holder*, 556 U.S. 418 (2009) ............................................................ 13, 14

*Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393 (2d Cir. 2004) ...............................13

*Rodriguez by Rodriguez v. DeBuono*, 175 F.3d 227 (2d Cir. 1998).......................19

*Romer v. Green Point Sav. Bank*, 27 F.3d 12 (2d Cir. 1994) ......................... 3, 7, 11

*Sajous v. Decker*, No. 18-cv-2447, 2018 U.S. Dist. LEXIS 86921, 2018 WL 2357266 (S.D.N.Y. May 23, 2018) ....................................................................7

*Uniformed Fire Officers Ass'n v. De Blasio*, 973 F.3d 41 (2d Cir. 2020).... 7, 12, 13

*United States v. Miller*, 14 F.3d 761 (2d Cir. 1994) .................................................8

*Yang*, *v. Kosinski*, 960 F.3d 119 (2d Cir. 2020).......................................................6

**Statutes**

28 U.S.C. § 1291 ................................................................................................2

28 U.S.C. § 1292(a)(1) ......................................................................................2

## INTRODUCTION

This case involves a challenge to New York's most recent attempt to infringe the Second Amendment right to bear arms. In response to the Supreme Court's recent vindication of the right to keep and bear arms in public in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), the state hastily enacted a poorly named and ineptly drafted statute called the "Concealed Carry Improvement Act" ("CCIA"). Rather than obey the *Bruen* decision, the CCIA thumbs its nose at the Supreme Court, making concealed carry far more restrictive, and the licensing process far more onerous, than it was before the Court's decision.

In the district court below, Plaintiffs-Appellees ("Appellees") filed suit seeking to enjoin the CCIA's patently unconstitutional provisions, seeking both a temporary restraining order and a preliminary injunction (ECF #1, 6). In response, the district court first offered Defendants-Appellants ("Appellants") the opportunity to submit briefing and to participate in oral argument and, only then, issued a temporary restraining order, enjoining certain parts of the CCIA, allowing others to take effect, and granting Appellants three-business (six calendar) days to seek this Court's review. Inexplicably waiting four days after the district court's order, and leaving Appellees and this Court only two days[1] to respond and decide, Appellants

---

[1] According to Appellants, they have left the Court with *only one day*, as they claim the TRO "is scheduled to take effect on Wednesday (10/12)." ECF #16, cover sheet. But Monday was a federal holiday and thus presumably does not count as a "business

now seek a stay pending appeal of the court's decision, along with what they style an "emergency … interim … administrative stay" while this Court considers their motion. For the reasons below, **Appellees oppose both stays**, and ask this Court to dismiss Appellants' appeal or, in the alternative, to deny their motion.

Appellants malign the district court's order as "an extraordinary temporary restraining order," but fail to note that the CCIA is no ordinary law – breathtaking in both its scope and its blatant unconstitutionality. This Court should decline Appellants' invitation to be the first circuit court to defy the *Bruen* decision, and should dismiss Appellants' appeal in order to give the district court the opportunity to issue a ruling on Appellees' motion for preliminary injunction.

## ARGUMENT

## I.    The District Court's Partial Grant of a Limited Temporary Restraining Order Is Not Appealable.

Defendants-Appellants ("Appellants") appeal from the district court's *partial* grant of a *limited* temporary restraining order for a *limited* period of time. Yet as this Court has repeatedly explained, "[a]s a general matter, appeal lies only from final judgments of the district court, 28 U.S.C. § 1291, or interlocutory orders that grant or refuse injunctions. 28 U.S.C. § 1292(a)(1). As a TRO is interlocutory and

---

day" for the purpose of calculation. Thus it seems the TRO would take effect this Thursday, October 13, 2022.

is not technically an injunction, it is ordinarily not appealable." *Romer v. Green Point Sav. Bank*, 27 F.3d 12, 15 (2d Cir. 1994). The only exception to this general rule requires Appellants to make a two-part showing: "[i] when a grant or denial of a TRO 'might have a "serious, perhaps irreparable, consequence," and ... [ii] can be "effectually challenged" only by immediate appeal'...."[2] *Id.* at 16. Otherwise, "the general congressional policy against piecemeal review will preclude interlocutory appeal." *Carson v. American Brands, Inc*., 450 U.S. 79, 84 (1981). Here, Appellants have failed to meet either prong of the required showing.

### A. The TRO Will Cause No Irreparable Harm to Appellants or the Public.

First, the district court's TRO will cause no harm to Appellants, as many of the CCIA's provisions, which have been in effect barely a month, are entirely without historical – or modern – analogue, having never existed in any form in the laws of any state. Thus, Appellants' argument that there will be "serious, perhaps irreparable, consequence[s]" by a pause in enforcement is pure speculation. *See* Memorandum of Law in Support of Motion for a Stay Pending Appeal and an Administrative Stay Pending Resolution of the Motion ("Mem.") at 1 (the claim that interviewing a person's children, and access to an applicant's social media accounts, is "vital to the determination of good moral character" is unsupportable, since such

---

[2] *See ContiChem LPG v. Parsons Shipping Co.*, 229 F.3d 426, 430 (2d Cir. 2000) (citing *Carson*, at 84).

determinations were made for decades without that information, prior to the CCIA); Mem. at 2 (asserting – without any citation or evidence – that "more guns carried in more places by more people result in more crime…."). *See also* Defendant's Memorandum of Law in Opposition to Plaintiffs' Motion for a Preliminary Injunction in *Antonyuk v. Bruen*, No. 22-cv-734, 2022 U.S. Dist. LEXIS 157874 (N.D.N.Y. Aug. 31, 2022) ("*Antonyuk I*"), ECF #19 at 40-41 (speculating that licensing officials might be able to sniff out "persons who commit mass shootings" on the basis of their posting "a photo of a body of a dead frog that [they] killed," thus assuming that a mass murderer would be dissuaded by being denied a carry license); *see also* at 65 (arguing that, if a preliminary injunction issued, "[g]uns would immediately be allowed in a host of inappropriate places" – *where guns were already legal prior to the CCIA* – but somehow now causing "chaos and … fear" that did not exist prior to the CCIA *when few such restrictions existed*).

Indeed, prior to the CCIA's effective date of September 1, 2022, those with valid carry licenses could *and did* carry concealed handguns in most of the locations that the CCIA now declares off limits. What is more, even under the TRO, it would not mean that *everyone* could carry a firearm in such locations,[3] but only those who

---

[3] Appellants' speculative claim that such harm might occur erroneously assumes that criminals obey the law. *See* Mem. at 17 (claiming that the district court's order "increase[es] the chance that someone will carry a loaded gun in" a variety of entirely ordinary public locations, and that "[a] shooting death (intentional or

have gone through a significant screening process to obtain a carry license – *i.e.*, the same group of persons who *have always carried* in these locations, and who *have already demonstrated* to the state's satisfaction that they are law-abiding, trained, responsible gun owners.  The sky did not fall prior to the CCIA's enactment, and the sky is not falling now.  Rather, the TRO places a temporary pause on some of the new CCIA's provisions, and returns the law to what it was just a few short weeks ago.

---

inadvertent) in any such area" is irreparable.).  On the contrary, the purported harm Appellants speculate will occur *because of* the district court's order is already occurring *in spite of* the CCIA's categorical ban on firearm possession in nearly all of the state.  *See, e.g.*, https://www.fox5ny.com/news/several-shootings-across-nyc (shooting at a park); https://nypost.com/2022/10/07/14-year-old-with-18-priors-suspected-in-scooter-shootings/ (shooting at "prohibited location" by 14-year-old prior felon who was already doubly prohibited from obtaining a carry license); https://www.nbcnewyork.com/news/local/crime-and-courts/19-year-old-shot-dead-in-front-of-long-island-mcdonalds/3865791/ (shooting at restaurant); https://hudsonvalleypost.com/shooting-at-hudson-valley-school-cops-in-new-york-search-for-2/ (shooting at school); https://abc7ny.com/nyc-subway-crime-teen-shot-in-the-leg-brooklyn/12248465/ (shooting on subway platform); https://www.nydailynews.com/new-york/nyc-crime/ny-bail-reform-poster-boy-pedro-hernandez-arrested-three-card-monte-st-patricks-20220926-bpetscwmwzeftj56c7kpqdjuqe-story.html shooting at church).  Each of these (and many other) shootings occurred *after implementation of the CCIA*, and at a location where the CCIA prohibits firearms.  It is hard to think of a social policy that has failed so spectacularly, and so immediately.  Such violent crimes as those above are, by definition, committed by criminals who do not obey the law, regardless of the CCIA's onerous restrictions.

*Even if* Appellants had demonstrated some actual public safety benefit, it would come at the cost of disarmament of law-abiding gun owners, an unacceptably high cost, as "[t]he right to keep and bear arms … is not the only constitutional right that has controversial public safety implications." *McDonald v. Chicago*, 561 U. S. 742, 783 (2010). Such enumerated rights cannot be balanced away by legislators, or judges, because "the Second Amendment is … the very product of an interest balancing by the people … it [] elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense…." *D.C. v. Heller*, 554 U.S. 570, 635 (2008).

Nor can Appellants plausibly claim irreparable harm from temporarily halting enforcement of an unconstitutional law: "the public consequences in employing the extraordinary remedy of [injunctive relief]" are not just the vindication of constitutional rights but also the prevention of their egregious curtailment. *Yang*, *v. Kosinski*, 960 F.3d 119, 135-136 (2d Cir. 2020). Indeed, it is *always* in the public interest to enjoin an unconstitutional law. *See, e.g., Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6ᵗʰ Cir. 1982). The government has no "interest in the enforcement of an unconstitutional law." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). *See also Airbnb, Inc. v. City of N.Y.*, 373 F. Supp. 3d 467, 500 (S.D.N.Y. 2019) (same) *Dzhabrailov v. Decker*, No. 20-cv-3118 (PMH), 2020 U.S. Dist. LEXIS 91892, at *31 (S.D.N.Y. May 26, 2020) (same); *Sajous v.*

*Decker*, No. 18-cv-2447, 2018 U.S. Dist. LEXIS 86921, 2018 WL 2357266, at *13 (S.D.N.Y. May 23, 2018) ("The public interest is best served by ensuring the constitutional rights of persons within the United States are upheld.").

### B. Seeking a Stay of the TRO Is Far from the Only Way for Appellants to Challenge the District Court's Ruling.

For the second factor, Appellants cannot show that the TRO can be "'effectually challenged' only by immediate appeal…." Appellants wrongly claim that the district court's "Order bears all the hallmarks of" and "is in substance an immediately appealable injunction…." Mem. at 1-2, 15. As this Court has explained, such "interim orders ordinarily are reviewed with considerable deference." *Romer* at 16 (explaining there, under very different facts, "the district court's order had the effect of a permanent injunction *finally resolving the issue* before the court," and calling it a "rare instance … where the TRO will *dispose of all that is at stake* in the litigation.").[4] Here, the district court below has yet to rule on Appellees' motion for a preliminary injunction and, in fact, set a compressed briefing schedule, whereby Appellants are scheduled to file their response briefs by October 13, 2022, with Appellees' reply due October 20, 2022. ECF #8. Appellants

---

[4] Appellants' reliance on *Uniformed Fire Officers Ass'n v. De Blasio*, 973 F.3d 41, 47-48 (2d Cir. 2020) is unpersuasive, as that case involved a district court order which "enabled the NYCLU to make publicly available disciplinary report information adverse to thousands of police officers. If made, the disclosure could not be undone, thus rendering the consequences irreparable."). Here, nothing in the TRO cannot be undone at a later date.

claim that "[t]he Order is of indefinite duration," and that "no hearing date has yet been scheduled and the district court has not committed to issuing a decision by a date certain." Mem. at 2, 16; *see also* at 15. This is hardly a showing that Appellants have *no vehicle* but appeal to challenge the district court's temporary order, which is only to "remain in effect pending a hearing and ruling on Plaintiffs' motion for a preliminary injunction." Order at 53.

Unlike in *United States v. Miller*, 14 F.3d 761 (2d Cir. 1994), the district court has not "treated [the TRO] in effect as an application for a preliminary injunction." *Id*. at 764. Rather, the Court has ordered *separate* and *additional* briefing on the preliminary injunction component of Appellees' motion, and indicated an intent to schedule additional oral argument thereafter, ordering that "a hearing and ruling on Plaintiffs' motion for a preliminary injunction [] *shall occur as expeditiously as possible*…." Order at *53-54 (emphasis added). Indeed, the district court both (i) has indicated an intent to move swiftly to resolve the motion, and (ii) *has* moved swiftly with both its order dismissing the complaint in *Antonyuk I* (8 days from argument to opinion) and the TRO in this matter (7 days from argument to opinion). There is no reason to believe the district court will become dilatory now.

In other words, here – as in *Carson* – Appellants "could still obtain the full permanent [] relief [they] requested" (denial of Appellees' motion) by continuing to litigate, and urging the district court to deny Appellees' motion for a preliminary

8

injunction. *Id.*, 450 U.S. at 86. *See also Long Island R. Co. v. International Ass'n of Machinists*, 874 F.2d 901, 905 (2d Cir. 1989) ("the matter of the [TROs] could be reviewed after decision on the motions for preliminary injunctions.").

Appellants claim that the district court's TRO "clearly presages a preliminary injunction, if not 'final victory in the litigation' … The district court's views of the CCIA are not a secret." Mem. at 18 (the "[e]nsuing injunctive relief seems inevitable."). In other words, Appellants ask this Court to assume the district court will ignore further briefing and argument, to agree with their speculation as to how the district court will ultimately decide, and to step in now and take over the case. This is not the law of this or any other circuit. Under Appellant's theory, *all* temporary restraining orders would be immediately appealable, as they are inevitably based on a judge's finding that a party is likely to succeed on the merits.

This Court should reject Appellants' invitation to litigate this case in piecemeal fashion by granting emergency review of a limited TRO of short duration. To do otherwise would force the parties to simultaneously litigate in both this Court and the district court – as Appellants' response brief[5] on Appellees' preliminary

---

[5] Appellants claim that they "lacked a fair opportunity to rebut" Appellees' claims below. Mem. at 3. On the contrary, "the State Defendants had a reasonable opportunity, in their opposition papers and oral argument, to advise the Court of all historical statutes they believe to be analogues (including those presented to the Court in *Antonyuk I*). … They simply chose not to do so (possibly because they knew the Court would take notice of those statutes anyway, as it has done)." Order

injunction motion is due on October 13, 2022.  Such a result, not to mention being prohibited by this Court's precedents, would be an absurd waste of judicial economy and party resources (especially those of Appellees, who do not have the benefit of a veritable army of government lawyers and the unlimited use of taxpayer funds).

In short, Appellants have not even come close to showing that emergency relief from this Court is their only way to vindicate their interests, when their brief opposing Plaintiffs' motion for a preliminary injunction is due just two days from today.  Since they have not met either requirement for showing that this Court has jurisdiction to consider the district court's order, Appellants' appeal should be dismissed.

### C. The District Court's Temporary Restraining Order Is Not an Order that Can be Properly Reviewed by this Court.

Appellants seek this Court's review of an interim TRO, despite the fact that it was issued on an emergency basis, until such time as the court is able to properly

---

at 12.  Even if deprived before, the district court's briefing schedule provides Appellants the very opportunity Appellants seek.

Appellants' claim that they needed more time (Mem. at 3, 23) ignores that, in *Antonyuk I*, Appellants sought and received leave to file a 65-page brief (Docket No. 19 in that case), along with 54 exhibits (Docket No. 20).  Here, Appellants sought neither additional pages, nor an extension of time.  Moreover, Appellants were not time-limited during oral argument, as the court stated at the outset that it would provide both parties all the time they needed to present their case.  Moreover, it was Appellants who decided against briefing some of the issues at stake, "in the interest of brevity," on the theory that the district court would not strike certain provisions. ECF# 18, p 2, n.1.  The fact that Appellants were wrong, and now regret that decision, does not provide cause for an emergency stay.

consider and decide Appellees' motion for preliminary injunction. Although Appellants believe they have been deprived of the opportunity to fully present their case, they seek to deprive the district court of the opportunity to issue a complete and thorough opinion. Indeed, "Rule 52(a)'s requirement of findings of fact and conclusions of law upon the issuance of interlocutory injunctions does not apply to a TRO … because they are characteristically issued in haste, in emergency circumstances, to forestall irreparable harm, are of quite limited duration, and are exempt from appellate review." *Romer* at 16. As such, the district court's TRO is not the law of the case and does not bind the court from later changing its opinion.

In addition to the briefing that will occur in the coming days, the district court has yet to hear live testimony, subject to cross-examination, which will occur at the preliminary injunction hearing. *See* ECF#8 (a hearing "at which testimony will be adduced"). The district court's view of a number of issues could change, and an eventual opinion could be more (or less) favorable to Appellants' position.

Indeed, the district court described its findings as tentative, reserving final judgment until later. *See* Op. at 20 ("appears fatally flawed"); 25 ("apparent dearth of historical analogues"); 26 ("appears to be … far more invasive and onerous" and "based on the briefing so far"); 27 ("let this provision stand for now" and "not yet persuaded by Plaintiffs"); at 32 ("also let stand for now"). *See also* similar statements at pages 37, 38, 39, 42, and 47. The district court's interim order is thus

11

subject to change, revision, or wholesale reversal at the preliminary injunction stage. In fact, the TRO does not address many issues in depth which is to be expected, as the court's order is *temporary* in nature, *limited* in scope, and *short* in duration.

This Court should reject Appellants' invitation to wrest control of this case from the district court before the court is able to fully analyze the issues, detail its factual findings, and explain its legal conclusions in a well-reasoned opinion. The alternative would require this Court to become the factfinder in the first instance.

## II.    Appellants Have Not Shown Entitlement to a Stay Pending Appeal.

Even if this Court were to find that it has jurisdiction to choose to consider Appellants' appeal of the TRO, their motion should be denied, as Appellants have made none of the required showings for a stay. When considering such an application, this Court utilizes a four-factor test, with the first two being the "most critical." *Uniformed Fire Officers* at 48. Appellants must provide a "[i] strong showing that [they are] likely to succeed on the merits, [ii] irreparable injury to the applicant in the absence of a stay, [iii] substantial injury to the nonmoving party if a stay is issued, and [iv] the public interest." *Id.* Moreover, a stay "is not a matter of right, *even if* irreparable injury might otherwise result;" rather "it is an exercise of judicial discretion, and [t]he party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* (emphasis added). Next, when an applicant is "totally lacking" a strong showing of likelihood of success, "the

aggregate assessment of the factors bearing on issuance of a stay pending appeal cannot possibly support a stay."[6] *Id.* at 49. Finally, "[a] grant of a preliminary injunction[7] is reviewed on appeal for abuse of discretion ... which will be found if the district court 'applies legal standards incorrectly or relies upon clearly erroneous findings of fact' ... or 'proceeds on the basis of an erroneous view of the applicable law.'" *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 398 (2d Cir. 2004) (citations omitted). At bottom, "[a]buse of discretion is a high standard." *Leopard Marine & Trading, Ltd. v. Easy St. Ltd.*, 896 F.3d 174, 194 (2d Cir. 2018). Appellants fail all four factors.

### A. Appellants Offer No Plausible Explanation as to How they Might Succeed on the Merits.

Addressing the likelihood of success factor, which this Court has held to be one of the "most critical" *(Uniformed Fire Officers* at 48), Appellants (as noted

---

[6] Rejecting the current standard, Appellants point the Court instead to a 2006 decision from this Circuit, predating the Supreme Court's decision in *Nken v. Holder*, 556 U.S. 418 (2009) which now requires a "strong showing" on the merits. By urging use of this outdated test, Appellants argue they need not have a particularly strong showing on the merits because of the alleged "strength of the equities for a stay." Mem. at 19. In other words, Appellants appear to concede that they have virtually no chance of succeeding on the merits in this or any Court, having blatantly rejected the Supreme Court's clear teachings in *Bruen*. Nevertheless, the ask this Court to overlook that problem (the merits), arguing that the State has a compelling interest in enforcing a patently unconstitutional, anti-gun statute.

[7] Appellees have been unable to identify an applicable TRO standard, likely since TRO's are almost never appealable. At worst, the standard would seem to be the same as for a preliminary injunction.

above, n.5) instead rely on a pre-*Nken* case for the proposition that, when the balance of hardships "tips decidedly" in the movant's favor, "only some possibility of success" on the merits is needed. Mem. at 21. Of course, that case is no longer good law, as it predates *Nken* (which requires a "strong showing") and conflicts with this Court's more recent pronouncements, which follow *Nken*. Appellants ask this Court to adopt the lax standard, and offer up only the slenderest of reeds as to why the district court erred in finding a strong likelihood that Appellees will succeed on the merits.

Appellants claim that below, "plaintiffs had the burden of showing that the provisions implicated the Second Amendment in the first place, and they failed to do so." Mem. at 3. Apparently disputing the district court's conclusion that Appellees *had* shown their conduct to be presumptively covered by the Second Amendment's text (Order at 31), Appellants claim that "Plaintiffs' bald statement that 'the regulated conduct falls under the phrase 'keep and bear' … did not shift the burden to defendants to justify any or every sensitive location," and similarly that there was no showing "that carrying firearms onto others' *private* property … equates with 'carrying handguns *publicly'*…." Mem. at 23, 25. Appellants' claim fails for two reasons.

First, Appellees fully explained how the *Heller* and *Bruen* decisions unequivocally show that "the People" (which includes the law-abiding plaintiffs),

14

arms (handguns), and activities (bearing arms) in this case are fully within the scope of the Second Amendment. *See* Complaint, ECF #1 ¶¶ 37-40, 235-237; Memorandum in Support of TRO/PI, ECF#6-1, at 33 n.36. Likewise, the district court concluded that "the Second Amendment's plain text covers the conduct in question" and thus "'the constitution presumptively protects that conduct.'" Order at 31. *See also Antonyuk I* at *68-69 ("the Second Amendment's plain text covers the conduct in question: carrying a handgun in public for self-defense. More specifically, the Court finds that (1) Plaintiff Antonyuk (and the members of the other two Plaintiffs) are part of 'the People' protected by the amendment, (2) the weapons in question are in fact 'arms' protected by the amendment, and (3) the regulated conduct falls under the phrase 'keep and bear.'"). The simplicity and brevity of Appellees' allegations and the district court's findings and conclusions does not mean that the analysis is erroneous. Indeed, the Supreme Court has conclusively held that ordinary citizens have a right to carry "handguns publicly for self-defense." *Bruen*, at 2134.

Second, knowing that they cannot hope to meet their burden to justify the CCIA under the *Bruen* test, Appellants wrongly conflate their burden with, and attempt to shift their burden to, Appellees – arguing that Plaintiffs must show that the Second Amendment's text applies specifically in each "sensitive location" and "restricted location" *before* the government can be required to provide historical

analogues justifying any restriction. Mem. at 22, 25. On the contrary, it is enough that the CCIA deprives law-abiding members of "the people" the right to "bear" (carry on their person) handguns that are quintessential self-defense "arms." No further showing is required before Appellants are required to justify the CCIA's restrictions. *See Bruen* at 2126. Requiring plaintiffs to demonstrate the negative (that there is no historical analogue) before requiring government defendants to show that there are analogues puts the *Bruen* cart before the horse.

After attempting to improperly burden shift, Appellants generally express disagreement with the district court's legal conclusions that the majority of the CCIA's "sensitive locations" and "restricted locations" have no sufficient historical analogues and therefore are unconstitutional. Mem. at 23-25. With little rebuttal or analysis, Appellants generally claim that the district court should have been "more nuanced" in accepting "relevantly similar" founding era statutes as analogues. Mem. at 23-24. Of course, Appellants' claim that the district court should have stretched *Bruen*'s language farther than it did is fundamentally an admission that Appellants have no historical analogues even remotely similar to the CCIA's vast and unprecedented listing of "sensitive locations" and unparalleled declaration of all private property within the state to be a "restricted location."

Finally, Appellants claim that the CCIA's requirement of "good moral character" and associated requirements can be "validate[d] … without resort to

history," on the basis that they are "designed to ensure that those bearing arms" are law-abiding. Mem. at 26. Of course, this claim is directly contrary to *Bruen*'s *unequivocal demand for a historical analysis in every case*. Contrary to Appellants' claim, simply calling something a licensing requirement which contributes to a determination of lawfulness does not make it conclusively constitutional without further analysis.

To be sure, Appellants later will have the opportunity to appeal any district court ruling applying *Bruen*. But that time is not now.

### B. The Remaining Factors Do Not Support a Stay.

Addressing the remaining three elements as a group, Appellants generally claim that "equitable factors overwhelmingly support" their stay request. Mem. at 19. Yet the reasons they offer in support are weak at best. Indeed, Appellants submit that they "devoted significant resources" to implementing the challenged statute – consisting of (i) the state's construction of a website listing frequently asked questions; (ii) a New York City (not a defendant here) press release; and (iii) New York City's (again, not a defendant here) investment in laminated paper and zip ties to put up some "gun free zone" signs around Times Square. Mem. at 19, n.7. Additionally, Appellants claim that, if the district court's TRO is allowed to take effect, they will need to communicate with the public "that guns again are allowed in many of the places" – but the minor inconvenience associated with return to the

status quo of a month ago hardly constitutes irreparable harm necessitating this Court's emergency review.

Next, Appellants claim that there will be "confusing and inconsistent enforcement" of the CCIA across jurisdictions. *Id*. at 19-20. Confusingly, however, Appellants simultaneously ask this Court to limit the district court's uniform, statewide order only to the six plaintiffs (Mem. at 27), which certainly will lead to a "confusing and inconsistent" situation, with local officials left in the lurch as to whether they must continue to enforce a law that a federal court has deemed largely unconstitutional.

Finally, Appellants claim (again) an "imminent risk to public safety and wellbeing" and a "risk of violence to the public." *Id*. at 20. Appellants do not even claim that this harm is certain or even likely, but merely that "the public's [altered] **_sense_** of safety … **_may_** be enormous." Mem. at 17 (emphasis added). Unsurprisingly, Appellants put forth not one iota of evidence that licensed permit holders are a meaningful cause of crime in New York. Nor do they explain how any of the CCIA's firearm prohibitions will stop any actual criminal from committing a violent act.

In stark contrast to Appellants' bemoaning the being forced to take down some no-gun signs, the district court held that Appellees' "have made a strong showing that they will likely experience irreparable harm if the [TRO] is not issued…." Order

at 46.  Moreover, "the irreparability of harm may not be casually suspended pending appeal." *Rodriguez by Rodriguez v. DeBuono*, 175 F.3d 227, 234-35 (2d Cir. 1998).  Thus, "the grant of a stay of a preliminary injunction pending appeal will almost always be logically inconsistent with a prior finding of irreparable harm…." *Id*.  In any event, enjoining an unconstitutional statute is always in the public interest, notwithstanding that the state may be upset that its law has been found unconstitutional.

### III.   Appellants' Delay in Seeking Relief Weighs in Favor of Denying their Request for an Emergency Interim Administrative Stay.

Appellants seek not only a stay of the district court's TRO, but also ask for what they call an "emergency … interim … administrative stay" while this Court considers their motion.  Of course, any "emergency" here is an emergency in name only, created first by New York's blatant repudiation of the Supreme Court in *Bruen*, and second by Appellants' delay of *four* days in seeking relief from this Court.  It was, in fact, Appellants who asked the district court for a *three*-business day stay if the court were to grant a TRO.  *See* Appellants Letter Brief in opposition to Plaintiffs' Motion, ECF #18, at 10.  What is more, by issuing its opinion last Thursday, October 6, 2022, the Court gave Appellants *more than they asked for* – a total of six days to seek this Court's review (due to the intervening weekend, plus a federal holiday).  Yet instead of filing their motion immediately after the district court's opinion issued (on Thursday), or even after their appeal was docketed (on

Friday), Appellants waited until yesterday (Monday) to seek emergency relief. In other words, Appellants waited *four* days even to ask this Court for the relief they promised to seek within *three* days.

Based on the district court's prior opinion in *Antonyuk I* (dated August 31, 2022) Appellants were on notice that the district court might find much of the CCIA to be unconstitutional when the case was refiled with additional plaintiffs. *Certainly*, Appellants could have begun work on their motion when they asked the district court for a three-business day stay in their brief filed September 28, 2022 (12 days ago). Indeed, Appellants are represented by the New York Attorney General, whose office reportedly has an army of no fewer than 650 attorneys and 1,700 staff. https://ag.ny.gov/bureaus. In short, there is no reason for Appellants' significant delay in seeking relief in this Court, providing Appellees a very short fuse to respond, and the Court with a limited window to consider the matter. In fact, by miscalculating the date that the district court's order is scheduled to take effect (three "business days" would mean the TRO would take effect Thursday, not Wednesday), Appellants seem to have sought to deprive Appellees of any meaningful opportunity to respond, and to deprive the Court of any reasonable time to consider the matter.

## CONCLUSION

For the reasons stated, Appellants' requests for a stay and administrative stay should be denied, and the appeal dismissed.

Respectfully submitted,

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS  38654
(601) 852-3440
stephen@sdslaw.us

Robert J. Olson (VA # 82488)
William J. Olson, PC
370 Maple Ave. West, Suite 4
Vienna, VA 22180-5615
703-356-5070 (T)
703-356-5085 (F)
wjo@mindspring.com
*Application for admission forthcoming*

Dated: October 11, 2022

## CERTIFICATE OF COMPLIANCE

Pursuant to Rules 27 and 32 of the Federal Rules of Appellate Procedure, I hereby certify that according to the word count feature of Microsoft Word 365, the document contains 5,190 words and complies with the typeface requirements and length limits of Rules 27(d) and 32(a)(5)-(6).

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh